# EXHIBIT A

H7EPDOYC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    KATE DOYLE, ET AL.,

4                    Plaintiffs,

5            v.                          17 CV 2542 (KPF)

6    U.S. DEPARTMENT OF HOMELAND
     SECURITY,
7
                    Defendant.
8    ------------------------------x
                                         New York, N.Y.
9                                        July 14, 2017
                                         4:08 p.m.
10   Before:

11                HON. KATHERINE POLK FAILLA,

12                                       District Judge

13                        APPEARANCES

14   CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON
          Attorneys for Plaintiffs
15   BY:  ANNE L. WEISMANN, ESQ.

16

17   KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY
          Attorneys for Plaintiffs
17   BY:  ALEXANDER ABRAHAM ABDO, ESQ.
18        JAMEEL JAFFER, ESQ.

19

20   U.S. ATTORNEY'S OFFICE, SDNY
          Attorneys for Defendant
     BY:  SARAH SHEIVE NORMAND, ASSISTANT UNITED STATES ATTORNEY
21

22   U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
          Attorneys for Defendant
23   BY:  BRAD P. ROSENBERG, ESQ.

24

25

H7EPDOYC

1    (In open court)

2    THE COURT:  Thank you very much.  Good afternoon.

3   Thank you for your patience.  I understand all of you waited

4   outside.  I thank you for that also.  You may be seated.

5    (Case called)

6    MS. WEISMANN:  Good afternoon, your Honor.  I'm Anne

7   Weismann for the plaintiffs.

8    THE COURT:  Ms. Weismann, good afternoon.  I'm going

9   to ask you to stand because I have two monitors that are

10  blocking most of your head.  Perfect.  Thank you very much, and

11  Good afternoon to you.  Will you be taking the laboring oar

12  this afternoon?

13    MS. WEISMANN:  This afternoon, I will, yes, but with

14  me is Alex Abdo and Jameel Jaffer.

15    THE COURT:  I'll even let them introduce themselves.

16    MR. JAFFER:  Jameel Jaffer for the Knight First

17  Amendment Institute at Columbia University.

18    MR. ABDO:  Good afternoon, your Honor.  Alex Abdo.

19    THE COURT:  Thank you, and good afternoon.

20    MS. NORMAND:  Good afternoon, your Honor.  Sarah

21  Normand from the U.S. Attorney's Office on behalf of the

22  defendant.

23    MR. ROSENBERG:  Good afternoon, your Honor.  Brad

24  Rosenberg from the Department of Justice, Civil Division,

25  Federal Programs Branch, also on behalf of the defendant.

H7EPDOYC

1          THE COURT:  Okay.  Thank you.  And as between the two

2     of you, who should I be directing my questions to?

3          MS. NORMAND:  I'll be speaking today, your Honor.

4          THE COURT:  Thank you.  Very much.  Ms. Weismann, let

5     me please begin with you.  This is our initial pretrial

6     conference.  I, first of all, welcome all of you this

7     afternoon.  I would like to get a sense what has happened, if

8     anything, since the lawsuit was filed in April.

9          I do have an understanding of the protocols the

10    parties would like to use, and the summary judgment motions I

11    understand completely, but to the extent that there is any

12    further clarity or perhaps even identification of disputes, I'd

13    be happy to hear from you.

14         MS. WEISMANN:  Okay.  Thank you, your Honor.  Well, as

15    our letter reflects --

16         THE COURT:  Yes.

17         MS. WEISMANN:  -- the parties did talk, pursuant to

18    this Court's order, and I mean, I think it was an enlightening

19    discussion not only in terms of process but for the plaintiffs

20    to learn sort of the universe of documents.  We were able to

21    rule exclude from that, for example, Trump Tower.

22         THE COURT:  I saw that, yes.

23         MS. WEISMANN:  Knowing that the President had not made

24    any visits to Trump Tower during the relevant period.  We also

25    were advised that records for Mar-a-Lago would be processed

1    under the Freedom of Information Act, and we did limit -- we

2    were able to narrow that group, as well, based on the request

3    of the government, for example, local law enforcement officers

4    who wanted a photo op with the President, we were happy to

5    exclude that, as well as certain family members who routinely

6    would not have shown up in the automated system within the

7    White House.

8         So that left a body of visitors for which, our

9    understanding is, the government is in the process of

10   processing those records and will be releasing to us, I think

11   it's by September 7th or 8th, all non-exempt records.

