UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

KATE DOYLE, NATIONAL SECURITY ARCHIVE,
CITIZENS FOR RESPONSIBILITY AND ETHICS IN
WASHINGTON, KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA UNIVERSITY,

    Plaintiffs,

No. 17 Civ. 2542 (KPF)

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
EXECUTIVE OFFICE OF THE PRESIDENT,

    Defendants.

---

## DECLARATION OF KIM E. CAMPBELL, SPECIAL AGENT IN CHARGE, LIAISON DIVISION, AND FREEDOM OF INFORMATION AND PRIVACY ACTS OFFICER, UNITED STATES SECRET SERVICE

I, Kim E. Campbell, make the following declaration in lieu of affidavit pursuant to 28 U.S.C. §1746:

1. I am the Special Agent in Charge of the Liaison Division, Office of Government and Public Affairs, and the Freedom of Information and Privacy Acts (FOI/PA) Officer for the United States Secret Service ("Secret Service"), Department of Homeland Security ("DHS"). I have been assigned as the Secret Service FOI/PA Officer since July 2014 and have been employed with the Secret Service as a Special Agent (GS-1811) since July 1990.

1

2. DHS regulations, Title 6, Code of Federal Regulations, Section 5.4, and Appendix A, II(I)(3), 68 FR 4056, 4058, and 4069, vest authority in the Secret Service FOI/PA officer to make determinations as to whether to grant requests for access to Secret Service records made under the Freedom of Information Act ("FOIA"), Title 5 of the United States Code, Section 552(b).

3. I submit this declaration in response to Plaintiffs' motion for an order to show cause, to describe the Secret Service's search for and processing of records potentially responsive to Plaintiffs' March 10, 2017 FOIA request seeking records of "presidential visitors" at the White House Complex, Trump Tower in New York City, and Mar-a-Lago, in West Palm Beach. This declaration is based upon my personal knowledge, upon information contained in the Secret Service records, and upon information acquired by me during the performance of my official duties from other Secret Service employees who were involved in the processing of Plaintiffs' FOIA requests.

Plaintiffs' Requests and the Initial Processing of those Requests

4. I am aware that Plaintiffs allege in the above-captioned lawsuit that on January 23, 2017, Plaintiff Kate Doyle sent a FOIA request to the Secret Service requesting Worker and Visitor Entry System (WAVES) and Access Control Records (ACR) records for January 20, January 21, and January 22, 2017. My office does not have a record of receiving this request in the ordinary course of business. I understand, however, that after filing this lawsuit, Plaintiffs provided a document purporting to indicate that a fax was sent to the Secret Service FOIA/PA Communications Center on January 23, 2017.

5. I am also aware that Plaintiffs allege that on February 24, 2017, Plaintiff Doyle sent an administrative appeal to DHS based on the Secret Service's failure to respond to her

2

January 23, 2017 request. The Secret Service has no record of receiving or being notified of this appeal in the ordinary course of business. I understand, however, that after filing this lawsuit, Plaintiffs provided a document purporting to indicate that a fax was sent to the DHS Office of General Counsel on February 24, 2017.

6. The Secret Service did receive a March 10, 2017 request from Plaintiffs seeking (1) WAVES and ACR records from January 20, 2017 until March 8, 2017 (assigned as Request Number 20171321); (2) records of "presidential visitors" at Mar-a-Lago from January 20, 2017 to March 8, 2017 (assigned as Request Number 20171322); and (3) records of "presidential visitors" at Trump Tower from January 20, 2017 to March 8, 2017 (assigned as Request Number 20171323). Plaintiffs' request stated that "this request [the three requests set out above] specifically seeks the same 28 fields of data that previously were posted on the White House Visitor Records Request website." My office acknowledged receipt of the March 10, 2017 request on April 11, 2017.

7. With respect to the requests of January 23, 2017 and March 10, 2017 seeking WAVES and ACR records, these records are not Secret Service records, but rather are Presidential Records pursuant to the Presidential Records Act (PRA), 44 U.S.C. § 2201 et seq. Therefore, my office did not seek to search for, locate, or process these records.

8. With respect to the request for records of Presidential visitors at Trump Tower, the Secret Service was aware that President Trump had not traveled to Trump Tower during the requested time period. Therefore, after confirming this information, the Secret Service did not seek to search for the material requested by Plaintiffs.

9. With respect to the request seeking records of Presidential visitors at Mar-a-Lago, at the time of Plaintiffs' request, the Secret Service's protective efforts at the Mar-a-Lago

3

location and the particular protective situation at that location were newly developed. Therefore, it was unclear what, if any, record systems or record groupings might exist in regard to who visited the President at Mar-a-Lago, or where such record systems or record groupings might be located.

10. In order to clarify this issue, it was determined that a broad set of searches would be conducted to determine what, if any, record systems or record groupings existed that might contain information potentially responsive to Plaintiffs' request for Presidential visitors at Mar-a-Lago, and in particular, the request for the 28 fields of data found in WAVES records.

