UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

KATE DOYLE, NATIONAL SECURITY ARCHIVE,
CITIZENS FOR RESPONSIBILITY AND ETHICS IN
WASHINGTON, KNIGHT FIRST AMENDMENT
INSTITUTE AT COLUMBIA UNIVERSITY,

Plaintiffs,

No. 17 Civ. 2542 (KPF)

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
EXECUTIVE OFFICE OF THE PRESIDENT,

Defendants.

## DECLARATION OF PHILIP C. DROEGE

I, Philip C. Droege, hereby declare as follows:

1.  I am the Director of the White House Office of Records Management ("WHORM"). In this capacity, I am responsible for managing, preserving, and forwarding to the National Archives and Records Administration ("NARA") at the appropriate time records reflecting the business of the Presidency and Vice Presidency in accordance with the Presidential Records Act. I have held this position since July 2004, and have been an employee of the White House Office since July 1990. The statements made herein are based on my personal knowledge and on information made available to me in my official capacity.

### The White House and Presidential Records

2.  The United States Secret Service (Secret Service) provides security for,

1

monitors, and controls access to the White House Complex, which includes the White House, the Eisenhower Executive Office Building ("EEOB"), the grounds encompassing the EEOB and the White House, and the New Executive Office Building ("NEOB"). The White House Complex includes office space for the President and his closest advisors and staff in the White House Office, as well as office space for the Vice President and his closest advisors and staff in the Office of the Vice President.

3.   Since at least 1990, throughout the last five Presidential administrations, it has been the policy and practice of the White House Office, in accordance with the Presidential Records Act, 44 U.S.C. § 2201 *et seq.,* to retain and maintain control over records generated by the Worker and Visitor Entrance System ("WAVES").

Treatment of WAVES/ACR Records

4.   Since at least 2001, it has been the practice of the Secret Service to transfer newly-generated WAVES records to the WHORM, generally every 30 to 60 days. In recent years, the transfer of records has occurred approximately every 30 days. (The note and description fields from prior to 2006 were not initially transferred to the WHORM; those fields from 2004 to 2006 were subsequently transferred to the WHORM in 2006.)

5.   At least as early as 2001 (at the end of the Clinton Administration), and upon revisiting the issue in 2004, the Secret Service and the White House recognized and agreed that Access Control Records (ACR) records should be treated in a manner generally consistent with WAVES records. Since at least 2006, the Secret Service has been transferring ACR records to the WHORM, generally every 30 to 60 days (and more recently approximately every 30 days), similar to the transfer of WAVES records.

6. In May 2006, the WHORM entered into a Memorandum of Understanding with the Secret Service Records Management Program ("2006 MOU") that documented what was then understood to be past practice and interests regarding WAVES and ACR records (which at that time were collectively termed White House Access Control System, or WHACS, records). The 2006 MOU confirmed the Secret Service's historical practice of transferring WAVES records to the WHORM within 30 to 60 days after the visit (and then deleting those records from its systems), as well as the WHORM's management and custody of those records under the Presidential Records Act.

7. The 2006 MOU expressly acknowledged that the "White House, but not the Secret Service, has a continuing interest in [WAVES and ACR] Records . . . ." 2006 MOU at ¶ 20. Such records reflect the activities and official functions of the Presidency and Vice Presidency, and the White House continues to use the information contained in such records for various historical and informational purposes. Accordingly, WAVES and ACR records, like other records that reflect the activities of the Presidency and Vice Presidency, are maintained as records subject to the Presidential Records Act.

8. The 2006 MOU continues to reflect current practices and interests with respect to WAVES and ACR records.

9. By contrast, "[o]nce the visit ends, the information contained in WAVES Records and ACR Records has no continuing usefulness to the Secret Service." 2006 MOU at ¶ 13. The Secret Service's temporary retention of such records after an individual's visit to the White House Complex is solely for the purpose of facilitating an orderly and efficient transfer

3

of the records to the WHORM. 2006 MOU at ¶ 14(a).

10. At the conclusion of each Presidential Administration, it is the practice of the WHORM to transfer to NARA all WAVES and ACR records the WHORM has received during the course of that Administration.

11. I understand that Plaintiffs in this case have sought WAVES and ACR records for the period January 20 through March 8, 2017. Pursuant to long-established practice, as reflected in the 2006 MOU, those records were transferred by the Secret Service to the WHORM on the routine 30 day basis. The WHORM will continue to maintain and preserve the records under the Presidential Records Act, and the records will be transferred to NARA at the conclusion of the current Administration. However, the WHORM has assured the Secret Service that, should there be a final judgment in favor of Plaintiffs in this matter (including any appeal), WHORM will provide the Secret Service with the records necessary to satisfy the judgment.

## The Former Voluntary Disclosure Policy

12. In 2009, the White House adopted a policy of voluntarily disclosing certain information contained in a subset of WAVES and ACR records, starting on September 15, 2009.

13. The voluntary disclosure policy was subject to exceptions for: (1) information that implicated personal privacy or law enforcement concerns (e.g., dates of birth, social security numbers, and contact phone numbers); (2) records that implicated the personal safety of EOP staff (their daily arrival and departure); (3) records whose release would threaten national security interests; (4) records related to purely personal guests of the first and second

families (i.e., visits that do not involve any official or political business); and (5) records related to a small group of particularly sensitive meetings (e.g., visits of potential Supreme Court nominees). Records and information falling within these categories were not made public or, in the case of particularly sensitive meetings, were made public only after the records were no longer sensitive.

14. The policy of voluntary disclosure was rescinded on April 14, 2017, and is no longer in effect.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 23, 2017.

*[signature]*

PHILIP C. DROEGE, DIRECTOR
White House Office of
Records Management
