**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KATE DOYLE, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   Civil Action No. 17-2542 (KPF) |
| | ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND DISMISSAL**

**Table of Contents**

Table of Authorities .................................................................................................... iii

INTRODUCTION ........................................................................................................1

BACKGROUND ..........................................................................................................1

ARGUMENT ...............................................................................................................3

   I.     The Court Should Deny Defendants' Summary Judgment Motion for Failure to Comply with Local Rule 56.1...................................................................................3

   II.    WAVES and ACR Records Are Agency Records.........................................................4

        A.    Tax Analysts II controls this case. ................................................................... 4

        B.    The D.C. Circuit's four-factor test of "control" contradicts Tax Analysts II............................................................................................................ 7

        C.    The government fails to demonstrate that WAVES and ACR records are not "agency records," even under the D.C. Circuit's four-factor test of "control." ................................................................................................... 14

   III.   Defendants Must Produce WAVES and ACR Records from Those EOP Components Subject to FOIA......................................................................................19

   IV.   The Secret Service Has Failed to Demonstrate It Conducted an Adequate Search............................................................................................................................22

        A.    The Secret Service declarations do not meet the agency's burden of proof.............................................................................................................. 22

        B.    Publicly available information casts further doubt on the Secret Service's assertions and production............................................................... 26

   V.    Defendants Have Failed to Comply with Their Obligations to Produce Non-Exempt Agency Records of Presidential Visitors to Mar-a-Lago. ............................28

        A.    Defendants improperly excluded "presidential schedule information" from their production of Mar-a-Lago visitor records. ................................... 28

        B.    The Secret Service's claim that "operational records" and "public information" are not responsive has no support in FOIA. .............................. 30

   VI.   Plaintiffs Have Stated Valid, Judicially Reviewable Claims Under the Federal Records Act and the Presidential Records Act. .........................................................32

CONCLUSION...........................................................................................................35

# Table of Authorities

## Cases

*ACLU v. Dep't of Defense,*
   664 F. Supp. 2d 72 (D.D.C. 2009) ...................................................................... 10

*ACLU v. Nat'l Sec. Agency,*
   No. 13-civ-09198, 2017 U.S. Dist. LEXIS 44597 (S.D.N.Y. Mar. 27, 2017)........................ 23

*Aguiar v. Drug Enf't Admin.,*
   865 F.3d 730 (D.C. Cir. 2017) ........................................................................ 24

*Armstrong v. Bush,*
   924 F.2d 282 (D.C. Cir. 1991) .................................................................... 32, 34

*Armstrong v. Exec. Office of the President,*
   1 F.3d 1274 (D.C. Cir. 1993) ........................................................................ 33

*Baldrige v. Shapiro,*
   455 U.S. 345 (1982)................................................................................. 10

*Center for Effective Gov't v. U.S. Dep't of State,*
   7 F. Supp. 3d 16 (D.D.C. 2013) ..................................................................... 12

*Coffey v. Bureau of Land Mgmt.,*
   249 F. Supp. 3d 488 (D.D.C. 2017) .................................................................. 25

*Consumer Federation of America v. Dep't of Agriculture,*
   455 F.3d 283 (D.C. Cir. 2006) ...................................................................... 8, 9

*CREW v. Dep't of Homeland Sec.,*
   527 F. Supp. 2d 101 (D.D.C. 2007) ................................................................... 2

*Crooker v. U.S. State Dep't,*
   628 F.2d 9 (D.C. Cir. 1980) ......................................................................... 31

*Davis v. Dep't of Justice,*
   460 F.3d 92, 98 (D.C. Cir. 2006) .................................................................... 21

*Dep't of the Air Force v. Rose,*
   425 U.S. 352 (1976)................................................................................. 14

*Department of Justice v. Tax Analysts (Tax Analysts II),*
   492 U.S. 136 (1989)............................................................................ passim

*Ferguson v. FBI,*
   89 Civ. 5071 (RPP), 1995 U.S. Dist. LEXIS 7472 (S.D.N.Y. June 1, 1995)........................... 3

*Forsham v. Harris,*
  445 U.S. 169 (1980) ............................................................................................. 5

*Founding Church of Scientology v. National Agency,*
  610 F.2d 824 (D.C.Cir.1979) ........................................................................... 23

*Freedberg v. Dep't of the Navy,*
  581 F. Supp. 3 (D.D.C. 1982) ........................................................................... 31

*Freedom Watch, Inc. v. Nat'l Sec. Agency,*
  220 F. Supp. 3d 40 (D.D.C. 2016) ................................................................... 25

*Immigrant Def. Project v. U. S. Immigration & Customs Enf't,*
  208 F. Supp. 3d 520 (S.D.N.Y. 2016) ............................................................. 26

*In re Cheney,*
  406 F.3d 723 (D.C. Cir. 2005) ......................................................................... 18

*Judicial Watch v. Secret Serv,*
  726 F.3d 208 (D.C. Cir. 2013) ................................................................... passim

*Judicial Watch, Inc. v. Dep't of Energy,*
  412 F.3d 125 (D.C. Cir. 2005) ...................................................................... 9, 18

*Judicial Watch, Inc. v. Dep't of Justice,*
  365 F.3d 1108 (D.C. Cir. 2004) ....................................................................... 29

*Judicial Watch, Inc. v. U.S. Secret Service,*
  579 F. Supp. 2d 143 (D.D.C. 2007) .................................................................. 2

*Kissinger v. Reporters Committee for Freedom of the Press,*
  445 U.S. 136 (1980) ............................................................................................ 4

*Leopold v. CIA,*
  177 F. Supp. 3d 479 (D.D.C. 2016) ................................................................. 31

*Lindsey v. Bureau of Prisons,*
  736 F.2d 1462 (11th Cir. 1984) ......................................................................... 8

*Lykins v. Dep't of Justice,*
  725 F.2d 1455 (1984) .......................................................................................... 8

*Mead Data Center, Inc. v. U.S. Dep't of the Air Force,*
  566 F.2d 242 (D.C. Cir. 1977) ......................................................................... 19

*Milner v. Dep't of Navy,*
  562 U.S. 562 (2011) .......................................................................................... 31

*New York Times Co. v. U.S. Dep't of Justice*,
    756 F.3d 100 (2d Cir. 2014)..................................................................... 12

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975),.............................................................................. 13

*Oglesby v. U.S. Dep't of Army*,
    920 F.2d 57(D.C. Cir. 1990) .................................................................... 23

*Paisley v. CIA*,
    712 F.2d 686 (D.C. Cir. 1983) ................................................................. 11

*Public Citizen v. Dep't of Justice*,
    491 U.S. 440 (1989)................................................................................ 18

*Rodriguez v. Dep't of Def.*,
    236 F. Supp. 3d 26 (D.D.C. 2017) ........................................................... 25

*Tax Analysts v. Dep't of Justice* (*Tax Analysts I*), 845 F.2d 1060 (D.C. Cir. 1988)................. 8, 10

*Tax Analysts v. IRS*,
    117 F.3d 607 (D.C. Cir. 1997) ................................................................. 10

*United States v. Triumph Capital Grp., Inc.*,
    211 F.R.D. 31 (D. Conn. 2002) ................................................................ 25

*United We Stand Am., Inc. v. IRS*, 359 F.3d 595 (D.C. Cir. 2004) ........................................... 9, 11

*Valencia-Lucena v. U.S. Coast Guard*,
    180 F.3d 321(D.C. Cir. 1999) .................................................................. 23

*Weisberg v. U.S. Dep't of Justice*,
    705 F.2d 1344 (D.C. Cir. 1983) ............................................................... 23

**Statutes**

5 U.S.C. § 552(a)(3) ....................................................................................... 30

5 U.S.C. § 552(a)(4)(B) ..................................................................................... 4

5 U.S.C. § 552(b) ...................................................................................... 19, 31

5 U.S.C. § 552(f) ............................................................................................ 33

5 U.S.C. § 552(d) ........................................................................................... 31

44 U.S.C. § 3301 ............................................................................................. 6

**Rules**

LCvR 56.1(a) .................................................................................................................... 3

**Miscellaneous**

The Sedona Conference Best Practices Commentary on the Use of Search & Information
    Retrieval Methods in E–Discovery, 8 Sedona Conf. J. 189, 201 (2007) .......................26

## INTRODUCTION

At a time when the fundamentals of our democracy are being tested on a near daily basis, the need for transparency in government that the Freedom of Information Act ("FOIA") affords could not be greater. Here, however, far from permitting the public to see what our government is up to, Defendants seek to cloak the White House in secrecy by claiming the need to protect any and all information that merely reflects something about the schedules of the president and Executive Office of the President ("EOP") officials. As we show, Defendants' motion for summary judgment and to dismiss must be denied on multiple grounds.