12        So as to that group of records, I think the issues

13   that we will be looking towards possibly litigating further, if

14   we're not satisfied, would be exemption claims.  I can't say at

15   this point that we will have an issue, for example, as to the

16   adequacy of the search because we just have no information,

17   really, hard information, about the kinds of records that

18   visits to Mar-a-Lago create, except that we know that they are

19   not the automated records that the White House uses.

20        So I think that leaves what probably will become the

21   key issue in this case, which is the records that are created,

22   the automated records WAVES and ACR and other acronyms that are

23   created when a visitor goes to the White House compound.  And

24   as to those records, the government continues to assert they

25   are not agency records; they are records of the White House,

H7EPDOYC

1    presidential records and, therefore,subject not subject to the

2    Freedom of Information Act.

3              THE COURT:  And you contest that position?

4              MS. WEISMANN:  Yes, we do.

5              THE COURT:  Now, I was directed to, or at least it was

6    called to my attention, the Judicial Watch case from the DC

7    circuit.

8              MS. WEISMANN:  Yes.

9              THE COURT:  To be clear, I'm sure your knowledge of

10   FOIA currently exceeds mine.  I hope to get mine up to speed by

11   the time these motions are filed, but what is different about

12   this case than was present in that case, or is your view simply

13   that Judicial Watch was wrongly decided?

14             MS. WEISMANN:  Well, some of each, frankly.

15             THE COURT:  Please.

16             MS. WEISMANN:  So first of all, we do not know

17   currently what the practices of the Secret Service are.  We

18   don't know if they remain what they were at the time the

19   Judicial Watch case was litigated, and the primary reason for

20   that is that, in a separate piece of litigation that I handled

21   on behalf of CREW, we were able to reach a settlement with the

22   White House, and that led to the practice that President Obama

23   put in place for the majority of his term in office, whereby

24   they voluntarily made the records publicly available every

25   month.

H7EPDOYC

1          THE COURT:  And this was his September 2009 policy?

2          MS. WEISMANN:  Correct, and that was in effect until

3    President Obama left office.

4          THE COURT:  May I ask you something?  Was it your

5    sense that that policy played any part in the analysis in

6    Judicial Watch?  I mean, I saw it discussed.  I wasn't sure

7    that it actually entered the calculus, and the reason I'm

8    asking is it's my understanding that that policy is not today

9    in effect.

10         MS. WEISMANN:  That's correct.  I think, at the time

11   that the Judicial Watch Appellate Court litigation was ongoing,

12   the policy was very new, and it had not yet been fully

13   implemented.

14         THE COURT:  Okay.

15         MS. WEISMANN:  So, you know, we now have the benefit

16   of all those years of implementation and seven years, or maybe

17   it's six-and-a-half -- math is not my strong point -- so we

18   think that could be a critical difference in this case.

19         THE COURT:  May I understand why?  Let's all be clear.

20   I know this is our initial pretrial conference.  I'm not asking

21   for the fullest exposition of your arguments, but as I prepare

22   myself and read up on these cases to make sure that I'm

23   prepared for this case, I'd be interested in the thoughts that

24   you have because I'll direct my research accordingly.

25         MS. WEISMANN:  Okay.  Well, I think that sort of

1  running throughout, and at least a significant theme in the

2  Judicial Watch decision, is the idea that to otherwise require

3  the White House to make the visitor logs public would somehow

4  intrude on, for lack of a better word, the constitutional

5  prerogatives of the President.

6       There are definitely separation of powers concerns

7  that seem to have animated Judge Garland's decision, and that's

8  where I think the experience under the Obama administration,

9  where these records were made available on a monthly basis and

10  where there was, as far as we know, there was never any

11  suggestion that that created any concerns or unduly intruded on

12  the President or the White House or his staff.  So we think

13  that is a very relevant factor.

14       THE COURT:  I see.

15       MS. WEISMANN:  And beyond that, though, I mean --

16       THE COURT:  You're not suggesting, for example, that

17  the existence of the policy for six or seven years gave an

18  entitlement to individuals?

19       MS. WEISMANN:  No, we are not.  It was a voluntarily

20  adopted policy.  It was not imposed by court order; so we are

21  not here saying they are bound by a court order and they

22  violated that, no.

23       THE COURT:  Your argument, instead, is if only the DC

24  circuit had known then what we now know, having impleted this

25  policy and having seen how it worked and it did work, at least

1    that is your argument, they might have come to a different

2    decision?

3              MS. WEISMANN:  Yes, precisely.

4              THE COURT:  I understand.  Okay, please continue.

5              MS. WEISMANN:  And then beyond that, as Judge Garland

6    notes in a number of places, where he raises the fact that

7    parties or we, as the amicus, had challenged some of the

8    evidence but he says this was decided on summary judgment, so I

9    have to accept the facts.