11. The Secret Service's search is described below. It is noted, however, that the below search and review of records confirmed that there is no system for keeping track of Presidential visitors at Mar-a-Lago, as there is at the White House Complex. Specifically, it was determined that there is no grouping, listing, or set of records that would reflect Presidential visitors to Mar-a-Lago.

12. Additionally, as to Plaintiffs' specific request for Mar-a-Lago "presidential visitor" records containing "the same 28 fields of data that previously were posted on the White House Visitor Records Request web site," the below search and review of records confirmed that the Secret Service does not maintain any data system, grouping of records, listing, or document(s) that contains, nor does it have access to any White House or other entity's data system, grouping of records, listing, or document(s) that contains, those 28 fields or any limited subset of those fields.

13. As the Secret Service's search and review of records determined that the Secret Service neither maintained, nor had access to, any Mar-a-Lago Presidential visitor record(s) or

listing or database containing the 28 fields as specifically sought by Plaintiffs' request or any subset of those fields, the Secret Service maintains no record and has no access to any record directly responsive to Plaintiffs' request.

14. In order to more fully explain the Secret Service's search and review efforts and the few scattered pieces of Mar-a-Lago Presidential visitor information found in paper or electronic documents located through the agency's search, the search and resulting documents are further described below.

The Secret Service's Searches

15. In searching for information to determine whether the Secret Service maintained a system or grouping of information indicating that an individual or individuals had visited or met with the President at Mar-a-Lago during the time period requested, the following offices were identified as offices that could potentially have access to responsive documents:

> the Office of Strategic Intelligence and Information (SII), which oversees the Protective Intelligence Division (PID). This office conducts background checks pursuant to a sensitive security program;
>
> the Office of Investigations (INV), which oversees the Miami Field Office (FO) and the West Palm Beach Resident Office (RO). These offices would most likely have involvement in President Trump's visits to Mar-a-Lago as they are geographically located in proximity to Mar-a-Lago; and
>
> the Office of Protective Operations (OPO), which oversees the Presidential Protective Division (PPD). This is the division with direct operational responsibility for the protection of the President of the United States, including when the President is at Mar-a-Lago.

Each of these offices was tasked to conduct a search for records indicating that an individual or individuals had visited or met with the President at Mar-a-Lago for the time period January 20 to March 8, 2017.

16. The SII/PID's search for records of background checks for Presidential visitors to Mar-a-Lago for the time period January 20 to March 8, 2017 identified no responsive records.

17. The INV/Miami FO and INV/West Palm Beach RO searched for paper and electronic records that reflected that an individual visited with the President at Mar-a-Lago during the time period January 20 to March 8, 2017, and forwarded potentially responsive records for further responsiveness review.

18. The OPO/PPD searched for paper or electronic records that reflected that an individual visited with the President at Mar-a-Lago during the time period January 20 to March 8, 2017, and forwarded potentially responsive records for further responsiveness review.

19. In addition to the Division-specific searches tasked and conducted as indicated above, the Office of the Chief Information Officer (CIO) was tasked to conduct a search of the e-mail accounts of employees of PPD, the Dignitary Protective Division (DPD),[1] West Palm Beach RO, and Miami FO for the time period January 20 to March 8, 2017 in the Enterprise Vault, or E-Vault. The E-Vault contains e-mails sent, received, or deleted by all Secret Service employees, including during the time period at issue in this case. The E-Vault was searched with the following search terms in the body, subject line, or attachment: MAL **OR** Mar-a-Lago **OR** Mar a Lago **AND** at least one of the following terms: guest **OR** appointment **OR** visitor **OR** meet **OR** meeting **OR** clear **OR** cleared **OR** sweep **OR** swept **OR** checkpoint **OR** check point **OR** check **OR** [abbreviation for sensitive security program] **OR** background. Thousands of e-mails, some with

---

[1] E-mail accounts of DPD employees were searched as it appeared at this point that the Prime Minister of Japan had visited Mar-a-Lago to visit with President Trump during the relevant time period.

6

attachments, were captured through the word search, and forwarded for responsiveness review.

Further Responsiveness Review

20. In regard to any e-mails and their attachments as retrieved through the above-described word searches, these were placed into software that allows for reviewing and tagging, and duplicate e-mails were removed. Duplicates were also removed from the OPO/PPD e-mails that had been captured through OPO/PPD's search and forwarded for review, many of which had been also been captured through the CIO's word search.

21. The e-mails and attachments and other documents remaining after de-duplication were then further reviewed for responsiveness. There remained thousands of e-mails and other documents to individually review even after de-duplication.

22. In the course of this further review, it was determined that many of the e-mails and attachments capturing during the email search were merely copies of media reports concerning Presidential visits to Mar-a-Lago. This material was eliminated from further review as non-responsive, as it was not considered an Agency record of a Presidential visit, and as it was as available to the public as to the Secret Service.