Defendants' failure to comply with Local Rule 56.1 alone justifies denying them summary judgment. On the merits, their motion rests on caselaw fundamentally at odds with governing Supreme Court precedent that, as applied here, leads inescapably to the conclusion the requested visitor logs are agency records subject to FOIA. For the requested records of presidential visitors to Mar-a-Lago, the Secret Service has asserted exemptions that have no basis in FOIA and has failed to carry its burden of proving it conducted a reasonable search. Finally, Defendants' motion to dismiss the Federal Records Act ("FRA") and Presidential Records Act ("PRA") claims should be denied because Plaintiffs have brought a justiciable challenge to Defendants' treatment of records under those statutes.

## BACKGROUND

This case arises from two FOIA requests for records from the WAVES and ACR systems used by the Secret Service to track visitors at the White House complex for the period January 20, 2017, through March 8, 2017, and records of presidential visitors at Mar-a-Lago and Trump Tower for that same period (Dkt. 46-1). Defendants' Memorandum details the WAVES and ACR systems, conceding the most relevant fact–the Secret Service creates these records "[t]o

1

fulfill its statutorily mandated function to protect the White House Complex[.]" Memorandum of Law in Support of Defendants' Motion for Summary Judgment on Plaintiffs' FOIA Claims and Dismissal of Plaintiffs' Remaining Claims ("D's Mem.") (Dkt. 51) at 3. Further, while admitting the Secret Service creates these records and possesses them at least until a visit is complete, *id.* at 5, Defendants acknowledge they entered into a Memorandum of Understanding ("MOU") in 2006 in an effort to convert them into presidential records. *Id.* at 5-6; 2006 MOU ¶¶ 17-24 (Dkt. 47-1). The MOU was entered into after the Secret Service had been sued over multiple FOIA requests for visitor records. *See Judicial Watch, Inc. v. U.S. Secret Service*, 579 F. Supp. 2d 143 (D.D.C. 2007) (filed Feb. 22, 2006); *CREW v. Dep't of Homeland Sec.*, 527 F. Supp. 2d 101 (D.D.C. 2007) (filed May 10, 2006). Despite this MOU, in 2009, the Obama White House, in response to litigation from Plaintiff CREW, adopted a voluntary disclosure policy for the vast majority of WAVES and ACR records that remained in place until April 14, 2017. Declaration of Philip C. Droege (Dkt. 49) ¶¶ 12-14. Defendants have identified no instances – and Plaintiffs know of none – where these disclosures interfered in any way with the president's Article II powers.

    In response to the request for records of presidential visitors to Mar-a-Lago,[1] Defendants have provided Plaintiffs with only a single document – a State Department email listing individuals associated with the Japanese Prime Minister's visit who needed clearance. *See* Exhibit F to Plaintiffs' Memorandum in Support of Motion for an Order to Show Cause ("Ps' Show Cause Mem.") (Dkt. 33-1). The government's production omitted two previously promised records pertaining to the Japanese Prime Minister's visit. Exhibit D to Ps' Show Cause Mem.

---

    [1] Records of visitors to Trump Tower are not at issue because President Trump did not visit Trump Tower during the requested time period.

Defendants now characterize all other records as "non-responsive" because they are "operational materials" or "directly relat[e] to Presidential schedules." Ds' Mem. at 11.

Defendants have now moved for summary judgment on Plaintiffs' FOIA claims and to dismiss the remaining non-FOIA claims. In support of their motion, Defendants have proffered several declarations from Secret Service personnel, including the Second Declaration of Kim E. Campbell ("2d Campbell Decl.") (Dkt. 46).

## ARGUMENT

I.     **The Court Should Deny Defendants' Summary Judgment Motion for Failure to Comply with Local Rule 56.1.**

Local Rule 56.1 and this Court's Rule 4(C) require that "*any* motion for summary judgment" must include "a separate, short and concise statement . . . of the material facts" not genuinely in dispute.  LCvR 56.1(a) (emphasis added). Defendants argue such a statement is "unnecessary" here because, as a FOIA case, their agency declarations provide all the necessary support. Ds' Mem. at 13 n.5. These declarations, however, are no substitute for Defendants' responsibility to file a Rule 56.1 statement of facts and in any case, do not carry Defendants' burden of demonstrating that there are no genuine issues of material fact regarding the adequacy of Defendants' search and their assertions of exemptions.

The single case Defendants' cite, *Ferguson v. FBI*, is inapposite because Plaintiffs were challenging only the agency's exemption claims. 89 Civ. 5071 (RPP), 1995 U.S. Dist. LEXIS 7472 (S.D.N.Y. June 1, 1995). Here, as discussed below, Plaintiffs oppose summary judgment on a number of factual and legal objections that do not include challenges to any exemption claims. Given the complex facts presented by this case, a Rule 56.1 Statement from Defendants is needed for the Court to ascertain what facts are not genuinely in dispute in conducting the

required *de novo* standard of review, 5 U.S.C. § 552(a)(4)(B). Accordingly, on this basis alone pursuant to LCvR 56.1(a), Defendants' motion for summary judgment should be denied.

## II.     WAVES and ACR Records Are Agency Records.

The Supreme Court's two-part definition of "agency records" in *Department of Justice v. Tax Analysts* (*Tax Analysts II*), 492 U.S. 136, 144-46 (1989), governs this case and applies to the requested WAVES and ACR records. The government ignores that definition in favor of a four-factor test the D.C. Circuit first adopted in the decision under review in *Tax Analysts II*. The Supreme Court's two-factor test flatly contradicts the D.C. Circuit's test and, for that reason, controls here. In any event, visitor logs also are "agency records" under the D.C. Circuit's test.

### A.     *Tax Analysts II* controls this case.

In *Tax Analysts II*, the Supreme Court defined "agency records" to be records that an agency (1) creates or obtains, and (2) controls. 492 U.S. at 144-46. It gave both terms commonsense meanings, reflecting "Congress' desire to put within public reach the information available to an agency in its decision-making processes." *Id.* at 144. Most relevant here, it defined "control" to mean "that the materials have come into the agency's possession in the legitimate conduct of its official duties." *Id.* at 145. Under this definition, WAVES and ACR records clearly qualify as "agency records" because there is no dispute that the Secret Service created or obtained them "in the legitimate conduct of its official duties." *See* Ds' Mem. at 3.

The Supreme Court's definition of "agency records" and of "control" flows from two prior cases addressing the reach of FOIA. In *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136 (1980), the Court analyzed whether transcripts of phone calls made by Henry Kissinger while an Assistant to the President became "agency records" under FOIA when Kissinger physically took the transcripts to his new office at the State Department. *Id.* at 155–57. The requesters in that case argued that the "mere physical location" of the transcripts in the State

Department made them "agency records." *Id.* at 157. The Supreme Court rejected that argument, noting that defining "agency records" by reference solely to their location would subject to FOIA even "personal books" and "memorabilia" that happened to be in an official's office. *Id.*

In *Forsham v. Harris*, 445 U.S. 169 (1980), the Supreme Court considered whether records generated by a private organization with the financial support of the government were, because of that support, "agency records." *Id.* at 171, 182. The Court also rejected that argument, holding that an agency must "either create or obtain" a document for it to become an "agency record." *Id.* at 182. In doing so, the Court relied on the definitions given "records" in the Records Disposal Act and the PRA, each of which turned primarily on whether the records had been created or obtained by the relevant actor. *Id.* at 183–84.

From these cases, the Supreme Court in *Tax Analysts II* derived its two-part definition of "agency records." First, the Court said the records must be "created or obtained" by the agency to ensure that "records *acquired* by an agency," 492 U.S. at 145 (citation omitted), qualify but that records that "merely *could have been* obtained," *id.* at 144 (quoting *Forsham*, 445 U.S. at 186) (emphasis in original), do not. The requirement also focuses the definition of "agency records" on the most important factor: actual possession. As the Court said in *Forsham* and reiterated in *Tax Analysts II*: "The legislative history of the FOIA abounds with . . . references to records *acquired* by an agency." *Tax Analysts II*, 492 U.S. at 144–45 (omission and emphasis in original).

Second, the Court said, the records must be in the agency's "control," *id*, which the Court defined to mean "that the materials have come into the agency's possession in the legitimate conduct of its official duties." *Id.* at 145. This definition excludes from FOIA's reach personal material that happens to be located within an agency but otherwise bears no relationship to the

agency, such as Kissinger's transcripts. *Id.* In defining "control" broadly to encompass materials possessed by an agency "in the legitimate conduct of its official duties," the Supreme Court in *Tax Analysts II*, as in *Forsham*, drew upon the definition of agency records under the Records Disposal Act. That Act, as the Court quoted, includes a range of materials "made or received by an agency of the United States Government *under Federal law or in connection with the transaction of public business*." *Id.* (quoting 44 U.S.C. § 3301) (emphasis in original).