10             THE COURT:  Okay.

11             MS. WEISMANN:  So here we are today, we don't even

12   know what those factual record will be.  We will be waiting for

13   the government to set that course with its summary judgment

14   motion, and at that point, we'll have to evaluate -- and this

15   is also reflected in the letter -- we will be evaluating

16   whether we need discovery, whether there is other evidence that

17   we think the Court should be looking at.

18             We understand the 56D now, the proper procedure to do

19   that, and we've sort of built that into the schedule.  So I

20   don't know that this case will present the identical factual

21   record as the one before Judge Garland.  In fact, I know it

22   will not because we have the Obama years, where we have that

23   experience.

24             And then, finally, your Honor, with all due respect to

25   the DC circuit, I do think they got it wrong.  I think he

H7EPDOYC

1  failed to give significant emphasis and meaning to the fact

2  that these records are created when the Secret Service is

3  performing one of its core statutory responsibilities,

4  providing protection to the President, the Vice President and

5  the White House compound.  And I just don't know how you can

6  start from that and end up saying, nevertheless, the records

7  that are generated to help them do their job are not Secret

8  Service records.

9           THE COURT:  Okay.  So I am understanding that, at some

10  point, there will be an impasse in this case, that we're having

11  wonderful discussions right now --

12           MS. WEISMANN:  Yes.

13           THE COURT:  -- but I cannot --

14           MS. WEISMANN:  I can confidentially predict that.

15           THE COURT:  Hope springs eternal from this side of the

16  bench, but I did have the sense that, at some point, we were

17  going to have some disputes.

18           All right.  Anything else that you'd like me to know

19  at this time?

20           MS. WEISMANN:  No, your Honor.  Thank you.

21           THE COURT:  Thank you very much.

22           Ms. Normand.

23           MS. NORMAND:  Thank you, your Honor.  I think the

24  government's position is largely set forth in our letter.  We

25  have been working with the plaintiffs to try to narrow that

10

H7EPDOYC

1    piece of this case that relates to records that are being

2    processed under FOIA, and to identify categories of records in

3    which the plaintiffs are not interested so that the Secret

4    Service can process the remaining records that are responsive

5    as expeditiously as possible.

6           We've identified a September 8th proposed deadline for

7    production of those records and we will, in our summary

8    judgment motion, which we propose to file at the end of

9    September, identify the parameters of our search and assert

10   whatever applicable exemptions there are, assuming that there

11   remain disputes as to those records.

12          But I do agree with my colleague that the key issue in

13   this case will be whether the WAVES and ACR records of visitors

14   to the White House complex are agency records under FOIA.  That

15   is a legal determination that will be based on a record that

16   the government will put before the Court in detail.  We believe

17   that no discovery will be necessary both because discovery is

18   generally unavailable in FOIA cases, and because this is

19   exactly the type of issue that the DC circuit and the DC courts

20   were able to determine on summary judgment, as in the ordinary

21   case where the government's declarations are entitled to a

22   presumption of good faith and are sufficient for a legal

23   determination on summary judgment.

24          THE COURT:  Let me stop you for a moment, please.  I

25   understood you to be saying that, obviously, right now you are

H7EPDOYC

```
 1    working with your agency partners regarding the collection, or
 2    at least the understanding of how these records are kept and
 3    collected, and in what format they exist, correct?
 4             MS. NORMAND:  Yes, your Honor.
 5             THE COURT:  Okay.  I think what I understood
 6    Ms. Weissmann to be saying was that she's leaving open the
 7    possibility, in summary judgment practice, of issuing a 56D
 8    notice that more stuff is needed.
 9             My question is, is there any way to speak with your
10    adversary prior to these motions being filed, just so that
11    there is a sense of what the government did in order to find
12    these records, in case that possibly staves off some request
13    for additional discovery or information.  I guess my question
14    is, are there things that could be done pre-motion filing?
15             MS. NORMAND:  I would answer that question in two
16    ways.
17             THE COURT:  Yes.
18             MS. NORMAND:  With regard to the records of visits to
19    Mar-a-Lago --
20             THE COURT:  Yes.
21             MS. NORMAND:  -- I absolutely think that there will be
22    further discussions between the parties and that they may very
23    well be fruitful in narrowing issue, potentially even
24    eliminating disputes as to the scope and adequacy of the search
25    as to exemptions.  I'm being hopeful there as well, but we will
```

1    certainly have those discussions, and that's part of the reason

2    why we built in a period of time between producing the records

3    in early September and ultimately moving for summary judgment

4    in late September as to that category of records.