23. In reviewing the remaining records, questions arose as to who should be considered a Presidential visitor to Mar-a-Lago. I was advised, however, that through discussions between Plaintiffs' Counsel and the Department of Justice attorneys representing the Secret Service (DOJ), it was agreed that the Secret Service need not produce records regarding family members, cabinet members, and White House staff who were present at Mar-a-Lago, as those whose names generally would not have appeared in WAVES.

Therefore, any documents reflecting that such individuals were present at Mar-a-Lago were removed as non-responsive.

24. The Secret Service also identified a few records reflecting the names of local law enforcement and support personnel scheduled to have their photograph taken with the President. It was uncertain whether these records reflect the names of individuals who in fact visited the President at Mar-a-Lago, or were only scheduled to do so. It is my understanding, however, that Plaintiffs agreed, after discussions with DOJ, to exclude from their request records regarding such individuals who were scheduled to have their pictures taken with President Trump at Mar-a-Lago. Therefore, these records were considered non-responsive to Plaintiffs' request.

25. Documents relating to the visit of the Prime Minister of Japan, Shinzo Abe, to Mar-a-Lago were the largest remaining category of records captured through the above-described searches. As a visiting Head of State traveling with his spouse in the United States, Prime Minister Abe and Mrs. Abe were Secret Service protectees. See 18 U.S.C. 3056(a). Therefore, the Secret Service had created and maintained operational records concerning its protective efforts during Prime Minister Abe's visit to the United States. Some of these records contained references to the visit of the Prime Minister and his wife to Mar-a-Lago.

26. The Secret Service questioned whether this material was responsive to Plaintiffs' request or even the type of material that Plaintiffs were seeking.

27. It is my understanding that with respect to records that related to Prime Minister Abe's and Mrs. Abe's visit to Mar-a-Lago, DOJ engaged in discussions with Plaintiffs' Counsel

8

to reduce the number of records that would need to be reviewed and processed, as there were a large number of records in this category captured by the initial search.

28. Following discussions between DOJ and Plaintiffs' Counsel, the Secret Service located and initially processed three documents from the set of documents relating to the Prime Minister's visit: the president's travel schedules for Friday, February 10, and Saturday, February 11 (the dates that correspond to the Prime Minister's visit), respectively, and an e-mail that originated from the State Department identifying the individuals associated with the Prime Minister's visit who would need access to Mar-a-Lago.

29. The Secret Service subsequently undertook an expedited review of the remaining records concerning the Prime Minister's visit. The Secret Service determined that approximately fifteen documents contain any reference to an individual or individuals potentially meeting with the President. Those references consist solely of general and redundant references to the fact that Prime Minister and Mrs. Abe visited the President at Mar-a-Lago. Beyond that limited information, which is already publicly known and reflected on the State Department email, the records are duplicative and therefore were deemed non-responsive.

30. After carefully reviewing the materials captured through the initial searches and removing materials that the parties had agreed were non-responsive, it was determined that, apart from the records concerning Prime Minister Abe's visit described above, the Secret Service had access to only a handful of e-mails and copies of Presidential schedules showing that the President was expected to meet with an individual or individuals at Mar-a-Lago.

31. Most, if not all, of the records the Secret Service identified through its searches merely indicate the possibility of a "presidential visit" (e.g., a document indicating that a person is scheduled to meet with the President). They do not reveal whether a visit actually took place.

Consultation and Referral of Records for Review

32. In regard to the information concerning the Prime Minister's visit to Mar-a-Lago, as noted, the Secret Service located one e-mail that had originated with the Department of State which evidenced potential visitors to Mar-a-Lago. Although this record did not contain the 28 data fields sought by Plaintiffs, and did not confirm that any of the individuals named on the document had visited with the President himself at Mar-a-Lago, this record was referred to the Department of State for possible release to Plaintiffs. The record was reviewed for Department of State equities and returned to the Secret Service.

33. The records containing information concerning the President's schedule were referred to the Executive Office of the President ("EOP") through DOJ for consultation. As of September 7, 2017, this consultation had not been completed, and as a result, DOJ sought an extension of the production deadline until September 15 at noon.

34. It is my understanding that the Department of Justice released to Plaintiffs the State Department e-mail described in paragraph 32 above, on September 15, 2017. Redactions were made to that email pursuant to FOIA exemptions (b)(6) and (b)(7)(C).

35. The process of searching for and reviewing documents in response to Plaintiffs' FOIA request for records of "presidential visitors" at Mar-a-Lago, and completing the necessary referrals and consultations, took several months. The time spent by Secret Service

personnel to review the e-mails and paper documents captured by the initial set of searches took at least several weeks to accomplish, and involved hundreds of work hours.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

10/4/2017
Date

Kim E. Campbell
Special Agent in Charge,
Freedom of Information Act and
Privacy Act Officer
Liaison Division
United States Secret Service