Several aspects of the Court's application of its definition of "control" in Tax *Analysts II* are critical here. First, the Court made clear that possession is nine-tenths of the law of "control." The Court began its discussion of "control" by emphasizing that the requested records – district court opinions that the Department of Justice ("DOJ") received while litigating tax cases – were "in the agency's possession." 492 U.S. at 146. In response to the government's argument that the courts issuing the opinions had ultimate control over their text, *id* at 147, the Court again highlighted the importance of possession: "The control inquiry focuses on an agency's *possession* of the requested materials, not on its power to alter the content of the materials it receive[d]." *Id.* (emphasis added). The Supreme Court also expressed its expectation that "disputes over control should be infrequent" because "requested materials ordinarily will be in the agency's possession at the time the FOIA request is made." *Id.* at 146 n.6. In other words, absent extraordinary circumstances, possession usually suffices to show control, and thus records legitimately possessed by an agency ordinarily are "agency records."

Second, the Court made clear that the definition of "agency records" does not turn on "the intent of the creator of a document." *Id.* at 147. The Court rejected the government's argument that records originating outside an agency constitute "agency records" only if they

were "prepared substantially to be relied upon in agency decisionmaking." *Id.* (citation omitted).

The Court reasoned:

> This argument, however, makes the determination of "agency records" turn on the intent of the creator of a document relied upon by an agency. Such a *mens rea* requirement is nowhere to be found in the Act. Moreover, discerning the intent of the drafters of a document may often prove an elusive endeavor, particularly if the document was created years earlier or by a large number of people for whom it is difficult to divine a common intent.

*Tax Analysts II*, 492 U.S. at 147-48.

Defendants here do not actually grapple with the Supreme Court's bright-line definition of "agency records" and of "control." Instead, they incorrectly claim that "[n]either the Supreme Court nor the Second Circuit has had occasion to determine what constitutes sufficient 'control' to render a record an 'agency record' under FOIA." Ds' Mem. at 14. But *Tax Analysts II* did just that. 492 U.S. at 146-48. Here, the record put forth by Defendants demonstrates that the Secret Service obtains WAVES and ACR records while performing a core statutory function,[2] and has actual possession of those files on its servers.[3] These facts alone satisfy the Supreme Court's test in *Tax Analysts II*.

### B.    The D.C. Circuit's four-factor test of "control" contradicts *Tax Analysts II*.

Rather than apply the Supreme Court's definition of "control" from *Tax Analysts II*, the government applies the four-factor test that the D.C. Circuit articulated in the opinion that the Supreme Court was reviewing in *Tax Analysts II*. *See* Ds' Mem. at 14-17. The D.C. Circuit's four-factor test plainly conflicts with the Supreme Court's definition of "control," and the Court should therefore decline to follow it.

---

[2] *See, e.g.*, Ds' Mem. at 3 (describing the Secret Service's process of clearing visitors to the White House complex as in fulfillment of "its statutorily mandated function").

[3] *See infra* at 17.

In the lower-court litigation that would ultimately result in the Supreme Court's *Tax Analysts II* decision, the D.C. Circuit defined "agency records" under FOIA based primarily on the intent of the records' creator. *See Tax Analysts v. Dep't of Justice* (*Tax Analysts I*), 845 F.2d 1060, 1068 (D.C. Cir. 1988). For example, the D.C. Circuit stated that to determine whether "information originating in a FOIA-exempt entity" has become an "agency record," courts should look principally to "evidence surrounding the creation and transmittal of a document indicating that its creator intended to retain control." *Id.* It explained that "[if] there is [no intent to retain control], and the document, though created elsewhere, is presently within the 'free disposition of the agency with which [it] resides,' it may be deemed an agency record.'" *Id.* (quoting *Lykins v. Dep't of Justice*, 725 F.2d 1455, 1459 (1984)) (final alteration in original). Later, in listing the four factors that the D.C. Circuit presently uses to assess "control," the court began with "the intent of the document's creator to retain or relinquish control over the records." *Id.* at 1069 (quoting *Lindsey v. Bureau of Prisons*, 736 F.2d 1462, 1465 (11th Cir. 1984)).

The D.C. Circuit's focus on intent in defining "control" is irreconcilable with the Supreme Court's decision in *Tax Analysts II*. The Supreme Court specifically rejected reliance on the intent of a document's creator in determining whether it is an "agency record," noting that "[s]uch a *mens rea* requirement is nowhere to be found in [FOIA]." 492 U.S. at 147-48. At least one member of the D.C. Circuit has recognized this defect in the circuit's law on the definition of "agency records." In her concurrence in *Consumer Federation of America v. Dep't of Agriculture*, 455 F.3d 283 (D.C. Cir. 2006), Judge Henderson noted that the prevailing D.C. Circuit test of "control" "relie[s] heavily on the authors' purpose in creating the documents." *Id.* at 294 (Henderson, J., concurring). She acknowledged that after the D.C. Circuit articulated its test, "the Supreme Court determined that the author's intent is irrelevant to whether a document

is an 'agency record.'" *Id.* And she concluded that the Supreme Court in "*Tax Analysts* [*II*] thus

appears to have rejected the rationale" of the D.C. Circuit's test for "control." *Id. See also*

*Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125 131 n. * (D.C. Cir. 2005) (passingly

applying the test of "control" from *Tax Analysts II* in a manner inconsistent with the circuit's

four-factor test of control).

The D.C. Circuit has compounded this conflict by treating the first factor in its four-factor

test – intent of the record's creator – as the primary consideration for records created by entities

not subject to FOIA. In *United We Stand Am., Inc. v. IRS*, 359 F.3d 595 (D.C. Cir. 2004), for

example, the D.C. Circuit summarized its decisions distinguishing between congressional

documents and agency records as all turning principally on Congress's intent. *See, e.g.*, *id.* at

599-601. In *Judicial Watch v. Secret Serv,*, 726 F.3d 208 (D.C. Cir. 2013), the primary case the

government relies upon here, the D.C. Circuit was even clearer, describing "the first two factors

of the standard test" – intent and the agency's ability to use the record as it sees fit – as

"effectively dispositive." *Id.* at 221. In other words, the D.C. Circuit has doubled down on intent,

a factor the Supreme Court has rejected as lacking any statutory basis.

Even more fundamentally, the D.C. Circuit's four-factor test does not line up with the

Supreme Court's definition of "control" as meaning "that the materials have come into the

agency's possession in the legitimate conduct of its official duties." *Tax Analysts II*, 492 U.S. at

145. This straightforward test provides a bright-line rule that ensures FOIA applies to "the

information available to an agency in its decision-making processes," *id.* at 144, which Congress

intended to make publicly accessible under FOIA. The D.C. Circuit, by contrast, defines control

with reference to four factors divorced from FOIA's text and purpose: "[1] the intent of the

document's creator to retain or relinquish control over the records; [2] the ability of the agency to

9

use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files." *Judicial Watch*, 726 F.3d at 218 (quoting *Tax Analysts I*, 845 F.2d at 1069). While the three factors aside from intent are certainly *relevant* to whether an agency has, in the Supreme Court's words, acquired records "in the legitimate conduct of its official duties," those three factors as applied by the D.C. Circuit require far more than the Supreme Court's definition.

With respect to factor two, for example, agencies often are limited in their control of records that courts routinely subject to FOIA. For instance, statutory constraints on individual tax information impede an agency's ability to use and dispose of those records as it sees fit, but courts have understood those constraints as relevant only to whether the records are exempt under Exemption 3, *not* to whether they are "agency records." *See, e.g.*, *Tax Analysts v. IRS*, 117 F.3d 607, 610 (D.C. Cir. 1997). Similarly, regulations require agencies to treat classified records carefully under constraints courts consider relevant to Exemption 1, but not to the records' status as "agency records." *ACLU v. Dep't of Defense*, 664 F. Supp. 2d 72, 76 (D.D.C. 2009). And the Census Act prevents agencies from disclosing raw census data, which the Supreme Court has recognized exempts that data from FOIA under Exemption 3. *Baldrige v. Shapiro*, 455 U.S. 345, 352 (1982). In fact, strict application of the D.C. Circuit's second factor would render entirely superfluous Exemptions 1 and 3, both of which permit the withholding of information that agencies are not free to use and dispose of as they see fit.