5           With regard to the question of WAVES and ACR records,

6    that is not a question so much of finding out where the records

7    are.  We know where they are.  We simply need to develop the

8    record to explain to the Court why it is, in our view, and as

9    the court in Judicial Watch found, that those are not agency

10   records subject to FOIA.

11          And while we can have some discussions with the

12   plaintiffs, and we will certainly endeavor to do that before

13   our motion is filed, I think realistically it's likely that our

14   declarations will still be in the process of being finalized

15   shortly until that point.  So while we can engage in some

16   discussions with our colleagues, I think it's unlikely that

17   we'll be able to fully provide the factual basis for our motion

18   until the motion is filed.

19          That said, however, we built in a substantial period

20   of time for the purpose of plaintiffs to be able to evaluate

21   the factual record that the government puts before the Court

22   and plaintiffs in the motion, for them to be able to evaluate

23   whether that record is, in their view, sufficient or whether

24   they want to seek further relief, and then the parties would

25   potentially discuss and then potentially litigate any further

1      application by the plaintiffs.

2                THE COURT:  Is there an analog in the Second Circuit

3      to Judicial Watch?

4                MS. NORMAND:  There isn't.  There's no analog.

5      There's really just a handful of cases that address this issue

6      at all, and they're all in the District Court.

7                THE COURT:  I noticed a few of them in preparing for

8      this conference, and I was sort of hoping for something more

9      precedential, one might say, but I understand that.

10               Is it the position of the government that I should

11     adopt the analysis and the ultimate findings of Judicial Watch,

12     and then related to that, does the analysis change as a

13     consequence of the policy that I was discussing with

14     Ms. Weismann?

15               MS. NORMAND:  Nothing does change as a result of that

16     policy.  The institution is a voluntarily policy, and the

17     withdrawal is a voluntarily policy.  It was always, as

18     Ms. Weismann identified, a voluntary policy adopted by the

19     administration.  The Obama administration always maintained

20     that these ACR/WAVES records were not agency records under FOIA

21     and that was why Judicial Watch litigation continued after the

22     implementation of the voluntary disclosure policy.

23               And so really, they're, in the government's view, very

24     separate questions.  When the Court will be looking at the

25     government's motion, what we will be attempting to persuade the

1    Court is that, as a matter of law, these records are not agency

2    records, as Congress intended that category of records, to

3    define that category of records, and the interim adoption or

4    withdrawal of a voluntary policy really sheds no light on that.

5         What the Court will need to look at, as the Judicial

6    Watch court did, was the factual record before the Court about

7    how the records are created, how they're used, how they're

8    maintained.  Those are going to be the dispositive issues and,

9    ultimately, we believe the Court will reach the same conclusion

10   that the DC circuit reached in Judicial Watch.

11        THE COURT:  I think I understand from Ms. Weismann is

12   that a benefit or something that I may now consider with the

13   implementation of the policy that has since been withdrawn, is

14   that I may look at it to see whether the things on which the DC

15   circuit was focused were, in fact, things on which I should

16   focus.

17        I presume, I imagine, that you're going to tell me

18   that really, no, nothing has changed, but I think her point is

19   that the record in this case, just by dint of history, time has

20   passed, things have happened, will be different from the record

21   in Judicial Watch, but it is still your position that the

22   analysis is not going to change?

23        MS. NORMAND:  That's right.  The record will be

24   different because we will put before the Court a current

25   explanation of how these records during the relevant time

1    period were created, used and maintained.  We think, if

2    anything, the record here will be stronger than it was in

3    Judicial Watch with regard to the critical legal issue of

4    whether these are agency records.

5         If anything, we think any changes that have occurred

6    in the management of the system will only strengthen the

7    government's argument.  We don't think that a voluntary policy

8    of disclosure that was adopted in the interim, while the

9    government's legal argument with regard to the agency record

10   question, the statutory question under FOIA, remained the same,

11   we don't think that that policy really has any bearing

12   ultimately on what Congress meant by agency records and whether

13   these records, on the factual record we'll put before the

14   Court, are agency records as Congress intended that category to

15   be defined.

16        THE COURT:  I think your answer just sort of explained

17   to me or showed me perhaps a fallacy in my own question, which

18   is, I am focused on what's happened in the present and the very

19   recent past, but my sense is that the arguments that persuaded

20   the DC circuit and the arguments that you are going to be

21   making to be are much more historical in nature, and I should

22   be looking to those, you believe, in order to come to the

23   conclusion that these are agency or not agency records?