The D.C. Circuit's four factors also are indeterminate and difficult to apply. Courts can easily assess whether an agency has acquired records in the legitimate conduct of its activities. By contrast, as the D.C. Circuit's tangled decisions concerning congressional and presidential

records show, application of the four-factor test requires a fundamentally subjective analysis. *See, e.g.*, *United We Stand Am.*, 359 F.3d at 599–601; *Judicial Watch*, 726 F.3d at 220 ("Our past application of the test reveals its considerable indeterminancy."). This is in part because the D.C. Circuit has, in its definition of "agency records," incorporated "special policy considerations" better suited to FOIA's exemptions than to the definition of its scope of coverage. *See, e.g.*, *United We Stand Am.*, 359 F.3d at 599 ("we relied on policy considerations unique to the congressional context"); *Judicial Watch*, 726 F.3d at 221 ("a somewhat different control test applies when there are 'special policy considerations' at stake . . . [which] are at stake here." (quoting *Paisley v. CIA*, 712 F.2d 686, 693 n.30 (D.C. Cir. 1983)). These "special considerations" only deepen the conflict between the D.C. Circuit's four-factor test and the Supreme Court's decision in *Tax Analysts II*, which rejected intent as a relevant factor.

Moreover, even if there is reason to credit "special policy considerations" when addressing whether congressionally created documents are "agency records," there is no such reason to do so for records implicating executive prerogatives. Congress protected those interests through FOIA's exemptions, including Exemptions 1 (for properly classified information), 3 (for statutorily protected information), and 5 (for deliberations and other privileged materials, which some courts have extended to certain presidential communications and information). If the government believes these exemptions to be inadequate to protect its interests, then it is for Congress to determine whether to expand FOIA's exemptions, not for courts to artificially narrow FOIA's definition of "agency records."[4]

---

[4] Defendants' reliance on *Judicial Watch* is further undermined by the voluntary disclosure policy of the Obama administration, which – to Plaintiffs' knowledge – failed to implicate, much less threaten, any presidential prerogative.

The D.C. Circuit's assertion in *Judicial Watch* that FOIA's exemptions are inadequate to protect presidential prerogatives lacks merit. The court thought that applying FOIA to records that reveal the president's visitors would raise separation-of-powers concerns, *Judicial Watch*, 726 F.3d at 224-29, but its reasoning flows from a flawed syllogism. The court noted first that Congress exempted the president and his staff from FOIA. *See id.* at 225. It then presumed that requiring *agencies* to disclose information *about* the president or his staff would implicate the same interests that led Congress to exempt the president and his staff from FOIA. *Id.* And it concluded that, together, these two premises justified exempting from FOIA information in the possession of agencies that would reveal what could otherwise be acquired only from the president or his staff. *Id.*

The Court's second premise elides the critical distinction between subjecting the *president* to FOIA and subjecting *presidential information in the possession of agencies* to FOIA. Congress may have thought that subjecting the president to FOIA would threaten the separation of powers, but subjecting only information *about* the president to FOIA does not raise those same concerns. In fact, FOIA routinely is applied to records that reveal presidential decision-making. Any time the president issues a directive to federal agencies to implement policy, or authorizes an agency to carry out a course of action, or communicates or visits with agency officials, he leaves a trail of agency records subject to FOIA.[5] While courts have held that

---

[5] *See, e.g.*, *Ctr. for Effective Gov't v. U.S. Dep't of State*, 7 F. Supp. 3d 16, 18 (D.D.C. 2013) (granting summary judgment to plaintiff, which had requested under the FOIA a Presidential Policy Directive on Global Development); *New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 124 (2d Cir. 2014) (ordering disclosure of a redacted OLC memorandum on the legality of targeted drone strikes), *op. amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014).

some of those records are exempt from *production* under FOIA, none have suggested they are not "agency records" because they indirectly reveal information relating to the president.

The fact that the president must act through subordinate agency officials inevitably results in the creation of a documentary record that is subject to FOIA. The disclosure of that record subject to appropriate exemptions serves FOIA's core purposes. The D.C. Circuit converted this feature of FOIA into a "special policy consideration" against applying FOIA to the Secret Service's visitor logs. It did so only by tacitly assuming the president is entitled to interact with federal agencies in complete secrecy. For example, the court viewed Congress' requirement that the president accept Secret Service protection as compromising that entitlement to secrecy by effectively requiring that the president share his calendar with the Secret Service. *See Judicial Watch*, 726 F.3d at 225. While this is true in part, there are many federal agencies that must, to perform their function, obtain certain information from senior officials including the president or his aides. For example, the Office of Legal Counsel renders legal advice directly to the president in response to specific requests. The Office of Government Ethics renders ethics advice relating to prospective White House employees based on information the White House supplies. And the Department of Defense implements direct presidential orders relating to, among other things, the use of drone strikes to kill individuals abroad. As far as Plaintiffs are aware, however, courts treat these records and comparable ones as subject to FOIA, even if they are exempt in whole or part for other reasons.

Finally, the D.C. Circuit's definition of "control" is simply inconsistent with FOIA's text and purposes. As the Supreme Court has recognized many times, FOIA is a disclosure statute, *see, e.g.*, *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 136 (1975), through which Congress intended to make available to the public records held by agencies in the discharge of their official

13

responsibilities. *See Tax Analysts II*, 492 U.S. at 144. Toward that end, FOIA applies broadly to "agency records" and accounts for any legitimate interests in secrecy through carefully defined and, as the Supreme Court has said, narrowly construed exemptions. *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976). The D.C. Circuit's definition inverts the operation of the statute by infusing the definition of "agency records" with policy considerations and limitations of the sort Congress expressed through FOIA's exemptions. It would subvert FOIA's text and purposes to smuggle in through the term "agency records" an amorphous tenth exemption that courts could use to protect "special policy considerations" of their own creation.

### C.   The government fails to demonstrate that WAVES and ACR records are not "agency records," even under the D.C. Circuit's four-factor test of "control."

On summary judgment, the government bears the burden of demonstrating that WAVES and ACR records are not agency records, even applying the D.C. Circuit's four-factor test. The government's failure to file a Rule 56.1 statement of undisputed facts presents a particular obstacle in this regard, because it deprives Plaintiffs and the Court of the ability to ascertain what facts are both material and in dispute, and it impedes Plaintiffs from submitting a Rule 56(d) motion to seek discovery of facts essential to resolving the merits of this case. Should the Court nevertheless rely on the declarations and exhibits the government has submitted, that record is insufficient to support a judgment that WAVES and ACR records are not agency records.

In *Judicial Watch*, the D.C. Circuit determined that its four-factor test produced "indeterminate results" in evaluating whether WAVES and ACR records are agency records. 726 F.3d at 231. The Court found the first of its four factors (intent) "unambiguously favors" the Secret Service; the third factor (the extent to which the agency has read or relied on the records) "unambiguously favors" a finding that the visitor records are "agency records"; and the other two factors (the ability of the agency to use and dispose of the records as it sees fit and the degree to

which the records are integrated into the agency's record system or files) "are relatively uncertain." *Id.* at 220. Here, relying heavily on a 2015 MOU (Dkt. 50-2) and a 2015 Memorandum (Dkt. 50-1), the government argues that changed facts since *Judicial Watch* weaken any claim that the Secret Service "controls" WAVES and ACR records in its possession, and asserts that the first, second, and fourth factors all "unambiguously favor" White House control. *See* Ds' Mem. at 17.

Defendants' arguments stem from the premise that voluntary agreements between components of the executive branch can trump an act of Congress. Not only are they wrong as a matter of law, but also the text of those agreements belies that assertion. Both the 2015 Memorandum and the 2015 MOU explicitly disavow any application that is inconsistent with existing law, which necessarily includes FOIA. *See* 2015 Mem. §6(b) ("This memorandum shall be implemented consistent with applicable law."); 2015 MOU § 5.01 ("Nothing in this Memorandum restricts a Party's ability . . . to fulfill responsibilities imposed on a Party by law."). By their own terms the 2015 Memorandum and 2015 MOU simply do not control here to the extent they are inconsistent with Congress's determination that agency records should be available under the FOIA.

Indeed, contrary to the government's assertions, the 2015 MOU strongly suggests that the Secret Service maintains the ability to use and dispose of the records at issue – and thereby satisfies the second prong of the test – particularly when it has a legal obligation to do so. For instance, the 2015 MOU states that the Secret Service "shall provide, without limitation, all services which are not otherwise agreed to be provided by any other Party, and which USSS employees and agents require in order to perform USSS's protective functions as required by law." 2015 MOU § 2.08. The 2015 MOU further states that the Secret Service "shall serve as the

Parties' executive agent to perform the duties and functions necessary to discharge USSS's responsibility as lead agency under Section 2.08, including *the authority to issue policies and procedures related to the discharge of its responsibilities*." *Id.* at § 2.09 (emphasis added). According to the 2015 MOU each party, including the Secret Service, "will continue to independently maintain or operate any information resources or information systems which that Party maintains or operates for internal purposes, *or to fulfill independent responsibilities imposed by law*." *Id.* at § 2.10 (emphasis added). These passages undermine the government's assertions in its brief and its declarations that the Secret Service is merely a service provider; instead, the 2015 MOU contemplates that the Secret Service will have significant discretion, especially when it comes to fulfilling its obligations under the law and discharging its official responsibility to secure the White House complex.