24        MS. NORMAND:  That's right, your Honor.  We think that

25   to the extent that the DC circuit was looking at the policy

H7EPDOYC

1    questions underlying this, it was looking at those and

2    attempting to determine what Congress meant when it was

3    identifying agency records, as the scope of records that are

4    subject to FOIA.

5         THE COURT:  Okay.  Thank you.  Now, the parties'

6    letter to me on July 6th was appropriately detailed, and I

7    thank you very much for that.

8         Is there any issue that is not raised in this letter

9    that you want to bring to my attention today because we're

10   here?  We can talk about it.  Ms. Weismann, anything else

11   today?

12        MS. WEISMANN:  No.

13        THE COURT:  Other than endorsing your schedule, which

14   I do understand and I intend to do.

15        MS. WEISMANN:  No, but if I may respond briefly to a

16   point that the government raised.

17        THE COURT:  Please do.

18        MS. WEISMANN:  I think this issue that this Court will

19   have to decide with respect to the WAVES and ACR records is not

20   simply a matter of figuring out what Congress intended.  I

21   think it's very clear from every District Court that has

22   wrestled with this issue, as well as the DC circuit opinion,

23   that it is a very fact-bound question, and that is why I think

24   we cannot be confident today that the facts -- you know, what

25   has happened in the last seven or eight years will have no

1    bearing on that.

2            And if we are able, for example, to test some of those

3    facts through discovery, if we can convince this Court that

4    discovery is appropriate, the outcome may be very different

5    than was before the court in Judicial Watch.  As I noted, the

6    judge said, Judge Garland said in a number of places, you know,

7    they argue this but my hands are kind of bound because this is

8    here on summary judgment.

9            We will have an opportunity, we hope, to make sure

10   that the factual record that this Court has really fills in all

11   the blanks.

12           THE COURT:  I thought I heard Ms. Normand say that

13   typically in FOIA cases, discovery is not appropriate.

14           MS. WEISMANN:  She's correct, but this, I would

15   submit, is not a typical case.

16           THE COURT:  Okay.  And tell me why, please.

17           MS. WEISMANN:  Because the issue of whether or not

18   records are agency records or Presidential records is not an

19   issue that comes up very often, and it is such a fact-bound

20   question because it really depends on -- you have to look, as

21   the courts have done, you have to look at how are the records

22   created, how are they being used, what level of control does

23   the agency have over them.

24           And I also would point out that in the Judicial Watch

25   case, those factors were almost in equipoise.  I mean, it

1    really was this sort of additional layer that the Court looked

2    to to sort of push the issue over, to say these are not agency

3    records because of these constitutional concerns that the court

4    had, which again, I think the practice of the last six or seven

5    years has a great deal of bearing on that issue, but I would

6    submit this is not a typical case.

7          The Mar-a-Lago portion, absolutely, and I agree with

8    the government's counsel that we will certainly work to at

9    least narrow, if not eliminate, whatever issues we can.  But I

10   think the status of the other records is a fairly unique issue,

11   and as I said, I think the facts will play very heavily in the

12   legal analysis, and that's why we want to make sure that this

13   Court has the best factual record to make that analysis.

14         THE COURT:  I understand.  Okay.  Anything else today?

15         MS. WEISMANN:  No.  Thank you.

16         THE COURT:  Okay.  Ms. Normand, anything else today?

17         MS. NORMAND:  No, only to say that we will certainly

18   have arguments to make regarding the discovery question.  In

19   our view, and I think the case law supports it, these FOIA

20   cases are typically quite fact bound.  The issue is that

21   there's a procedure that the circuit has prescribed for how the

22   Court resolves the factual issues and makes a legal

23   determination as to the sufficiency of the government's

24   showing.  We think that while this case is unusual in some

25   respects, that same process will apply here.  We look forward

H7EPDOYC

1    to briefing the issue.

2              THE COURT:  Okay.  Then I will issue a scheduling

3    order replicating that sought by the parties.  It's my

4    expectation that the parties are going to adhere to that

5    schedule, and you'll tell me, but I hope not to hear from you,

6    that it needs to be changed in any way.  I'm imagining that one

7    of you, if not both of you, will be ordering the transcript.

8    It's my hope that you do, with whatever speed that you'd like.

9    Once you do that, I will receive a copy automatically; so

10   there's no need to send me a courtesy copy.  I will get one.

11   Anything else today?

12             MS. WEISMANN:  No, your Honor.

13             THE COURT:  Okay.  I'm keeping you from your weekends.

14   Thank you very much.

15             MS. WEISMANN:  Thank you, your Honor.

16             MS. NORMAND:  Thank you, your Honor.

17             (Adjourned)

18

19

20

21

22

23

24

25