The 2006 MOU does not dictate a different result, notwithstanding its proclamation that WAVES and ACR records "are at all times Presidential Records" and "under the exclusive legal custody and control of the White House." 2006 MOU ¶¶ 17(a), 18. As discussed in Part VI, this is a blatant and unlawful effort to convert federal records into presidential records, contrary to Congress's intent that the PRA not be used as a vehicle to shield agency records from FOIA. Further, the 2006 MOU acknowledges that the information contained in WAVES and ACR records comes from sources outside the White House, including members of the public and likely agency employees who are subject to FOIA, undermining the claim of exclusive White House control over this information. 2006 MOU ¶ 11. Accordingly, Defendants' reliance on the 2006 MOU as evidence that the Secret Service lacks control must fail.

This distinction between agency records, which are subject to FOIA, and presidential records, which are not, is important because treating the WAVES and ACR records at issue here

as presidential records would remove them from FOIA categorically. That kind of categorical treatment cannot be justified in light of the availability of FOIA's exemptions to accommodate the sort of discrete harms the government and the D.C. Circuit have posited. *See, e.g.*, *Judicial Watch*, 726 F.3d at 226 (disclosure "could substantially affect the President's ability to meet confidentially with foreign leaders"). It is FOIA's exemptions, not the definition of the threshold term "agency records," that are meant to prevent harms that would result from the disclosure of specific categories of records. Adopting the D.C. Circuit's categorical approach would sidestep the more tailored tools Congress provided the executive branch to protect its interests, and permit the government to withhold WAVES and ACR records whose disclosure would cause no harm.

Finally, with respect to the fourth factor (the degree of integration of the records into the agency's files), the government's filings demonstrate that the WAVES and ACR records are directly integrated into the Secret Service's information systems. The declaration of James M. Murray ("Murray Decl.") (Dkt. 47) states that information from the White House Appointment center is "automatically pulled . . . into WAVES" and that once the required fields for prospective visitors have been entered, that information "is saved into WAVES directly." Murray Decl. ¶ 8. Further, the Murray Declaration states unambiguously that the information is held on servers that are in the physical custody of the Secret Service, not the White House. *Id.* ¶ 16. ("WAVES servers are located at the Secret Service's headquarters in Washington, D.C., and Secret Service personnel operate this machinery."). Although these records are later transferred and destroyed, they are by the government's admission in the Secret Service's possession for at least 30 days after a visit is complete. *Id.* ¶ 13. Far from being evidence that the Secret Service lacks control, the fact that the Secret Service destroys these records by overwriting them, *id.*,

demonstrates the extent to which it, and not components of the White House, ultimately controls these records.[6]

Of course, to say that the WAVES and ACR records are subject to FOIA is not to say that they must categorically be disclosed. The government may invoke FOIA's exemptions to protect specific records it has a legitimate basis to withhold. And while, as discussed *supra*, the D.C. Circuit in *Judicial Watch* viewed the availability of FOIA's exemptions as inadequate, its analysis rested on cases like *Public Citizen v. Dep't of Justice*, 491 U.S. 440 (1989), *In re Cheney*, 406 F.3d 723 (D.C. Cir. 2005), and *Judicial Watch v. Dep't of Energy*, 412 F.3d 125 (D.C. Circ. 2005), that are categorically different than this one. *Judicial Watch*, 726 F.3d at 229. Each interpreted the Federal Advisory Committee Act ("FACA") or FOIA not to apply to particular individuals or entities when doing so would have effectively subjected the president or a presidential advisory body to a direct statutory right of access. *See Public Citizen*, 491 U.S. at 443 (Standing Committee on Federal Judiciary of the American Bar Association not an "advisory committee" under FACA); *In re Cheney*, 406 F.3d at 730 (National Energy Policy Development Group ("NEPDG") not an "advisory committee" under FACA); *Judicial Watch v. Dep't of Energy*, 412 F.3d at 129, 132 (NEPDG not an "agency" under FOIA, and it should not "be made effectively subject to the FOIA because it borrowed [from the Department of Energy], rather than hired, some of its staff"). As explained above, there is a critical distinction between subjecting the president himself to FOIA and subjecting only information about the president in an agency's possession to FOIA.

---

[6] That the Secret Service may have only temporary possession of WAVES and ACR records does not negate their character as agency records while they are in the agency's custody and control. National Archives and Records Administration recordkeeping guidance expressly recognizes two categories of agency records – temporary and permanent. *See* https://www. archives.gov/records-mgmt/faqs/scheduling.html#disposition.

**III.    Defendants Must Produce WAVES and ACR Records from Those EOP
Components Subject to FOIA.**

Summary judgment should also be denied because Defendants must at the very least

produce WAVES and ACR records for those components of the EOP that are subject to FOIA.

Defendants' declarations demonstrate that they have sufficient information to segregate and

produce non-exempt information requested by Plaintiffs. Although the government claims it

lacks the necessary control to produce those records, that assertion is based on agreements

between the Secret Service and the EOP that are contrary to and invalid under the federal records

laws to the extent they attempt to treat agency records as presidential records.

At bottom, the government seeks to evade its statutory responsibility to segregate and

produce all non-exempt information from agency records. The FOIA imposes on every agency

the core requirement to release "any reasonably segregable portion of a record[.]" 5 U.S.C. §

552(b). Only when the non-exempt material is "inextricably intertwined" with exempt material

will a court excuse the agency from its duty to segregate. *Mead Data Center, Inc. v. U.S. Dep't

of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). Here, according to the Secret Service, the

WAVES records do not contain sufficient information to permit the agency to "definitively

identify records reflecting visits to FOIA Components," Ds' Mem. at 24, leaving the agency with

nothing to segregate.

This claim cannot be squared with the information put forth in the Defendants' own

declaration from William Willson ("Willson Decl.") (Dkt. 48). Mr. Willson explains that all

WAVES records include, *inter alia*, the email address of the appointment requestor. Willson

Decl. ¶ 7. Further, as Mr. Willson concedes, "the requestor's e-mail address in the Caller_Email

field would reflect the component of the requestor." *Id.* ¶ 9. Stated differently, the email address

for each White House employee identifies where the employee works by its use of component

19

abbreviations such as OMB, CEQ, OSTP, ONDCP, and USTR (the five EOP agency components) after EOP employee names.[7] Accordingly, from the appointment requestor alone the Secret Service can ascertain which appointments are made by employees of the EOP agency components. Further, as attested to in the Murray Declaration, for each requested visitor clearance "[a] Secret Service employee at the WAVES Center verifies that the requestor is authorized to make appointments for the specific location requested[.]" Murray Decl, ¶ 8. Although Mr. Murray does not explain how that verification is made, at a minimum it necessarily would require a confirmation of the EOP component at which each requestor is employed. Accordingly, the Secret Service's own records provide sufficient information to identify which appointments were made by employees of the EOP agency components.

Notwithstanding its own sworn testimony, the Secret Service insists it cannot produce visitor records for EOP agency components because it cannot ensure with absolute confidence that the requestor in all cases is from the component being visited, that each visit to an agency component involved only employees of that component, or that the visitor did not also meet with employees of non-agency components. Ds' Mem. at 24. In other words, the Secret Service seeks to be excused from its FOIA obligations because it cannot guarantee that all agency visitor information is accurate or that it pertains only to agency components. The FOIA, however, neither requires the responding agency to verify the accuracy of any requested information nor places a burden on the requestor to demonstrate that the records sought will be fully accurate.

As to Defendants' hypothesis that visitors to agency components also may have visited individuals in non-agency components, the mere possibility that visitors met with additional

---

[7]As an example, CREW understands the (fictitious) email address for "John E. Doe" of the Office of Management and Budget would be John_E_Doe@omb.eop.gov.

people beyond those they were admitted to visit and beyond what WAVES and ACR records for agency components of the EOP reflect does not justify excusing Defendants from their statutory obligation to produce the requested visitor logs for agency components. In any event, as Mr. Willson confirms, the WAVES records contain "no field to indicate the attendees at a meeting." Willson Decl. ¶ 10. Thus, any such visit would not be memorialized in the records Plaintiffs seek. Further, should a particular visitor record contain this information notwithstanding Mr. Willson's testimony, the Secret Service could redact it as non-responsive to any request for visitor records of agency EOP components.

The Secret Service also has failed to demonstrate that as a matter of law it "has made reasonable use of the information readily available to it" to determine what portions of the WAVES/ACR records can be produced. *Davis v. Dep't of Justice*, 460 F.3d 92, 98 (D.C. Cir. 2006) (quotation omitted). Relying on what they call "the limitations" of WAVES records that hinder the Secret Service in "definitively identifying" records of visits to agency components, Defendants reason that only with additional research or the assistance of other agencies could the Secret Service respond most accurately to Plaintiffs' request. Ds' Mem. at 24-25. As the agency responsible for providing protection for the entire White House compound, it is difficult to believe that the Secret Service does not already possess information identifying those employees who work at the White House and their employing EOP component. Tellingly, the Secret Service's declaration does not deny the agency has this information, instead stating only that it is not included as a field in the WAVES system. Willson Decl. ¶¶ 9-10.

Defendants also raise the specter of separation-of-powers concerns should the non-agency EOP components be enlisted to help identify those visitor records that pertain to agency components. Ds' Mem. at 25. As discussed, such assistance is not required for the Secret Service

21

to comply with its requirement here to produce records of visitors to EOP agency components. Plaintiffs have asked the Secret Service – an agency unquestionably subject to FOIA – to search for and release *its* responsive records, not records from any EOP component.

For these reasons, Defendants' motion for summary judgment should be denied at least with respect to records from EOP agency components subject to disclosure under the FOIA. *See Judicial Watch*, 726 F.3d at 232-33. Defendants may not refuse to release responsive records by relying on agreements that are contrary to their FOIA responsibilities, establishing an "accuracy" threshold for production that has no basis in FOIA, failing to make reasonable use of information available to the Secret Service, or raising spurious separation-of-powers claims.

## IV.   The Secret Service Has Failed to Demonstrate It Conducted an Adequate Search.

### A.   The Secret Service declarations do not meet the agency's burden of proof.

After promising for months to produce all responsive, non-exempt records of presidential visitors to Mar-a-Lago, excepting certain agreed upon narrow subcategories, the Secret Service provided Plaintiffs with a single email from the State Department listing the individuals associated with the Japanese Prime Minister's visit who would need access to Mar-a-Lago.[8] The government now argues its search for responsive records was "more than adequate," Ds' Mem. at 26, ignoring entirely the litany of omissions plaintiffs previously identified. *See* Ps' Show Cause Mem. (Dkt. 33-1) and Reply (Dkt. 41). The declarations submitted by Defendants fail to carry the government's burden of proving it conducted an adequate search in two key ways.

---

[8] Plaintiffs agreed to exclude records of local law enforcement officers who wanted a photo op with the president as well as certain family members, cabinet members, and senior White House staff who routinely would not have shown up in the White House automated visitor systems.

First, they indicate the Secret Service interpreted Plaintiffs' request in an unduly narrow manner, and second, they demonstrate Defendants' search terms were critically underinclusive.

An agency is entitled to summary judgment only if it demonstrates "beyond material doubt [ ] that it has conducted a search reasonably calculated to uncover all relevant documents." *Weisberg v. U.S. Dep't of Justice,* 705 F.2d 1344, 1351 (D.C. Cir. 1983). "[T]he agency bears the burden of showing that there is no genuine issue of material fact, even when the underlying facts are viewed in the light most favorable to the requester." *Id.* at 1350. An agency satisfies this burden with "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see also ACLU v. Nat'l Sec. Agency*, No. 13-civ-09198, 2017 U.S. Dist. LEXIS 44597, at *11 (S.D.N.Y. Mar. 27, 2017). "However, if a review of the record raises substantial doubt, particularly in view of 'well defined requests and positive indications of overlooked materials,' summary judgment is inappropriate." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) (quoting *Founding Church of Scientology v. Nat'l Sec. Agency,* 610 F.2d 824, 837 (D.C. Cir.1979)).[9]

---

[9] In ordinary circumstances, declarations submitted by an agency are accorded a presumption of good faith. *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994). Here, however, no such presumption is warranted because the government has yet to provide a satisfactory explanation for its abrupt about-face and failure to produce records as it promised and this Court ordered. Just like the First Campbell Declaration, the Second fails to state when the Secret Service conducted its searches, determined the nature and volume of the records it had, conducted an initial review, conducted its more granular review, processed the documents relating to the Japanese Prime Minister's visit, and referred documents to the EOP for consultation. *See* Ps.' Show Cause Reply at 7. These dates are critical in evaluating, for example, the government's reliance on the absence of any formal system of records to justify the time it consumed to produce a single document and its failure to locate other records. 2d Campbell Decl. ¶¶ 9-11, 13. Given that Defendants conveyed that information to Plaintiffs early

The record put forth by the government in its declarations raises substantial doubts about the adequacy of the Secret Service's search for responsive records. Plaintiffs made a straightforward request for three categories of records: (1) WAVES and ACR records from January 20, 2017 to March 8, 2017; (2) records of presidential visitors at Mar-a-Lago from January 20, 2017 to March 8, 2017; (3) and similar records from Trump Tower.[10] Plaintiffs made every effort to help the government understand the scope of their requests to move this case along in an expeditious manner, agreeing to exclude certain categories of visitors. *See* n.8 *supra*. Nevertheless, in response the government repeatedly made unreasonable assumptions about the scope of Plaintiffs' FOIA requests, whittling them away until there was nothing left but the two pages that the Secret Service felt compelled to disclose. As to WAVES and ACR records, the Secret Service admits it "did not seek to search for, locate, or process [WAVES or ACR] records," 2d Campbell Decl. ¶ 7, all but conceding its search was inadequate as to those records.

Defendants' declarations raise additional questions of material fact about the adequacy of their searches that preclude summary judgment. The Secret Service explains it identified three offices[11] that "could potentially have access to responsive documents," *id.* ¶16, but does not explain why it was reasonable to look only at records from specific components of those offices. Under comparable circumstances, courts have deemed agency searches inadequate. *See Aguiar v. Drug Enf't Admin.*, 865 F.3d 730, 739 (D.C. Cir. 2017) (agency declarations deemed inadequate because "while they explain how the agency found the two case files, they do not explain why

---

on in this litigation, there is reason to question what the government knew and when – questions the declarations do not answer.

[10] The Trump Tower records were set aside by agreement of the parties since President Trump did not visit that property during the requested time-period.

[11] The Office of Strategic Intelligence and Information, the Office of Investigations, and the Office of Protective Operations. 2d Campbell Decl. ¶ 16.

the only reasonable place to look for the subpoenas was in case files maintained in the IRFS system."); *Rodriguez v. Dep't of Def.*, 236 F. Supp. 3d 26, 36 (D.D.C. 2017) (denying summary judgment because the agency failed to explain why the search was limited to certain agency subdivisions). Here, the decision by the Secret Service to limit the components it searched carried great significance because it limited the scope of searches for both paper and electronic records, including the search of email records in the Enterprise Vault ("E-Vault"). 2d Campbell Decl. ¶¶ 17-20. Accordingly, its failure to explain *why* that decision was reasonable is grounds for denying summary judgment. *Aguiar*, 865 F.3d at 739.

Further, the search terms employed by the Secret Service to search its E-Vault fall woefully short of the "standard of reasonableness" required of Defendants, *Coffey v. Bureau of Land Mgmt.*, 249 F. Supp. 3d 488, 498 (D.D.C. 2017), especially given the Secret Service's representation that it has no system for tracking visitors to Mar-a-Lago. 2d Campbell Decl. ¶¶ 11, 13. The Secret Service states that it searched its E-Vault using the following keyword search terms:

> MAL **OR** Mar-a-Lago **OR** Mar a Lago **AND** at least one of the following terms: guest **OR** appointment **OR** visitor **OR** meet **OR** meeting **OR** clear **OR** cleared **OR** sweep **OR** swept **OR** checkpoint **OR** check point **OR** check **OR** [abbreviation for sensitive security program] **OR** background.

*Id.* ¶ 20. Glaringly absent from this list is the word "visit" even though that word falls at the heart of Plaintiffs' FOIA requests and a variation of the term ("visitor") and a synonym ("meeting") are included. Although "keyword searches in response to FOIA requests are routine," *Freedom Watch, Inc. v. Nat'l Sec. Agency*, 220 F. Supp. 3d 40, 45 (D.D.C. 2016), there is an enormous difference between searching for "visit" as opposed to "visitor" because keyword searches only return records that match the precise sequence of characters included in the search term. *See United States v. Triumph Capital Grp., Inc.*, 211 F.R.D. 31, 50 (D. Conn. 2002) ("Keyword

searches are limited because they are literal and search only for an exact sequence of characters."); The Sedona Conference Best Practices Commentary on the Use of Search & Information Retrieval Methods in E–Discovery, 8 Sedona Conf. J. 189, 201 (2007). Indeed, the inclusion of a longer term that would yield fewer results in lieu of a shorter term that would yield more is precisely the kind of practice courts have found unreasonable. *Immigrant Def. Project v. U. S. Immigration & Customs Enf't*, 208 F. Supp. 3d 520, 529 (S.D.N.Y. 2016) (holding that searches for words in the plural form rather than the singular is unreasonable).

While the Secret Service need not have used every term that could possibly yield results, it does bear the burden on summary judgment of explaining why it failed to use terms that could capture additional responsive documents, *id.* at 528, a burden it has not met here. For example, although the Secret Service included words that would yield records of individuals who were "clear" or "cleared," it did not explain why its search did not include other, closely related terms to capture records that clearly would be responsive to Plaintiffs requests, such as "approval," "authorize" or "authorization." Although there may be valid reasons why the Secret Service settled on the search terms it chose, the Second Campbell Declaration does not answer the many questions raised above. At this stage, the government's failure to come forth with the required detailed declarations is fatal to its motion for summary judgment.

### B.    Publicly available information casts further doubt on the Secret Service's assertions and production.

Publicly available information Plaintiffs have been able to gather about presidential visitors to Mar-a-Lago also calls into question the adequacy of the Secret Service's search and the government's representations that it does not maintain records of visitors at Mar-a-Lago. On October 16, 2017, *ProPublica* reported that "seven Mar-a-Lago members and their guests told *ProPublica* that uniformed officers, who appear to be Secret Service, stand at the doors of the

resort on weekends when the president is there, and hold lists of people approved for access."[12] *ProPublica* also reported that "the Secret Service also regularly conducts criminal background checks on any guests or staff members who will spend more than a passing moment in physical proximity to the president."[13] This information directly contradicts the government's assertion that "the Secret Service does not maintain any system for keeping track of visitors at Mar-a-Lago." Ds' Mem. at 27; 2d Campbell Decl. at ¶ 11.

In addition, the Secret Service offers no explanation for the lack of records pertaining to other individuals known to have visited President Trump at Mar-a-Lago. For example, the government's production does not include any records for or mention of Wilbur Ross or Robert Kraft, who have been publicly identified as meeting with the president during the periods covered in plaintiffs FOIA requests.[14] And even as to that category, the government failed to produce the promised additional two documents containing the president's travel schedules to Palm Beach, Florida for Friday, February 10 and Saturday, February 11, 2017. *See* Aug. 3, 2017 Letter from Brad Rosenberg to Anne Weismann (Dkt. 33-6). Media reports and social media photographs further show that President Trump met with individuals attending the wedding of Carl Linder IV on February 11 at Mar-a-Lago, the same weekend President Trump met with the Japanese Prime Minister.[15] At the wedding, President Trump met with several individuals,

---

[12] Leora Smith and Derek Kravitz, <u>The White House Says It Doesn't Keep a List of Mar-a-Lago Visitors. Experts and Visitors Are Skeptical</u>, *ProPublica*, Oct. 16, 2017, *available at* <u>https://www.propublica.org/article/white-house-says-doesnt-keep-list-mar-a-lago-visitors-experts-visitors-skeptical</u>.

[13] *Id.*

[14] *See* <u>https://twitter.com/Scavino45/status/830239486831448064</u>; <u>https://www.instagram.com/p/BQW5PvhjUVV/</u>; Sam Dangremond, <u>Donald Trump is Spending Thanksgiving at Mar-a-Lago</u>, *Town and Country*, Nov. 20, 2017, *available at* <u>http://www.town</u> andcountrymag.com/society/politics/news/a9923/doanld-trump-mar-a-lago/.

[15] Chrissie Thompson and Jessie Balmert, <u>That Wedding Trump Crashed? It was a Lindner's</u>, *Cincinnati.com*, Feb. 13, 2017, *available at*   <u>https://www.cincinnati.com/story/news/politics</u>

including Vanessa Falk, Joyce Farly Hitt, George Kline Preston V, and Carl Lindner.[16] The Secret Service searched for and located records pertaining to the Japanese Prime Minister's visit from the same weekend, but offers no explanation for the absence of records pertaining to these individuals publicly identified as visiting President Trump.

## V.   Defendants Have Failed to Comply with Their Obligations to Produce Non-Exempt Agency Records of Presidential Visitors to Mar-a-Lago.

Summary judgment should also be denied because Defendants have failed to produce additional responsive documents and attempt to justify that decision with two novel and baseless theories. First, Defendants assert, without basis in FOIA, that they may withhold agency records that "contain, reflect or directly relate to the President's schedule." Ds' Mem. at 20. Second, Defendants assert, again with no support in FOIA, newly minted exemptions for "operational records" and records that contain "already public" information. The Court must therefore conclude that Defendants are not entitled to summary judgment with respect to Plaintiffs' request for records of presidential visitors to Mar-a-Lago.

### A.   Defendants improperly excluded "presidential schedule information" from their production of Mar-a-Lago visitor records.

Drawing on the *Judicial Watch* decision, Defendants attempt to carve out an overly broad and amorphous category they describe as "documents that contain, reflect or directly relate to the President's schedule." Ds' Mem. at 20. The *Judicial Watch* Court applied the doctrine of constitutional avoidance to conclude that "logs of visits to the Office of the President" were

---

/2017/02/13/wedding-donald-trump-crashed-carl-lindner/97855288/; https://www.facebook.com/photo.php?fbid=10154404278223123&set=a.202779258122.134261.689033122&type=3&theater. Carl Linder IV is the son of Carl Linder III, the co-CEO of American Financial Group and a major donor to Republican groups. *Id.*

[16] https://www.cincinnati.com/story/news/politics/2017/02/13/wedding-donald-trump-crashed-carl-lindner/97855288/.

agency records within the meaning of the FOIA. 726 F.3d at 224, 231. Defendants further

attempt to extract from *Judicial Watch* an even broader and more unsustainable rule that

documents that merely relate to information about the president's schedule are also, as a matter

of law, beyond FOIA's reach. This assertion defies reason and decades of FOIA practice and, if

adopted, would mean information contained in agency documents that merely references in some

way an appointment with not only the president, but also anyone within a non-agency component

of the EOP, cannot be accessed through FOIA.

Agencies routinely disclose under FOIA agency records that mention, refer to, or

otherwise reflect the president and exempt components. For example, in response to a FOIA

request by Plaintiff CREW for select pages from the calendar of Attorney General Jeff Sessions,

the DOJ released documents that included White House events and meetings that, under the

government's theory, must be treated as presidential records beyond FOIA's reach. *See* Ex. A. A

posted cache of calendars for former Attorney General Eric Holder reveals similar information

about White House meetings – information that could not be obtained directly from the White

House under FOIA, but has been readily available from agency heads.[17] Similarly, in *Judicial*

*Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108 (D.C. Cir. 2004), the Court addressed a FOIA

request seeking pardon documents from the DOJ that included documents solicited and received

by the president and top aides concerning individual pardon petitions. The Court upheld the

government's reliance on the presidential communications privilege to protect these documents

from disclosure pursuant to Exemption 5 of FOIA. *Id.* at 1123. Of significance here, these same

documents would have been treated as presidential records not accessible through FOIA while in

---

[17] *See, e.g.*, https://www.justice.gov/oip/foia-library/ag-cal-january2013/download (January 2013 calendars for Attorney General Holder, which include, for example, scheduled meetings with the Vice President).

the hands of the president and his staff but, when requested from DOJ, were treated as agency records under FOIA. Plaintiffs know of no examples – and Defendants cite none – where agency records that in some way reflect information about the activities of the president or another White House official have been treated as presidential records not accessible through FOIA.

> ### B.   The Secret Service's claim that "operational records" and "public information" are not responsive has no support in FOIA.

Defendants also seek to exclude public information and a category they denominate as "operational records," a term lacking any distinct meaning or significance within the context of FOIA. Ds' Mem. at 29. According to the Secret Service, it need not "expend resources processing these records" because they would yield only "a minute amount of already public information." Ds' Mem. at 29. And while Defendants represent that these documents "relate[] to the Japanese Prime Minister's visit" to Mar-a-Lago, they nevertheless characterize them as "not responsive to the request for Presidential visitors at Mar-a-Lago." *Id.* In other words, the Secret Service is claiming that it either has the authority to create new FOIA exemptions for "operational records" and information that is "already public" or that it has the discretion to decide how many of the requested records to produce. The government is wrong on both points.

Congress did not delegate to agencies the authority to determine what types of records may be requested under the FOIA. Instead, Congress mandated that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, *shall make* the records promptly available to any person." 5 U.S.C. § 552(a)(3) (emphasis supplied). Congress also carved out nine exemptions on which agencies may rely to withhold specified categories of information from disclosure, 5 U.S.C. § 552(b), but explicitly declined to give agencies the authority to withhold information that does not fall within these exemptions. *See* 5

U.S.C. § 552(d) ("This section does not authorize withholding of information or limit the availability of records to the public, except as specifically stated in this section."); *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) ("These exemptions are explicitly made exclusive and must be narrowly construed.") (internal citations and quotations omitted).

Here, the Secret Service does not and cannot point to any exemption for "operational records" or for information that is "publicly known." In the absence of an applicable exemption, Plaintiffs are entitled to receive all non-exempt documents that match the description of information they have requested, regardless of whether certain documents contain duplicative information. Moreover, Defendants have provided no evidence or explanation of what this purportedly duplicative information in fact is, much less where it can be found in the public domain. While courts have permitted agencies to withhold duplicate copies of the same document, they have not accorded agencies the power to assess which of several similar documents to produce. *See Leopold v. CIA*, 177 F. Supp. 3d 479, 490 (D.D.C. 2016) (rejecting the idea that "where there are similar but not identical documents, the government may choose which one to produce").[18]

The authorities on which the government relies do not hold to the contrary, but instead simply demonstrate that an agency does not have to produce documents that already have been made public or that already have been produced by another agency,[19] situations not present here.

---

[18] In at least one instance a district court has recognized there may even be circumstances in which an agency must produce records identical to those previously disclosed "in order to obtain a new piece of information." *Nat'l Sec. Counselors v. C.I.A.*, 931 F. Supp. 2d 77, 104 (D.D.C. 2013).

[19] *See Crooker v. U.S. State Dep't*, 628 F.2d 9, 10 (D.C. Cir. 1980) (FOIA "does not require that the agency from which documents are requested must release copies of those documents when another agency possessing the same material has already done so."); *Freedberg v. Dep't of the Navy*, 581 F. Supp. 3, 4 (D.D.C. 1982) ("Once such documents are open for inspection by the general public, there is no longer any matter in controversy before the Court under FOIA.");

*See* Ds' Mem. at 29. Instead, the Secret Service is claiming the discretion to choose which of several responsive records to produce—a power that neither FOIA nor courts interpreting it have recognized. In addition, the government's own assertion that there are only a "small number" of these documents, *id.*, undermines its claim that processing them would impose an unjustified burden and expense given their purportedly duplicative nature.

## VI.    Plaintiffs Have Stated Valid, Judicially Reviewable Claims Under the Federal Records Act and the Presidential Records Act.

Plaintiffs' FRA and PRA claims stem from Defendants' efforts to convert federal records into presidential records through the vehicle of a 2006 MOU that declared all the records of visits to agency components of the EOP to be, at all times, under the exclusive ownership, control, and custody of the president, vice president, or originating EOP component. 2006 MOU ¶¶ 17(a), 18. Defendants entered into this MOU just after CREW commenced other litigation over the legal status of White House visitor records,[20] in an apparent effort to evade FOIA's disclosure obligations. Defendants' motion lacks any legal basis.

First, based on an unduly narrow construction of the PRA and the caselaw interpreting that statute, Defendants advance the sweeping argument that courts can hear virtually no PRA claims, including those of Plaintiffs. Defendants' arguments find no support in *Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ("*Armstrong I*"), on which they principally rely. In *Armstrong I*, the D.C. Circuit addressed the interplay between the PRA and the FRA and the

---

*Triestman v. U.S. Dep't of Justice,* 878 F. Supp. 667, 672 (S.D.N.Y. 1995) (granting summary judgment against a plaintiff who requested documents about several DEA agents from public proceedings and statements).

[20] The MOU is dated May 17, 2006, just one week after CREW filed its first complaint seeking specified White House visitor records, *CREW v. Dep't of Homeland Security*, Civil No. 06-0883 (RCL) (D.D.C.) (Complaint attached as Exhibit B).

degree to which courts could review a president's decisions and actions under each statute. The court concluded that with respect to the PRA, Congress intended to preclude judicial review "of the president's general compliance with the PRA," albeit by implication, not expressly. *Id.* at 291. Left unanswered was the breadth of the preclusion for issues involving a president's "general compliance with the PRA."

Two years later, the D.C. Circuit narrowed and further explained the scope of this preclusion in *Armstrong v. Exec. Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993) ("*Armstrong II*"), when it held "courts are accorded the power to review guidelines outlining what is, and what is not, a 'presidential record' under the terms of the PRA." *Id.* at 1290. In reaching this conclusion, the court expressly declined to construe its *Armstrong I* decision as "stand[ing] for the unequivocal proposition that all decisions made pursuant to the PRA are immune from judicial review," *id.* at 1293, and eschewed an interpretation of the PRA that would deprive courts of the ability to review "the initial classification of materials as presidential records." *Id.* at 1294. Most significantly for this case, the *Armstrong II* Court emphasized that the PRA's definition of agencies as defined in FOIA (*see* 5 U.S.C. § 552(f)) mandates "a narrow, clearly defined limitation on the scope of the PRA . . . to prevent[] the PRA from becoming a potential *carte blanche* to shield materials from the reach of the FOIA." 1 F.3d at 1292. Judicial review of classification decisions, which necessarily include decisions that classify a record as presidential or agency, is essential to prevent the improper classification of an agency record as a presidential record, "forever remov[ing]" it from FOIA's provisions. *Id.* at 1293.

Accepting defendants' argument here that this Court cannot hear plaintiffs' PRA claims would lead precisely to the result the *Armstrong II* Court condemned as inconsistent with "the critical role of judicial review under the FOIA" that is necessary to "avoid[] a conflict between

33

the PRA and the FOIA." *Id.* at 1292. Plaintiffs challenge here the attempt by the EOP, though the vehicle of a 2006 MOU, to shield WAVES and ACR records from FOIA by labeling them presidential records from their inception. With their motion to dismiss, Defendants now proffer a second MOU that echoes this same ownership claim by the EOP. 2015 MOU. Both agreements, however, ignore the critical fact that the Secret Service creates WAVES and ACR records in performance of its core statutory function to protect the president, vice president, and White House compound. As discussed *supra*, this necessarily means they are created as agency records – a classification that is mutually exclusive from presidential records. *Id.* at 1292. Absent review of this classification decision, these records will forever be beyond FOIA's reach, a result that is "tantamount to allowing the PRA to functionally render the FOIA a nullity." *Archives II*, 1 F.3d at 1293. To maintain the integrity of the line Congress drew between agency records, which are subject to FOIA, and presidential records, which are not, this Court must be able to review the improper classification decision the MOUs embody. Denying review would cede to the president unchecked power to wrest control from agencies of records the president seeks to shield from the public access that Congress mandated.

For similar reasons, this Court also may hear Plaintiffs' FRA claims, which represent the flip side of their PRA claims by challenging the Secret Service's failure to treat the WAVES and ACR records as agency records under the FRA. As with the PRA, this Court may review the adequacy of an agency's recordkeeping guidelines and directives under the FRA. *Armstrong I*, 924 F.2d at 292. Such review is available here to challenge the agency's functional classification of WAVES and ACR records as presidential records by declaring them "at all times Presidential Records," 2006 MOU ¶ 17(a), and "under the exclusive ownership, control, or custody of the President, Vice President, or originating EOP component." 2015 MOU, § 3.01.

In arguing against judicial review, Defendants disingenuously characterize the 2015 MOU as silent as to whether ACR and WAVES records "belong to an agency or non-agency component of EOP." Ds' Mem. at 32. Plaintiffs' claim is not that ACR and WAVES records belong to agency components of EOP, but that they are agency records of the Secret Service – the agency that created and controls them. Nor are Plaintiffs challenging the destruction or alienation of agency records, as Defendants suggest, *id.* at 32-33, or using the FRA to challenge the failure of the Secret Service to segregate agency records for disclosure under the FOIA. *Id.* at 33. Plaintiffs' FRA claims stem wholly from the Secret Service's unlawful treatment of its agency records as presidential, as memorialized in the 2006 and 2015 MOUs. This classification decision falls precisely within the boundaries of those FRA issues subject to judicial review.

Finally, declaratory relief is available here to address these violations. Defendants assert plaintiffs cannot seek relief under the Declaratory Judgment Act because they have failed to state claims under the PRA, FRA, and Administrative Procedure Act. Ds' Mem. at 35. To the contrary, as discussed, Plaintiffs have properly alleged violations of the FRA and PRA by defendants that are reviewable and justiciable by this Court. This case presents an actual and adversarial issue that entitles Plaintiffs to declaratory relief.

## CONCLUSION

For the foregoing reasons, Defendants motion for summary judgment and to dismiss must be denied.

December 4, 2017                                        Respectfully submitted,

                                                         /s/ *Anne L. Weismann*
                                                        _____
                                                        Anne L. Weismann
                                                        Conor Shaw
                                                        455 Massachusetts Avenue, N.W.
                                                        Washington, D.C.  20001
                                                        (202) 408-5565

aweismann@citizensforethics.org

Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
Columbia University
206 Kent Hall
1140 Amsterdam Avenue
New York, New York 10027
(202) 854-9600
alex.abdo@knightcolumbia.org

*Counsel for Plaintiffs*