USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 26, 2018____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                     :

KATE DOYLE, NATIONAL SECURITY  :
ARCHIVE, CITIZENS FOR              :
RESPONSIBILITY AND ETHICS IN   :
WASHINGTON, and KNIGHT FIRST  :
AMENDMENT INSTITUTE AT COLUMBIA :
UNIVERSITY,                   :
                                       :

                  Plaintiffs,  :        17 Civ. 2542 (KPF)
                                :
           v.                :        OPINION AND ORDER
                                :

U.S. DEPARTMENT OF HOMELAND    :
SECURITY and EXECUTIVE OFFICE OF :
THE PRESIDENT,             ;
                                :
                 Defendants.  :
------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

      Plaintiffs Kate Doyle, National Security Archive ("NSA"), Citizens for

Responsibility and Ethics in Washington ("CREW"), and Knight First

Amendment Institute (collectively, "Plaintiffs") initiated this action against the

United States Department of Homeland Security ("DHS") and the Executive

Office of the President ("EOP," and with DHS, "Defendants"), after Doyle

unsuccessfully attempted to obtain, under the Freedom of Information Act

("FOIA"), 5 U.S.C. § 552, records related to visitors of President Trump at the

White House Complex, as well as at his properties at Trump Tower, in New

York, and Mar-a-Lago, in Florida.  The operative complaint brings claims under

FOIA, the Administrative Procedure Act ("APA"), 5 U.S.C. ch. 5, the Federal

Record Act ("FRA"), 44 U.S.C. §§ 2102-2118, 2901-2910, 3101-3107,

3301-3324, and the Presidential Records Act ("PRA"), 44 U.S.C. §§ 2201-2209; it seeks injunctive relief and, under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, declaratory relief.

Defendants have moved for summary judgment on Plaintiffs' FOIA claims and to dismiss the remainder of Plaintiffs' claims for lack of subject matter jurisdiction and, alternatively, for failure to state a claim.  For the reasons that follow, the Court grants in part and denies in part Defendants' motion for summary judgment, and grants Defendants' motion to dismiss in full.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   The Parties

##### a.   The Plaintiffs

"Plaintiff [NSA] is an independent, non-governmental, non-profit research institute organized under section 501(c)(3) of the Internal Revenue Code."  (Am. Compl. ¶ 5).  The NSA obtains government documents through FOIA, and "collects, analyzes, and publishes" them "to enrich scholarship and

---

[1]    This Opinion draws on factual allegations in the Amended Complaint (Dkt. #32 ("Am. Compl.")), along with the declarations submitted by the parties in support of, and in opposition to, the instant motions and the exhibits attached thereto.  Those declarations consist of the following: for Defendants, the Second Declaration of Kim E. Campbell, Special Agent in Charge, Liaison Division, and FOIA Officer, United States Secret Service (Dkt. #46 ("Campbell Decl.")), the Declaration of James M. Murray, Deputy Assistant Director, Office of Protective Operations, United States Secret Service (Dkt. #47 ("Murray Decl.")), the Declaration of Supervisory Information Technology Specialist William Willson, United States Secret Service (Dkt. #48 ("Willson Decl.")), the Declaration of Philip C. Droege (Dkt. #49 ("Droege Decl.")), and the Declaration of Charles Christopher Herndon (Dkt. #50 ("Herndon Decl.")); and for Plaintiffs, the Declaration of Anne L. Weismann (Dkt. #52-1 ("Weismann Decl.")).  For ease of reference, the Court refers to Defendants' memorandum of law in support of their motions for summary judgment and dismissal (Dkt. #51) as "Def. Br."; Plaintiffs' memorandum of law in opposition to the motions (Dkt. #52) as "Pl. Opp."; and Defendants' reply to Plaintiffs' opposition (Dkt. #55) as "Def. Reply."

journalism … , and to promote openness and government accountability." (*Id.*).
Plaintiff Kate Doyle is a senior analyst focusing on United States policy in Latin
America, who works in NSA "to open and analyze government files, including
through the use of the FOIA." (*Id.* at ¶ 4).

"Plaintiff CREW is a non-profit, non-partisan organization organized
under section 501(c)(3) of the Internal Revenue Code." (Am. Compl. ¶ 6).
CREW advocates for government openness and accountability through "a
combination of research, litigation, and advocacy." (*Id.*). A similar operation,
Plaintiff Knight First Amendment Institute at Columbia University is a New
York not-for-profit corporation seeking "to preserve and expand the freedoms of
speech and the press" through "litigation, research, and public education." (*Id.*
at ¶ 7). Both organizations utilize FOIA requests in furtherance of their
missions. (*See id.* at ¶¶ 6-7).

### b.    The Defendants

DHS is a federal agency that includes, as one of its components, the
United States Secret Service, which is required by statute to provide security to
the President and Vice President. *See* 18 U.S.C. §§ 3056(a)(1), 3056A(a)(4).
Acceptance of the Secret Service's protection is mandatory for the President,
Vice President, President-elect, and Vice President-elect. *See Judicial Watch,
Inc.* v. *U.S. Secret Serv.*, 726 F.3d 208, 211 (D.C. Cir. 2013) (citing Pub. L. No.
98-587, 98 Stat. 3110 (1984) (codified at 18 U.S.C. § 3056(a)). (*See also*
Murray Decl. ¶ 3). The Secret Service's protection also extends to the edifices

associated with the offices of the President and Vice President.  *See* 18 U.S.C.
§ 3056A(a).

The Executive Office of the President (the "EOP") comprises various
bodies, including the White House Office, which, in turn, includes the
President's immediate staff, the White House Counsel's Office, and the Staff
Secretary's Office.  (Herndon Decl. ¶ 2).  The EOP also encompasses the
Council on Environmental Quality ("CEQ"); the Office of Management and
Budget ("OMB"); the Office of National Drug Control Policy ("ONDCP"); the
Office of Science and Technology Policy ("OSTP"); and the Office of the United
States Trade Representative ("USTR").  (Am. Compl. ¶ 9).

### 2.    Records of Presidential Visitors

Plaintiffs seek from the DHS records maintained by the Secret Service
spanning the period of January 20, 2017, through March 8, 2017, related to
visits to the White House and to President Trump at his Mar-a-Lago and Trump
Tower residences.  (*See* Am. Compl. ¶¶ 1, 34, 39).  DHS contends that although
the security responsibility of the Secret Service extends to the White House
Complex, it "does not have a similar statutory authority to protect Mar-a-Lago
or Trump Tower."  (Murray Decl. ¶ 3).  The declarations that DHS has
submitted in support of its motions thus focus on the policies and procedures
attendant to records of White House Complex visitors, and this section
summarizes those guidelines.

### a.    Records of White House Complex Visitors

In order to vet, identify, and monitor visitors to the White House Complex, the Secret Service employs two interconnected electronic systems: (i) the Executive Facilities Access Control System ("EFACS"), through which the Secret Service controls and monitors White House Complex access; and (ii) the Worker and Visitor Entrance System ("WAVES"), which the Secret Service uses to vet visitors to the White House Complex.  (Murray Decl. ¶¶ 6-7).

Authorized White House Complex passholders may request permission for a visitor to the White House Complex by providing visitor information to the Secret Service through a system called "Appointment Center" or the "WAVES Request System" ("WRS").  (Murray Decl. ¶ 8).  Through these systems, WAVES gathers information related to prospective visitors, which information allows a Secret Service member to verify that the requestor is authorized to make appointments for the location requested, to acquire additional information, to conduct a background check, and to transmit the information to the EFACS server.  (*Id.*).  WAVES records include a variety of information fields, such as whether a visit is related to a certain event at the White House Complex or is subject to certain restrictions.  (*Id.* at ¶ 9).

When an individual receives approval to visit the White House Complex, he or she typically receives a badge to "swipe" over electronic badge readers located at entrances and exits to the White House Complex; each swipe generates an "Access Control Record" ("ACR") within the EFACS system. (Murray Decl. ¶ 10).  An ACR contains information such as the visitor's name,

and the date, time, and location at which the ACR was generated, which, "[o]nce a visit takes place," is integrated into the WAVES records. (*Id.* at ¶¶ 10-11). These aggregated records contain information identifying the visitor, visitee, and individual who made the appointment; as well as details of the visit, such as the points of entry and departure, the type of escort the visit requires, and whether the visit involved a highly sensitive meeting. (Willson Decl. ¶ 7). This dispute principally revolves around WAVES and ACR records.

### b. Recordkeeping Practices Related to WAVES and ACR Records

DHS contends that because the Secret Service utilizes WAVES records to vet potential visitors and verify visitors' admissibility at the time of a visit, the Secret Service ceases to have an interest in maintaining such information after the completion of a visit. (*See* Murray Decl. ¶¶ 8, 13). Thus, "[s]ince at least 2001," the Secret Service has maintained a practice of transferring WAVES records to the White House Office of Records Management ("WHORM") "generally every 30 to 60 days." (*Id.* at ¶ 13; *see also* Droege Decl. ¶ 4). "[A]s early as 2001," the White House and Secret Service agreed that ACR records "should be treated in a manner generally consistent with WAVES records," and thus, "[s]ince at least 2006," the Secret Service has transferred ACR records to the WHORM every 30 to 60 days. (Droege Decl. ¶ 5).

"[S]ince at least 2009," the Secret Service has transferred WAVES records to WHORM every 30 days. (Murray Decl. ¶ 13; *see also* Willson Decl. ¶ 5; Droege Decl. ¶ 4). After transferring the records, "[i]t is the intent of the Secret Service" that the records "be erased from [their] computer system," and WAVES

6

records over 60-days old are normally "auto-deleted" and "overwritten on the servers." (Murray Decl. ¶ 13; *see also* Willson Decl. ¶ 6 ("Records that are older than 60 days are ordinarily auto-deleted from the server operated by the Secret Service on a rolling basis.")).[2]  "Currently, the after-visit records that are transferred to the WHORM constitute a combination of WAVES and ACR information." (Murray Decl. ¶ 15).

In May 2006, the Secret Service Records Management Program and WHORM entered into a Memorandum of Understanding (the "2006 MOU"), which reflected the above practices regarding WAVES and ACR records.  (*See* Murray Decl. ¶ 14; Droege Decl. ¶ 6.  The 2006 MOU also expressed the Secret Service's and WHORM's understanding that such records "are at all times Presidential Records," "are not Federal Records," and "are not the records of an 'agency' subject to the Freedom of Information Act[.]" (Murray Decl., Ex. A at ¶ 17).  The 2006 MOU also provided that (i) such records "are at all times under the exclusive legal custody and control of the White House"; (ii) only the White House has a "continuing interest" in such records; (iii) "the Secret Service has no continuing interest in preserving or retaining" such records; and (iv) the Secret Service "will regularly transfer" such records to WHORM.  (*Id.*, Ex. A at ¶¶ 18, 20-22).

---

[2]     Because of pending litigation, and with White House permission, as of August 19, 2017, the Secret Service disabled the auto-delete function for WAVES records.  (Murray Decl. ¶ 21).  "The Secret Service will maintain a copy of the WAVES and ACR records that are sent to the WHORM during the pendency of that litigation, as well as this case." (*Id.*).

On March 19, 2015, President Obama issued a memorandum creating the position of the Director of White House Information Technology ("DWHIT"), who is "responsible for the information resources and information systems provided to the President, Vice President and [EOP]." (Herndon Decl. ¶¶ 1, 3). The memorandum also established the Presidential Information Technology Community in order to "bring[] various [information] systems and resources into a single community under the auspices of the DWHIT," which "would enhance the security of those systems and resources." (*Id.* at ¶¶ 3-4). Pursuant to the authority vested by President Obama's memorandum and in furtherance of the aims of that memorandum, in September 2015, the Presidential Information Technology Community entered into a Memorandum of Understanding with the member-entities of the Presidential Information Technology Community (the "2015 MOU"), including the Secret Service,[3] which MOU purported to provide protocols governing its operations. (*Id.* at ¶¶ 5-6).

The 2015 MOU provides that "[a]ll records created, stored, used, or transmitted by, on, or through the unclassified information systems and information resources provided to the President, Vice President, and EOP shall remain under the exclusive ownership, control, and custody of the President, Vice President, or originating EOP component." (Murray Decl. ¶ 17 (alteration in original); *see also* Herndon Decl. ¶¶ 8-9). Pursuant to the 2015 MOU — and despite the facts that the "WAVES servers are located at the Secret Service's

---

[3]     The other members of the Presidential Information Technology Community consist of the National Security Council, the Office of Administration, the White House Military Office, and the White House Communications Agency. (Herndon Decl. Ex. A, at 3).

headquarters ... and Secret Service personnel operate this machinery" — DHS maintains that "the President is the business owner of the EFACS and WAVES systems, and the Secret Service operates those systems on behalf of the President, acting as a service provider." (Murray Decl. ¶ 16).  As a result of the 2015 MOU, after a visit has concluded, the Secret Service must request permission from the White House to view records of the visit, and if the records have been transferred to WHORM, the Secret Service must also contact WHORM to access the records.  (*Id.* at ¶ 19).  The Secret Service must similarly request permission from the DWHIT to modify the WAVES or EFACS systems. (*Id.* at ¶ 20).

Under the Obama Administration, on September 15, 2009, the White House implemented a policy of voluntarily disclosing certain information contained in WAVES and ACR records.  (Droege Decl. ¶ 12).  This disclosure policy contained various exceptions, including information implicating personal privacy or law enforcement concerns, personal safety of EOP staff, and national security concerns.  (*Id.* at ¶ 13).  The current administration rescinded this policy on April 14, 2017.  (*Id.* at ¶ 14).

### 3.    The FOIA Requests Preceding This Litigation

#### a.    Plaintiffs' FOIA Requests

Plaintiffs allege that on January 23, 2017, Plaintiff Kate Doyle sent a FOIA request via facsimile to the Secret Service "requesting all WAVES and ACR records for" January 20 through January 22, 2017.  (Am. Compl. ¶ 34). More specifically, Doyle requested 28 data fields that were previously made

available to the public through the Obama Administration's Visitor Records Requests website. (*Id.*). After receiving no response from the Secret Service, on February 24, 2017, Doyle sent an administrative appeal of her request to the Secret Service via facsimile. (*Id.* at ¶ 35). DHS contends that it has no record of receiving either the initial request or the administrative appeal, but it acknowledges that after filing the complaint in this case, Plaintiffs provided documentation indicating that both the request and administrative appeal had been faxed to the DHS. (Campbell Decl. ¶¶ 4-5).

In any event, on March 10, 2017, Plaintiffs sent a second FOIA request to the Secret Service, seeking the extraction of the same 28 data fields from (i) "all WAVES and ACR records from January 20, 2017 until March 8, 2017," and (ii) "records of presidential visitors at Mar-a-Lago and Trump Tower from January 20, 2017 to March 8, 2017." (Am. Compl. ¶ 39). This second request also sought expedited processing "in light of [Plaintiffs'] significant concerns … about how President Trump [was] using his private properties at Mar-a-Lago and Trump Tower, the extensive media coverage of this issue, and the refusal of the President to date to commit to releasing the visitor logs data." (*Id.* at ¶ 40). Unlike the first request, DHS acknowledges receiving this request, to which DHS responded by letter on April 11, 2017, in which it denied Plaintiffs' request for expedited treatment. (*See* Campbell Decl. ¶ 6; *id.* at Ex. A).

### b.    The Secret Service's Response to the Requests

In response to Plaintiffs' FOIA requests, DHS maintains that WAVES and ACR records are not Secret Service records, but rather are Presidential Records

not subject to FOIA; DHS therefore "did not seek to search for, locate, or process these records." (Campbell Decl. ¶ 7). Further, "the Secret Service "was aware that President Trump had not traveled to Trump Tower during the requested time period" and "after confirming this information, the Secret Service did not seek to search for the material requested by Plaintiffs." (*Id.* at ¶ 8).[4]

The Secret Service handled Plaintiffs' request for information regarding Mar-a-Lago visitors in a different fashion. Although the Secret Service "easily … confirmed" that it did not "utilize WAVES or ACR records at Mar-a-Lago, it was unclear what, if any, record systems or record groupings might exist in regard to who visited the President at Mar-a-Lago, or where such record systems or record groupings might be located." (Campbell Decl. ¶ 9). The Secret Service thus undertook a set of searches "to determine what, if any, record systems or record groupings existed that might contain information potentially responsive to Plaintiffs' request,"[5] but according to DHS, this search ultimately revealed "no system for keeping track of visitors to Mar-a-Lago, as there is at the White House Complex." (*Id.* at ¶¶ 10-11). DHS therefore contends that, regarding the 28 data fields Plaintiffs seek, "the Secret Service maintains no record and has no access to any record directly responsive to

---

[4]    In light of this information, Plaintiffs no longer seek records related to Trump Tower. (*See* Pl. Opp. 2 n.1).

[5]    The Court discusses this search in more granular detail *infra*.

Plaintiffs' request for records of presidential visitors at Mar-a-Lago." (*Id.* at ¶ 13).

Further, aside from the 28 data fields that were available under a prior administration, DHS contends that its search uncovered only one record that was subject to FOIA — a two-page email from the Department of State that was forwarded to the Secret Service — which DHS provided to Plaintiffs in redacted form.  (Campbell Decl. ¶ 14).[6]  The email "evidenced potential visitors to Mar-a-Lago, some of whom were scheduled to attend a dinner with the President." (*Id.* at ¶ 33).  Before turning the email over to Plaintiffs, the DHS redacted "the names, email addresses, and a cell phone number of third parties," claiming that such information was exempt from disclosure under FOIA.  (*Id.*).

The Secret Service's search also revealed records involving a visit by the Prime Minister of Japan, Shinzo Abe, along with his wife, to Mar-a-Lago; in addition, the search produced "a handful of records that referred to individuals who were scheduled to meet with the President at Mar-a-Lago."  (Campbell Decl. ¶¶ 26-27).[7]  DHS contends that documents in the latter category "contain, reflect, or directly relate to Presidential schedules" and are therefore "Presidential records within the meaning of the [Presidential Records Act]" and are not subject to FOIA.  (*Id.* at ¶ 31).  As to the records involving Prime

---

[6]  The parties also agreed to exclude records involving presidential family members, cabinet members, and White House staff who visited Mar-a-Lago, and records involving "local law enforcement and support personnel scheduled to have their photographs taken with the president."  (Campbell Decl. ¶¶ 24-25; *see also* Pl. Opp. 22 n.8).

[7]  DHS contends that these documents "indicate the possibility of a 'presidential visit,'" rather than "whether a visit actually took place."  (Campbell Decl. ¶ 29).

Minister Abe, DHS decided that they are "not records of Presidential visitors at Mar-a-Lago," but instead "operational material that merely contain a repeated statement that the Prime Min[i]ster of Japan and his spouse would be meeting or dining or present with the President and First Lady at Mar-a-Lago, a widely published fact that [w]as already disclosed by the White House." (*Id.* at ¶ 32). DHS also argues that the records involving Prime Minister Abe are "duplicative" of the redacted State Department email that was provided to Plaintiffs. (*Id.*).

## B.    Procedural Background

On April 10, 2017, after receiving no response from the Secret Service within the timeframe required under FOIA,[8] Plaintiffs filed the initial complaint in this case. (*See* Am. Compl. ¶¶ 41-45; Dkt. #1). On July 14, 2017, the parties appeared for an initial pretrial conference, pursuant to which the Court issued an order directing the "Secret Service [to] complete its search for and processing of responsive 'records of presidential visitors at Mar-a-Lago,' and produce any non-exempt responsive records, by September 8, 2017"; the Court scheduled summary judgment briefing after such production. (Dkt. #23). The Court later extended the deadline for such production to September 15, 2017. (Dkt. #28).

The Court also granted Plaintiffs leave to file an amended complaint and issued a revised summary judgment briefing schedule on September 14, 2017. (Dkt. #30). The next day, Plaintiffs amended their complaint, which they now

---

[8]    An agency generally has 20 days to respond to a FOIA request. *See* 5 U.S.C. § 552(a)(6)(A)(i).

bring under FOIA, the APA, the FRA, and the PRA, in pursuit of injunctive and declaratory relief. (*See* Dkt. #32). On October 23, 2017, DHS moved for summary judgment on Plaintiffs' FOIA claims and to dismiss the remaining claims for failure to state a claim and lack of subject matter jurisdiction. (*See* Dkt. #45-51). On December 4, 2017, Plaintiffs opposed the motion (Dkt. #52), and DHS replied to Plaintiffs' opposition on January 12, 2018 (Dkt. #55).

The Court's analysis will proceed as follows: *First*, the Court addresses a request for judicial notice that Plaintiffs made after summary judgment briefing closed; *second*, the Court addresses Plaintiffs' FOIA claims; *third*, the Court addresses Plaintiffs' claims involving the APA, FRA, and PRA; and *fourth*, the Court addresses Plaintiffs' claim for declaratory judgment.

## DISCUSSION

## A.   The Court Denies Plaintiffs' Request for Judicial Notice

Before addressing the merits of Defendants' motions, the Court resolves a late-breaking dispute among the parties. On February 20, 2018, after summary judgment briefing had concluded, Plaintiffs filed a letter requesting that the Court take judicial notice of a settlement into which the Secret Service had entered in *Public Citizen, Inc.* v. *United States Secret Service*, No. 17 Civ. 1669 (CRC) (D.D.C.) (the "*Public Citizen* Settlement" or the "Settlement"). (Dkt. #58). The Settlement explains that, much like the case at bar, the plaintiff in that action, Public Citizen, Inc., had submitted FOIA requests to the defendant, the United States Secret Service, seeking WAVES and ACR records, along with records from "any other system used to track visitors to the White House

complex." (Dkt. #58, Ex. A (Settlement Agreement)).  These requests "specifically sought records related to visits" to the following EOP components: the OMB, OSTP, ONDCP, and CEQ.  (*Id.*).  As a result of the Settlement, the White House was to "add computer functionality to the existing system containing WAVES records by which it can sort WAVES records by the requester's email address[.]"  (*Id.*).

### 1.    The Parties' Positions on Plaintiffs' Judicial Notice Request

In requesting that the Court judicially notice the Settlement, Plaintiffs contend that the agreement establishes that the "Secret Service can distinguish between records of visits to agency components [of the EOP] from records of visits to non-agency components," as the Settlement requires the Secret Service "to add a functionality to its system that would allow it to sort WAVES records by the requester's email address, process the records [requested by the plaintiff in that separate action], and post them in agency online reading rooms."  (Dkt. #58).

On February 27, 2018, Defendants responded to Plaintiffs' request, providing no objection to the Court taking judicial notice of the Settlement, but arguing that the agreement in fact supported Defendants' pending motions. (Dkt. #59).  In particular, Defendants argue that the Settlement expressly acknowledges that an appointment requester's email address "does not necessarily show that a WAVES record reflects an EOP agency component visit," and that any functionality changes pursuant to the Settlement would be within the control of the White House rather than the Secret Service.  (*Id.*).

Indeed, Defendants contend that the Settlement renders moot Plaintiffs' FRA and PRA claims, insofar as they "allege wrongful treatment of agency records by EOP and the Secret Service" for failing to "distinguish between records of visits to Presidential components of EOP (which are not subject to FOIA) and records of visits to agency components of EOP (which are)." (*Id.*). In Defendants' view, the Settlement "creates a mechanism for doing just that, thereby mooting Plaintiffs' FRA and PRA claims in their entirety," and "the [S]ettlement provides virtually all the relief that [P]laintiffs could achieve under FOIA, and more." (*Id.*). Further, Defendants argue that the only aspect of Plaintiffs' FOIA claim "that is not moot is the possibility that plaintiffs may wish to challenge any redactions that the EOP agency components may apply to the records before posting," but because any such redactions and corresponding objections are unknown at this point, the Court should hold this portion of Plaintiffs' FOIA claim in abeyance and dismiss the remainder of Plaintiffs' claims. (*Id.*).

Plaintiffs replied to Defendants' response on March 2, 2018, arguing at the outset that Defendants' opposition letter improperly raised grounds for summary judgment and dismissal that were not raised in Defendants' formal briefing. (Dkt. #60). In addition, Plaintiffs contend that the *Public Citizen* Settlement does not render the claims at issue moot for three reasons:

- *First*, the Settlement "expires" if either the EOP modifies its email system so that email addresses no longer indicate that an employee works for an EOP component, or the White House modifies the WAVES system so that it does not automatically populate the email address of an appointment requester. (*Id.*).

16

- *Second*, until Defendants have searched for the records that Plaintiffs are seeking and produced all non-exempt records, the Settlement does not speak to any challenges Plaintiffs might raise to Defendants' withholding of records.  (*Id.*).

- *Third*, the Settlement defines "FOIA components" within the EOP more narrowly than Plaintiffs' operative complaint.

(*Id.*).[9]

## 2. Plaintiffs' Request for Judicial Notice Is Denied

Under the Federal Rules of Evidence, a "court may judicially notice a fact that is not subject to reasonable dispute" where it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2).  "[B]ecause the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under Rule 201(b)."  *Braun* v. *United Recovery Sys., LP*, 14 F. Supp. 3d 159, 164 (S.D.N.Y. 2014) (alteration in original) (citation omitted).  "A court may take judicial notice of a document filed in another court 'not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.'"  *Int'l Star Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (quoting *Liberty Mut. Ins. Co.* v. *Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)).

---

[9]     The operative complaint defines "FOIA components" of the EOP to include the Office of the United States Trade Representative, while the Settlement does not.  (Dkt. #60).

The scope of Plaintiffs' request for judicial notice of the *Public Citizen* Settlement far exceeds the purposes for which the Court may properly consider it.  Although Defendants do not object to judicial notice of the fact of the Settlement, the parties' submissions on the issue make clear that they vehemently disagree as to which facts the Court should glean from the Settlement Agreement.  (*Compare* Dkt. #58, 60, *with* Dkt. #59).  Because both sides have offered plausible views of the practical implications of the Settlement, *a fortiori*, the Court cannot find that the factual purpose for which Plaintiffs urge the Court to consider the Settlement would be beyond "reasonable dispute."  Fed. R. Evid. 201(b).

Moreover, to grant Plaintiffs' request would not only require the Court to consider the Settlement for the truth of the matters stated therein, but to make the inferential leap of drawing facts from the Settlement that are not necessarily borne out by its terms.  To be sure, a court may judicially notice a settlement agreement to establish the fact of a prior litigation.  *See, e.g.*, *Deylii* v. *Novartis Pharm. Corp.*, No. 13 Civ. 6669 (NSR), 2014 WL 2757470, at *4 (S.D.N.Y. June 16, 2014) (collecting cases).  But it may not do so to take as true any facts contained in such settlement agreement.  *See Int'l Star Class Yacht Racing Ass'n*, 146 F.3d at 70.  The Court therefore denies Plaintiffs' request that the Court judicially notice the *Public Citizen* Settlement.

## B.   Defendants' Summary Judgment Motion Is Granted in Part and Denied in Part

### 1.   Applicable Law

#### a.   FOIA Generally

FOIA vests federal courts with "jurisdiction to enjoin [a federal] agency from withholding agency records and to order the production of any agency records improperly withheld[.]"  5 U.S.C. § 552(a)(4)(B).[10]  The statute mandates disclosure of any requested "agency records" unless they fall within one of FOIA's enumerated exemptions.  *See Grand Cent. P'ship, Inc.* v. *Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999); *Adamowicz* v. *I.R.S.*, 672 F. Supp. 2d 454, 461 (S.D.N.Y. 2009), *aff'd*, 402 F. App'x 648 (2d Cir. 2010) (summary order).  FOIA thus allows public access to information held by agencies of the federal government, but such access is not limitless:  In enacting FOIA, Congress sought to strike a balance between the public's interest in government transparency and accountability, and the Government's need to hold sensitive information in confidence.  *See Nat'l Council of La Raza* v. *Dep't of Justice*, 411 F.3d 350, 355-56 (2d Cir. 2005); *Nat. Res. Def. Council, Inc.* v. *U.S. Dep't of Interior*, 36 F. Supp. 3d 384, 397 (S.D.N.Y. 2014) (quoting *John Doe Agency* v. *John Doe Corp.*, 493 U.S. 146, 152 (1989)).

---

[10]   The Second Circuit has explained that "jurisdiction," in this context, refers to a federal court's "remedial power, not subject-matter jurisdiction," meaning that 5 U.S.C. § 552(a)(4)(B) "does not speak to the court's ability to adjudicate a claim, but only to the remedies that the court may award."  *Main St. Legal Servs., Inc.* v. *Nat'l Sec. Council*, 811 F.3d 542, 566 (2d Cir. 2016).

### b.    Resolving FOIA Claims at Summary Judgment

Summary judgment is the usual mechanism for resolving a FOIA dispute.  *N.Y. Times Co.* v. *United States Dep't of Justice*, 235 F. Supp. 3d 522, 529 (S.D.N.Y. 2017).  Federal jurisdiction over a FOIA action requires "a showing that an agency has [i] 'improperly' [ii] 'withheld' [iii] 'agency records,'" and "[o]nly when these criteria are met may a district court 'force an agency to comply with the FOIA's disclosure requirements.'"  *Grand Cent. P'Ship*, 166 F.3d at 478 (quoting *U.S. Dep't of Justice* v. *Tax Analysts* ("*Tax Analysts II*"), 492 U.S. 136, 142 (1989)).  Where, as here, "the question is whether requested documents are 'agency records' subject to disclosure under FOIA, '[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records[.]'"  *Id.* (quoting *Tax Analysts II*, 492 U.S. at 142 n.3).  A court reviews *de novo* an agency's decision to withhold information.  *N.Y. Times Co.*, 235 F. Supp. 3d at 529 (citing 5 U.S.C. § 552(a)(4)(B)).

A district court considering a FOIA claim "may grant summary judgment in favor of an agency 'on the basis of agency affidavits if they contain *reasonable specificity* of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'"  *Grand Cent. P'ship*, 166 F.3d at 478 (quoting *Gallant* v. *NLRB*, 26 F.3d 168, 171 (D.C. Cir. 1994)); *see also Garcia* v. *U.S. Dep't of Justice, Office of Info. & Privacy*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002) ("If the agency's submissions are facially adequate, summary judgment is

warranted unless the plaintiff can make a showing of bad faith on the part of the agency or present evidence that the exemptions claimed by the agency should not apply.").  "As such, where the agency's submissions are 'adequate on their face,' district courts 'may forgo discovery and award summary judgment on the basis of affidavits.'"  *N.Y. Times Co.*, 235 F. Supp. 3d at 529 (quoting *Carney* v. *U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994)).  Conversely, "[s]ummary judgment in favor of the FOIA plaintiff is appropriate 'when an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption."  *Nat. Res. Def. Council, Inc.*, 36 F. Supp. 3d at 398 (quoting *N.Y. Times Co.* v. *U.S. Dep't of Def.*, 499 F. Supp. 2d 501, 509 (S.D.N.Y. 2007)).[11]

### c.    Defining "Agency Records" Under FOIA

The propriety of Defendants' decision to withhold the WAVES and ACR records at issue turns on whether those records are "agency records," and thus subject to disclosure under FOIA.  By all accounts, this is an issue of first impression within this Circuit.  Yet, as discussed below, the Court of Appeals for the District of Columbia Circuit has addressed this very issue, and the parties therefore focus initially on disputing whether the Court should adopt

---

[11]    Indeed, "'[t]he general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment,' and Local Civil Rule 56.1 statements are not required."  *N.Y. Times Co.* v. *U.S. Dep't of Justice*, 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (quoting *Ferguson* v. *Fed. Bureau of Investigation*, No. 89 Civ. 5071 (RPP), 1995 WL 329307, at *2 (S.D.N.Y. June 1, 1995), *aff'd*, 83 F.3d 41 (2d Cir. 1996)).  The Court therefore rejects Plaintiffs' bid to deny Defendants' summary judgment motion for failure to submit an accompanying Local Civil Rule 56.1 statement along with their motion for summary judgment.  (*See* Pl. Opp. 3-4).

the D.C. Circuit's approach here.[12]   The Court discusses the various bases of
the D.C. Circuit's approach, and then considers the parties' arguments
supporting and opposing adoption of that approach.

### i.   Supreme Court Decisions: *Kissinger*, *Forsham*, and *Tax Analysts II*

The progenitor of modern FOIA case law is *Kissinger* v. *Reporters
Commission for Freedom of the Press*, where the Supreme Court held that
Congress did not intend FOIA to define an "agency" to include "the Office of the
President," meaning the President, his "immediate personal staff[,] or units in
the Executive Office whose sole function is to advise and assist the President[.]"
445 U.S. 136, 156 (1980) (quoting H.R. Rep. No. 93-1380, at 232 (1974) (Conf.
Rep.)).   There, the Court held in relevant part that notes of telephone
conversations of then-Assistant to the President for National Security Affairs,
Henry Kissinger, were not "agency records" subject to FOIA, as the requested
documents were generated while Kissinger was acting in his capacity as a
presidential adviser.  *Id.* at 157.   And this was so even though, at the time of
the FOIA request, the notes were removed from White House files and
physically transferred to an agency subject to FOIA — Kissinger's office at the
Department of State, where Kissinger was serving as the Secretary of State.  *Id.*

---

[12]     This Court observes that the Second Circuit has previously "acknowledge[d] the
considerable experience of the Court of Appeals for the District of Columbia Circuit" in
analyzing FOIA's application to records generated by units of the Executive Office of the
President.  *Main St. Legal Servs., Inc.*, 811 F.3d at 547 (holding that National Security
Council is not an agency subject to FOIA).

In *Forsham* v. *Harris*, a companion case to *Kissinger*, the Court addressed a separate definitional issue:  Whether materials generated by a private organization that has received federal funds from an agency, but has not transmitted the materials back to that agency, are agency records subject to FOIA.  *See* 445 U.S. 169, 178 (1980).  Answering the question in the negative, the Court held that "an agency must first either create or obtain a record as a prerequisite to its becoming an 'agency record' within the meaning of FOIA."  *Id.* at 182.  While noting that FOIA does not define the term "agency records," the Court drew its conclusion from FOIA's definition of "agency" and its legislative history, both of which indicated that Congress did not intend to subject private organizations receiving federal funds to FOIA.  *Id.* at 178-79.  The Court also noted that the use of the term "record" in related statutes such as the Records Disposal Act and the PRA suggested that an agency record must at least be "create[d] or obtain[ed]" by the agency.  *Id.* at 182-84.

Drawing from *Kissinger* and *Forsham*, the Supreme Court expanded on what constitutes an "agency record" for FOIA purposes in *United States Department of Justice* v. *Tax Analysts*, 492 U.S. 136 (1989).  The Court held that to qualify as an agency record, requested materials must (i) either be "create[d] or obtain[ed]" by an agency, and (ii) be in the agency's "control … at the time the FOIA request is made."  *Id.* at 144-45.  Of particular relevance to the case at bar, the Court hewed to the analysis in *Kissinger* by explaining that sufficient control under the second prong "mean[s] that the materials have come into the agency's possession in the legitimate conduct of its official

duties." *Id.* at 145.  Thus, considering the FOIA request at issue there, the Court held that district court decisions received by the Department of Justice while litigating tax cases were agency records; although the Department of Justice did not internally generate the decisions, they had received and possessed them at the time of the FOIA request at issue.  *Id.* at 146-47.

###   ii.    The D.C. Circuit's Decision: *Judicial Watch*

In *Judicial Watch, Inc.* v. *United States Secret Service*, the D.C. Circuit considered a FOIA claim mirroring the one at bar, in which the plaintiffs sought from the Secret Service "[a]ll official visitors logs and/or other records concerning visits made to the White House from January 20, 2009 to [August 10, 2009]."  726 F.3d 208, 214 (D.C. Cir. 2013) (first alteration in original). After explaining the Secret Service's recordkeeping procedures, and while acknowledging that the circumstances presented "a difficult case," the court held that WAVES and ACR records "that disclose the kind of information" presented in "documents like the President's appointment calendar" are not agency records subject to FOIA, while WAVES and ACR records "that reveal visitors to those offices within the White House Complex that are themselves subject to FOIA" would constitute agency records.  *See id.* at 233-34.

In reaching its conclusion, the D.C. Circuit first found no dispute that the Secret Service had "obtained" the WAVES and ACR records at issue, thus satisfying the first prong of the test set forth in *Tax Analysts II*.  *Judicial Watch*, 726 F.3d at 217.  The case thus turned on whether the Secret Service had sufficient control over the documents to render them agency records.  To

answer that inquiry, the D.C. Circuit generally looked to four factors originally

announced in the Court of Appeal's decision in *Tax Analysts*, which the

Supreme Court later affirmed, albeit on different grounds.  *Id.* at 218

(discussing *Tax Analysts* v. *U.S. Dep't of Justice* ("*Tax Analysts I*"), 845 F.2d

1060 (D.C. Cir. 1988), and collecting D.C. Circuit cases applying the four-factor

test).  These four factors consist of the following:

> [i] the intent of the document's creator to retain or
> relinquish control over the records; [ii] the ability of the
> agency to use and dispose of the record as it sees fit;
> [iii] the extent to which agency personnel have read or
> relied upon the document; and [iv] the degree to which
> the document was integrated into the agency's record
> system or files.

*Id.* (quoting *Tax Analysts I*, 845 F.2d at 1069).

Applying these factors produced an equivocal result.  The first factor

weighed in the Secret Service's favor in light of the 2006 MOU, which as

discussed above expressed the intention of the Secret Service and the White

House to place WAVES and ACR records under the control of the White House

rather than the Secret Service.  *Judicial Watch*, 726 F.3d at 218.  The second

factor, considering the Secret Service's authority to use and dispose of the

records, weighed in neither party's favor; although the Secret Service used the

records to vet potential White House visitors and verify their identities, it had a

"longstanding practice" of turning those records over to the White House and

the 2006 MOU further restricted the Secret Service's ability to use and dispose

of the records as it pleased.  *Id.* at 218-19.  The third factor, assessing the

extent of the Secret Service's reliance on the records, indicated Secret Service

control, as the agency used the records to vet and verify the identity of White House visitors "without restriction." *Id.* at 219.  And the fourth factor, taking into account the degree to which the records were integrated into the Secret Service's systems or files, was found by the D.C. Circuit to weigh in favor of neither party; the Court acknowledged that the records were in the Secret Service's system at least at one point, but the physical servers on which the records were stored were located in the White House Complex and the records were removed from those servers within 60 days.  *Id.* at 219-20.

Having found that only two of the four factors yielded decisive answers — and even then pointed in different directions — the Court drew parallels to another line of cases, one involving "documents that an agency has either obtained from, or prepared in response to a request from, a governmental entity not covered by FOIA: the United States Congress," where the four-factor "test does not apply[.]" *Judicial Watch*, 726 F.3d at 221.  In those cases, courts consider "special policy considerations," which in the context of WAVES and ACR records suggested that such records would not fall within the scope of FOIA.  *Id.* at 220-21 (quoting *Paisley* v. *C.I.A.*, 712 F.2d 686, 693 n.30 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (1984)).  As in the context of FOIA requests for congressional records obtained by an agency, the Court noted that it should defer to an "affirmatively expressed intent" to control such documents, which the White House had expressed toward the WAVES and ACR records.  *Id.* at 221 (quoting *Paisley*, 712 F.3d at 693 n.30).  And more importantly, subjecting these records to FOIA would force the President

to "either 'surrender [his] constitutional prerogative of maintaining secrecy' regarding his choice of visitors (and therefore of outside advisors), or to decline to cooperate with the executive branch agency entrusted with (and necessary for) his personal protection."  *Id.* at 224 (quoting *United We Stand Am., Inc.* v. *I.R.S.*, 359 F.3d 595, 599 (D.C. Cir. 2004)).

As a "more fundamental" reason for denying FOIA coverage for the WAVES and ACR records, the D.C. Circuit discussed the separation-of-powers issues that such a state of affairs would precipitate.  *Judicial Watch*, 726 F.3d at 224.[13]  Relying on *Kissinger*, the Court explained that it was "undisputed" that a FOIA plaintiff could "not obtain the appointment calendars (or visitor logs)" of individuals within the Office of the President, as such documents "are simply not 'agency records' as FOIA defines the term."  *Id.* at 225.  Thus, although the Secret Service is subject to FOIA, it effectively replicated the schedules of the individuals in the Office of the President through its recordkeeping practices.  As *Kissinger* made clear, Congress intentionally excluded the President's documents from FOIA, and a FOIA request should not act as a tool to obtain indirectly what it may not obtain directly.  *Id.*

The canon of constitutional avoidance also weighed against holding for the *Judicial Watch* plaintiffs.  *See generally Clark* v. *Martinez*, 543 U.S. 371,

---

[13]    Although communications between the White House and the Secret Service constitute *intra*-branch communications, *Judicial Watch* recognized that this dynamic does not lessen the separation-of-powers issues involved.  726 F.3d at 224.  Indeed, in comparison to *inter*-branch communications between Congress and agencies subject to FOIA, Congress would have the option to amend FOIA so as to avoid any such dilemma. "No such solution is available to the President if Congress, in enacting FOIA, authorized an intrusion into the confidentiality of his communications."  *Id.*

381 (2005) (stating that the canon of constitutional avoidance "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts").  As a practical matter, the Court reasoned, applying FOIA to the records at issue "could substantially affect the President's ability to meet confidentially with foreign leaders, agency officials, or members of the public," and supporting such an application of FOIA would therefore permit a congressional incursion on the President's constitutional prerogatives.  *Judicial Watch*, 726 F.3d at 226-27.  In other words, interpreting FOIA in this manner could present the issue of whether Congress exceeded its constitutional power over the executive branch, a worrisome outcome of which Congress was aware when excluding Presidential advisors from FOIA.  *See id.* at 227 (discussing H.R. Rep. No. 93-1380, at 232 (Conf. Rep.)).

Finally, the D.C. Circuit considered the PRA to provide a more natural fit for WAVES and ACR records.  The PRA requires the United States to preserve "complete ownership, possession, and control of Presidential records," 44 U.S.C. § 2202, and it defines "Presidential records" to include documents "created or received by the President," his "immediate staff," or individuals in the EOP "whose function is to advise or assist the President," and to exclude "official records of an agency" as defined under FOIA, § 2201(2).  While noting that "Congress did not intend the PRA to diminish the scope of FOIA," *Judicial Watch*, 726 F.3d at 228 (citing 44 U.S.C. § 2201(2)(B)), the Court reasoned that

the records at issue tracked more closely the definition of presidential records in the PRA, which "gives the President 'virtually complete control'" over such records while in office, *id.* (quoting *Armstrong* v. *Bush*, 924 F.2d 282, 290 (D.C. Cir. 1991)).  For these reasons, the D.C. Circuit squarely held for the Government.

### 2.    The Court Adopts the Approach of *Judicial Watch*

The Court finds the reasoning in *Judicial Watch* to be persuasive, and therefore proceeds from the premise that it will adopt the D.C. Circuit's approach unless Plaintiffs provide compelling countervailing reasons.  As discussed herein, Plaintiffs have not done so.

In urging the Court to depart from *Judicial Watch*, Plaintiffs take issue with the four-factor test that the D.C. Circuit applied to determine whether an agency has sufficient control over materials to render those materials agency records.  (*See* Pl. Opp. 7-14).  Specifically, Plaintiffs argue that this test is inconsistent with the Supreme Court's framework for determining such control under *Tax Analysts II*.  This Court disagrees.

Preliminarily, the Court observes that the outcome in *Judicial Watch* was driven more by "special policy considerations" related to the prospect of applying FOIA to Presidential documents than by the four-factor test for control with which Plaintiffs take issue.  *Judicial Watch*, 726 F.3d at 220-21.  Indeed, as discussed above, that test's indeterminate findings provided the *Judicial Watch* Court with little guidance in deciding the issue.  Nevertheless, the Court will address Plaintiffs' arguments.

Plaintiffs hone in on a discussion in *Tax Analysts II* that rejected the notion that "the intent of the creator of a document relied upon by an agency" should determine whether material is an agency record subject to FOIA, reasoning that "[s]uch a *mens rea* requirement is nowhere to be found in the Act." 492 U.S. at 147.  In Plaintiffs' view, this proposition wholly undermines the D.C. Circuit's focus on "the intent of [a] document's creator to retain or relinquish control over the records." *Judicial Watch*, 726 F.3d at 218 (quoting *Tax Analysts I*, 845 F.2d at 1069).  But these statements of law are reconcilable:  In the discussion above from *Tax Analysts II*, the Court was responding to an argument by the Department of Justice that would "limit 'agency records,' at least where materials originating outside the agency are concerned, 'to those documents prepared substantially to be relied upon in agency decisionmaking.'"  492 U.S. at 147.  The Court was thus considering an issue separate and apart from whether a document's creator intended "to retain or relinquish control" of the document.

Perhaps more importantly, the intent of a document's creator in retaining or relinquishing control over the document accords with *both* the Supreme Court *and* the Second Circuit's analysis in FOIA cases.  In *Kissinger*, for instance, the Supreme Court did not blind itself to Henry Kissinger's demonstrated intent to retain control over notes of his phone calls.  *See* 445 U.S. at 140-41, 157 (holding that Kissinger's records did not become subject to FOIA when he stored them in his State Department office and considering his efforts to determine whether the documents were "agency records").  And the

Second Circuit has similarly looked to the President's intent in determining whether a governmental entity created in part by the President is an agency subject to FOIA.

In *Main Street Legal Services, Inc.* v. *National Security Council*, the Second Circuit held that the National Security Council System, parts of which were created by statute and other parts of which were created by presidential directive, was not an agency subject to FOIA based in part on the President's intentions as expressed in a presidential directive.  811 F.3d 542, 544-45, 553 (2d Cir. 2016).  The court reasoned that "separation of powers ... counsels a respectful measure of deference to the President's own statements of intent," and the presidential directive did not "indicate[] any intent to transfer presidential authority so that it c[ould] be exercised [by the National Security Council System] independent of the President."  *Id.* at 558-59.  The case law to which this Court is bound therefore supports consideration of the drafter's intent in determining whether a document is an agency record subject to FOIA.

As to *Judicial Watch*'s remaining three factors, Plaintiffs concede that they "are certainly *relevant* to whether an agency has" sufficient control over materials to render them subject to FOIA (Pl. Opp. 10), but argue that the D.C. Circuit's application of those factors goes beyond the Supreme Court's definition of "control" as "hav[ing] come into the agency's possession in the legitimate conduct of its official duties," *Tax Analysts II*, 492 U.S. at 145.  The Court declines to adopt Plaintiffs' restrictive reading of *Tax Analysts II*.

Plaintiffs contend that a "strict application" of the second factor — "the ability of the agency to use and dispose of the record as it sees fit," *Judicial Watch*, 726 F.3d at 218 (quoting *Tax Analysts I*, 845 F.2d at 1069) — would render two of the nine enumerated FOIA exemptions superfluous.  (*See* Pl. Opp. 10).  Those two exemptions shield materials from disclosure under FOIA if they are either (i) "established by" and "properly classified pursuant to" "an Executive order to be kept secret in the interest of national defense or foreign policy," 5 U.S.C. § 552(b)(1); or (ii) "specifically exempted from disclosure by statute," *id.* § 552(b)(3).  Plaintiffs' argument, however, fails to displace the probative value of considering an agency's ability to use and dispose of a record in determining whether that agency controls such record.  Moreover, the D.C. Circuit's analysis under this factor considers, as a practical matter, how an agency handles particular material to the extent it is authorized to do so, *see, e.g.*, *Judicial Watch*, 726 F.3d at 218-19; this does not mean, as Plaintiffs would have the Court believe, that if an agency's authorization in this regard were in some way limited, such limitation would render materials exempt from FOIA to the same extent as an Executive Order protecting their secrecy or a specific statutory exemption from disclosure under FOIA.[14]

---

[14]     As an example of the broader protections the Government is afforded when claiming an exemption as opposed to maintaining that materials are not agency records recoverable under FOIA, when claiming an exemption, the Government may submit a "*Glomar* response," which "neither confirms nor denies the existence of documents responsive to the request, and is permissible 'where to answer the FOIA inquiry [by confirming or denying the existence of responsive documents] would cause harm cognizable under a[ ] FOIA exception.'" *Ctr. for Constitutional Rights* v. *C.I.A.*, 765 F.3d 161, 164 (2d Cir. 2014) (alterations in original) (quoting *Wilner* v. *Nat'l Sec. Agency*, 592 F.3d 60, 68 (2d Cir. 2009)).

On the topic of FOIA's exemptions, Plaintiffs argue that "even if there is reason to credit 'special policy considerations' when addressing whether congressionally created documents are 'agency records,'" as *Judicial Watch* reasoned, "executive prerogatives" are sufficiently protected by FOIA's exemptions,[15] and any further protection for presidential documents would be Congress's responsibility. (Pl. Opp. 11). But this argument puts the cart before the horse. Notwithstanding the applicability of any FOIA exemption, as *Kissinger* recognized, "Congress did not intend for 'the President's immediate personal staff or units in the [EOP] whose sole function is to advise and assist the President' to be 'included within the term 'agency' under the FOIA.'" *Main St. Legal Servs., Inc.*, 811 F.3d at 546 (alteration in original) (quoting *Kissinger*, 445 U.S. at 156). This congressional intent speaks to the inapplicability of FOIA to the President and his immediate staff without regard to any statutory exemptions. For this reason, the Court rejects Plaintiffs' contention that the D.C. Circuit's analysis of agency "control" over materials "is simply inconsistent with FOIA's text and purposes" and would create "an amorphous tenth exemption" to FOIA. (Pl. Opp. 13-14).

Mindful of the analysis in *Kissinger*, the Court also disposes of Plaintiffs' argument that revealing "information *about* the [P]resident" does not raise the same concerns as subjecting the President himself to FOIA. (Pl. Opp. 12

---

[15]   Specifically, Plaintiffs rely on the two exemptions discussed above, as well as an exemption for privileged documents, *see Grand Cent. P'ship, Inc.* v. *Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999) (discussing 5 U.S.C. § 552(b)(5)), as providing sufficient protection for presidential documents.

(emphasis in original)).  This is a rhetorical sleight-of-hand:  Surely, if the Supreme Court had shared Plaintiffs' view, it would not have interpreted Congress's intent as carving out from FOIA's definition of an agency the President's immediate staff and advisers.  In addition, Plaintiffs' attempt to distinguish "subjecting the *[P]resident* to FOIA" from "subjecting *presidential information in the possession of agencies* to FOIA" is unpersuasive.  (*Id.* (emphases in original)).  Although this difference is certainly relevant to *Tax Analysts II*'s first prong — whether requested materials are "create[d] or obtain[ed]" by an agency — the mere fact of possession would have much less relevance in deciding the second prong — whether that agency had "control" over such materials.  492 U.S. at 144-45.

Finally, Plaintiffs argue that "FOIA routinely is applied to records that reveal presidential decision-making" (Pl. Opp. 12), but none of the examples to which Plaintiffs cite, such as policy directives or redacted memoranda, is as personal to the President as his daily schedule.  This differentiation "accords with *Kissinger*'s teaching that the term 'agency records' is not so broad as to include personal materials in an employee's possession, even though the materials may be physically located at the agency."  *Tax Analysts II*, 492 U.S. at 145.  Further, without citing to any particular cases, Plaintiffs argue that many federal agencies obtain information from the President and his aides, and that courts treat records generated by such interactions as subject to FOIA, though they may be exempt for other reasons.[16]  The Court derives little from

---

[16]     Plaintiffs provide the following examples:

Plaintiffs' contention on this point, as it is unable to compare the facts of this case to the abstract examples Plaintiffs have provided.  Moreover, Plaintiffs' argument is not without examples to the contrary.  *See, e.g.*, *Main St. Legal Servs.*, 811 F.3d at 549-53 (affirming dismissal of FOIA claims seeking records from National Security Council related to drone strikes of United State citizens and foreign nationals on grounds that Council was not "agency" subject to FOIA because its sole statutory function is to advise and assist the President).

Having considered and rejected Plaintiffs' arguments, the Court hereby adopts the D.C. Circuit's approach, as provided in *Judicial Watch*, in determining whether the Secret Service exercises sufficient control over the documents at issue to require disclosure under FOIA.  In the following section, the Court explains how developments since *Judicial Watch* have underscored the correctness of that holding.

### 3.   Post-*Judicial Watch* Developments

Since *Judicial Watch*, President Obama's establishment of the Director of White House Information Technology and the 2015 MOU have reinforced the conclusion that WAVES and ACR records are within the control of the White House rather than the Secret Service.

---

[T]he [O]ffice of [L]egal Counsel renders legal advice directly to the [P]resident in response to specific requests.  The Office of Government Ethics renders ethics advice related to prospective White House employees based on information the White House supplies.  And the Department of Defense implements direct presidential orders relating to, among other things, the use of drone strikes to kill individuals abroad.

(Pl. Opp. 13).

*First*, the White House's intention to retain control over WAVES and ACR records is manifest in the relevant memoranda.  The Memorandum establishing the DWHIT provides that its intention is "to maintain the President's exclusive control of the information resources and information systems provided to the President, Vice President, and EOP."  (Herndon Decl., Ex. A, at 1).  Accordingly, the 2015 MOU states that "[a]ll records created, stored, used, or transmitted by, on, or through the unclassified information systems and information resources provided to the President, Vice President, and EOP" — which include WAVES and ACR records — "shall remain under the exclusive ownership, control, and custody of the President, Vice President, or originating EOP component."  (*Id.*, Ex. B, at § 3.01; *see* Herndon Decl. ¶ 9).  As discussed above, this intention weighs in favor of finding that the WAVES and ACR records are not agency records subject to FOIA, and in determining whether to command disclosure of documents under FOIA, "separation of powers further counsels a respectful measure of deference to the President's own statements of intent[.]"  *Main St. Legal Servs.*, 811 F.3d at 558.

*Second*, pursuant to the White House's exerted control over the records at issue, the Secret Service "cannot make changes to the [WAVES or EFACS] systems, or make purchases related to the systems, without the consent of the DWHIT."  (Herndon Decl. ¶ 8).  In addition, pursuant to the 2015 MOU, the Secret Service's access to the records is "limited … as necessary to perform its protective functions," and "once a visit is concluded," the Secret Service "may not access EFACS or WAVES records without White House Approval."  (*Id.* at

¶ 9).  These considerations, and particularly the later restriction on the Secret Service, compel a finding that the White House (rather than the Secret Service) controls the WAVES and ACR records, as they indicate that the Secret Service's ability to utilize and dispose of these records is subject to constraints imposed by the White House that were not present at the time that the D.C. Circuit decided *Judicial Watch*.  *Cf*. 726 F.3d at 218-19.

Thus, the Court holds that WAVES and ACR records are not agency records subject to disclosure under FOIA.  Having adopted the D.C. Circuit's approach articulated in *Judicial Watch*, however, the Court must address an additional wrinkle:  Certain components within the EOP *are* subject to FOIA, and, as explained in the following section, so are records of visits to such components.

### 4.    Records Involving EOP Components That Are Subject to FOIA

In *Judicial Watch*, the Court delineated a subcategory of WAVES and ACR records to which its holding did not apply: Components of the EOP that are agencies for the purposes of FOIA ("EOP Agency Components") and whose records are thus subject to disclosure under FOIA.  726 F.3d at 232.  Here, Defendants contend that the 2015 Presidential Memorandum creating the DWHIT and the 2015 MOU undermine this portion of *Judicial Watch*, and even if not, that Defendants are unable to segregate records of visits to EOP Agency Components from EOP components that employ members of the President's immediate staff whose "sole function" is to "advise and assist the President."

*Kissinger*, 445 U.S. at 156.  (*See* Def. Br. 32).  Defendants' arguments miss the mark.

An EOP component is an "agency" subject to FOIA if it possesses "substantial independent authority in the exercise of specific functions" rather than the "sole function … to advise and assist the President[.]"  *Main St. Legal Servs.*, 811 F.3d at 547 (quoting *Soucie* v. *David*, 448 F.2d 1067, 1075 (D.C. Cir. 1971)).  The creation of the DWHIT and terms of the 2015 MOU do not speak to this analysis, and the Court therefore dismisses out of hand Defendants' assertion that such developments undermine *Judicial Watch*'s determination that records of visits to EOP Agency Components are subject to disclosure under FOIA.  Although the Secret Service does not exert sufficient control over WAVES and ACR records of visits to the President or EOP components that advise and assist the President, the reasoning underlying that conclusion does *not* extend to WAVES and ACR records of visits to members of EOP components that are themselves subject to FOIA.[17]

As to Defendants' contention that they are unable to segregate records of visits to EOP Agency Components, Defendants admit that "[i]n most cases" a WAVES record will contain the email address of the individual scheduling a visit that "will provide an indication of whether the person making the

---

[17]   The parties do not address which EOP components, specifically, are subject to FOIA.  Although *Judicial Watch* indicated that OMB, CEQ, ONDCP, USTR, and OSTP are EOP Agency Components, that conclusion was based on sources that either are not binding or, in the case of a former White House website including a list of units covered by FOIA, no longer available.  *See* 726 F.3d at 233 n.28.  In any event, the Court need not decide the issue for the purposes of the instant motion.

appointment is employed by" an EOP Agency Component or an EOP component that is not subject to FOIA.  (Def. Br. 24).  According to Defendants, this information does not indicate with certainty whether such visit implicated an EOP component that is not subject to FOIA.  (*Id.*).  But such an assertion proves too much, as the Court will not hold that material ceases to be an agency record because of information that it does not contain.  Indeed, the lack of any indication that a visit implicated the President or an EOP component involved in advising and assisting the President should lessen Defendants' concerns regarding revealing the President's schedule and related information.

To the extent that any WAVES or ACR record from an EOP Agency Component contains information that would not constitute agency records in light of its connection to the President, Defendants may redact such information.  Indeed, FOIA "expressly authorize[s]" redaction and places the burden on "the agency when it seeks to justify the redaction of identifying information in a particular document as well as when it seeks to withhold an entire document."  *Associated Press* v. *U.S. Dep't of Def.*, 554 F.3d 274, 284 (2d Cir. 2009) (quoting *U.S. Dep't of State* v. *Ray*, 502 U.S. 164, 173-74 (1991)).  Moreover, if disclosure of records from an EOP Agency Component threatened the President's security, it would likely be exempt from FOIA.  *See Judicial Watch*, 726 F.3d at 233 (citing as an example 5 U.S.C. § 552(b)(7)(F), which "exempt[s] records compiled for law enforcement purposes whose production 'could reasonably be expected to endanger the life or physical safety of any individual'").  In short, WAVES and ACR records of visits to EOP Agency

Components are agency records subject to FOIA.  The Court next considers records of visits to President Trump's Mar-a-Lago residence.

### 5.     Records of Presidential Visitors at Mar-a-Lago

The Court's analysis of this category of records proceeds in two stages: *First*, the Court considers the adequacy of Defendants' search for records responsive to Plaintiffs' FOIA request, and *second*, the Court considers the propriety of Defendants' withholding of two categories of documents.

### a.     The Adequacy of Defendants' Search

At the time of Plaintiffs' request, the Secret Service's approach to providing security at Mar-a-Lago was "newly developed," and "it was unclear what, if any, record systems or record groupings might exist in regard to who visited the President at Mar-a-Lago, or where such record systems or record groupings might be located."  (Campbell Decl. ¶ 9).  The Secret Service maintains that the ensuing search resulted in only one "arguably responsive" document that is "not duplicative of information previously made public by the White House" (*id.* at ¶ 14), and that the search also confirmed that "there is no Secret Service system that controls access to Mar-a-Lago, nor is there any grouping, listing, or set of records that would reflect Presidential visitors to Mar-a-Lago" (*id.* at ¶ 11).

The Secret Service has provided an affidavit detailing its search for responsive records.  Early on in its search, the Secret Service identified three offices as potentially holding responsive documents:

> the Office of Strategic Intelligence and Information (SII), which oversees the Protective Intelligence Division (PID).

> This office conducts background checks pursuant to a sensitive security program;
>
> the Office of Investigations (INV), which oversees the Miami Field Office (FO) and the West Palm Beach Resident Office (RO).  These offices would most likely have involvement in President Trump's visits to Mar-a-Lago as they are geographically located in proximity to Mar-a-Lago; and
>
> the Office of Protective Operations (OPO), which oversees the Presidential Protective Division (PPD).  This is the division with direct operational responsibility for the protection of the President of the United States, including when the President is at Mar-a-Lago.

(Campbell Decl. ¶ 16).  A search of the first office resulted in no responsive documents, while a search of each of the latter two offices indicated "that an individual visited with the President at Mar-a-Lago during the time period January 20 to March 8, 2017"; any "potentially responsive documents" proceeded to "further responsiveness review."  (*Id.* at ¶¶ 17-19).

Separately, the Office of the Chief Information Officer ("CIO") searched the email accounts of employees within the PPD, Dignitary Protective Division, as well as the Miami FO and West Palm Beach RO.  (Campbell Decl. ¶ 20).  The CIO carried out this search by applying a series of search terms to the body, subject line, or attachment of any email, for the period January 20 to March 8, 2017, contained in a database of any emails "sent, received, or deleted by all Secret Service employees including during the time period at issue in this case."  (*Id.*).  Any responsive emails proceeded to "further responsiveness review."  (*Id.*).[18]

---

[18]    The search terms consisted of the following:

All responsive records from these searches were aggregated, and any duplicate emails were electronically removed, leaving "[o]ver four thousand e-mails and documents" for further responsiveness review.  (Campbell Decl. ¶¶ 21-22).  Any materials that were "merely copies of media reports concerning Presidential visits to Mar-a-Lago" were removed "as non-responsive, as [they were] not considered [ ] Agency record[s] of a Presidential visit, and [were] as available to the public as to the Secret Service."  (*Id.* at ¶ 23).  Further winnowing down the universe of responsive documents, the parties agreed "that the Secret Service need not produce records regarding Presidential family members, cabinet members, and White House staff who were present at Mar-a-Lago," as well as "the names of local law enforcement and support personnel scheduled to have their photographs taken with the President."  (*Id.* at ¶¶ 24-25).

After refining the documents in that manner, "the largest remaining category of records" consisted of documents related to Prime Minister Abe's visit to Mar-a-Lago.  (Campbell Decl. ¶ 26).  These included "operational records" regarding the Secret Service's security for the Prime Minister's visit. (*Id.*).  Aside from this category of documents, the search yielded "only a handful of records" referring to persons scheduled to meet with the President at

---

MAL **OR** Mar-a-Lago **OR** Mar a Lago **AND** at least one of the following terms: guest **OR** appointment **OR** visitor **OR** meet **OR** meeting **OR** clear **OR** cleared **OR** sweep **OR** swept **OR** checkpoint **OR** check point **OR** check **OR** [abbreviation for sensitive security program] **OR** background.

(Campbell Decl. ¶ 20 (brackets and emphases in original)).

Mar-a-Lago.  (*Id.* at ¶ 27).  The following section considers the content of these records; here, the Court considers the antecedent issue of the adequacy of the search.

To prevail on a summary judgment motion in a FOIA case, the defending agency bears the burden of establishing the adequacy of its search, and it may satisfy this burden by submitting "[a]ffidavits or declarations supplying facts indicating that the agency has conducted a thorough search[.]"  *Long* v. *Office of Pers. Mgmt.*, 692 F.3d 185, 190-91 (2d Cir. 2012) (quoting *Carney* v. *U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994)).  Agency affidavits are presumed to be made in "good faith," but must show that the agency's search was "'reasonably calculated' to produce documents responsive to the FOIA request."  *Seife* v. *U.S. Dep't of State*, 298 F. Supp. 3d 592, 607 (S.D.N.Y. 2018) (quoting *Garcia* v. *U.S. Dep't of Justice, Office of Info. and Privacy*, 181 F. Supp. 2d 356, 366 (S.D.N.Y. 2002)).  "The adequacy of a search is not measured by its results, but rather by its methods," and therefore, "a search is not inadequate merely because it does not identify all responsive records."  *N.Y. Times Co.* v. *U.S. Dep't of Justice*, 756 F.3d 100, 123-24 (2d Cir.), *opinion amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014), *supplemented*, 762 F.3d 233 (2d Cir. 2014).

Based on the affidavit provided by the Secret Service, the Court finds the search adequate.  Because the Secret Service had not established a formal recordkeeping system at the time of Plaintiffs' FOIA request, the search began by identifying the offices that could potentially possess responsive documents.

Plaintiffs' argument that Defendants' search was inadequate because the affidavit detailing the search failed to "explain why it was reasonable to look only at records from specific components of" the SII, INV, OPO  (Pl. Opp. 24) is simply wrong, because the affidavit provides such explanations:  The PID, under the auspices of the SII, "conducts background checks pursuant to a sensitive security program"; the Miami FO and West Palm Beach RO, which are overseen by the INV, "would most likely have involvement in President Trump's visits to Mar-a-Lago as they are geographically located in proximity to Mar-a-Lago"; and the PPD, which the OPO oversees, has "direct operational responsibility for the protection of the President … , including when the President is at Mar-a-Lago."  (Campbell Decl. ¶ 16).  These details easily distinguish this case from those on which Plaintiffs rely.  *Cf. Aguiar* v. *Drug Enf't Admin.*, 865 F.3d 730, 739 (D.C. Cir. 2017) (holding agency search inadequate where declarations describing search did "not explain why the only reasonable place to look for" requested materials was in one record system); *Rodriguez* v. *Dep't of Def.*, 236 F. Supp. 3d 26, 36-37 (D.D.C. 2017) (denying summary judgment where court could not "fathom any legitimate reason for the location limitation" that agency imposed on its search).  And in addition to the paper and electronic records that the Secret Service searched within these offices, it also searched emails through the CIO.  The Court finds these efforts as a whole to be reasonably calculated to identify any responsive documents.

Plaintiffs' second line of argument contends that the search terms that the Secret Service utilized were underinclusive, in that they did not contain

certain terms that Plaintiffs would have included and also failed to include variants of certain terms that effectively narrowed the search.  (*See* Pl. Opp. 25-26).  Yet this challenge amounts to precisely the sort of nit-picking that courts have rejected in the FOIA context.  An agency's "burden [is] to show that its search efforts were reasonable and logically organized to uncover relevant documents; it need not knock down every search design advanced by every requester."  *DiBacco* v. *U.S. Army*, 795 F.3d 178, 191-92 (D.C. Cir. 2015) (citing *SafeCard Servs., Inc.* v. *SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991)); *see also Liberation Newspaper* v. *U.S. Dep't of State*, 80 F. Supp. 3d 137, 146-47 (D.D.C. 2015) ("Where the search terms are reasonably calculated to lead to responsive documents, the Court should not 'micro manage' the agency's search." (citing *Johnson* v. *Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002)).  The Secret Service's search terms here were reasonably calculated to identify records responsive to Plaintiffs' FOIA request, and the Court will not second-guess the formulation of those terms.

Finally, Plaintiffs contend that media reports indicate that Defendants' search should have yielded more results with respect to presidential visitors at Mar-a-Lago.  (*See* Pl. Opp. 26-28).  But this, too, is a line of reasoning that courts have rejected.  Even assuming the accuracy of the reports to which Plaintiffs cite, as mentioned above, the proxy for the adequacy of an agency's search is its *methodology*, not its results.  *See N.Y. Times Co.*, 756 F.3d at 123-24.  The Court therefore refuses to find the search at bar inadequate based on Plaintiffs' supposition as to what the search should have produced.

Because the Court finds the Secret Service's selection of offices along with the CIO email database and the search terms employed to be reasonable, the Court awards Defendants summary judgment as to Plaintiffs' claim that the search at issue was inadequate.

### b.   The Propriety of Defendants' Withholdings

In response to Plaintiffs' request for documents related to presidential visits at Mar-a-Lago, Defendants located a variety of documents, none of which is contained in formal recordkeeping systems comparable to the WAVES or EFACS systems, and the vast majority of which Defendants maintain are not subject to disclosure under FOIA.  In fact, Defendants considered only one such document to be responsive to Plaintiffs' FOIA request — an email from the State Department to the White House Office and forwarded to the Secret Service listing individuals who would accompany the Japanese Prime Minister to Mar-a-Lago.  (Def. Br. 10-11).[19]  Defendants withheld the remainder of the documents, maintaining that they were either (i) "Presidential schedules or information directly relating to Presidential schedules" provided from the White

---

[19]   More specifically, the Secret Service describes the email as

> an e-mail from the Department of State, Office of the Chief of Protocol, that was sent to the White House Office and forwarded to the Secret Service, providing a listing of the names of individuals (and their titles or job responsibilities) who would be accompanying the Prime Minister of Japan and his wife during their visit to Mar-a-Lago.

(Campbell Decl. ¶ 28(xii)).  Within this document, the Secret Service withheld "the name and email address of one EOP employee, and the names, certain e-mail addresses, and one cell phone number of non-visitor third parties."  (Campbell Decl. ¶ 37).  In support of this withholding, the Secret Service invokes FOIA exemptions 6, for protection of "personal privacy," 5 U.S.C. § 552(b)(6), and 7(C), for protection of "records or information compiled for law enforcement purposes," § 552(b)(7)(C).  (*See* Def. Br. 27-28).  Plaintiffs' opposition brief does not challenge this withholding.

House to the Secret Service "for the limited purpose of providing information necessary for the Secret Service to perform its statutory duty to protect the President" and thus not agency records under FOIA,[20] or (ii) "operational materials that merely contain a repeated statement that the Prime Minister of Japan and his spouse would be meeting, dining, or present with the President and First Lady at Mar-a-Lago, which had already been publicly released by the White House," which Defendants consider "non-responsive because they are not records of Presidential visitors at Mar-a-Lago[.]"  (*Id.* at 11).[21]

---

[20]   These documents consist of the following:

> i.  three White House documents, received from the White House Office, titled "Official Travel Schedule, the Visit of the President to Palm Beach, Fl," for the dates of February 10, 2017, February 11, 2017, and February 12, 2017, respectively … ;

> ii.  a White House document, received from the White House Office, titled "Schedule of the President, Sunday February 21, 2017;"

> iii.  an e-mail from the White House Office containing the President's schedule for February 10, 2017;

> iv.  an e-mail from the White House Office containing the White House Chief of Staff's Schedule, which includes an entry referring to the President's dinner with the Prime Minister of Japan at Mar-a-Lago on February 10, 2017;

> v.  two Secret Service e-mails containing the President's schedules for February 10, 2017, and February 11, 2017, respectively, obtained from the White House Office; [and]

> vi.  three e-mails from the White House Office to [the Presidential Protective Division] each providing specific information concerning the arrival of an individual who was scheduled to meet with the President on February 12 or February 19, and the person(s) accompanying the individual[.]

(Campbell Decl. ¶¶ 28(i)-(vi)).

[21]   These documents consist of the following:

> [i] a Secret Service email containing a "Final Intelligence Situation Report for the visit of President Donald J. Trump . . . to Palm Beach, FL" from February 10-21, 2017, containing the statement that the President and First Lady are traveling to Palm Beach, FL to host the Prime Minister of Japan;

> [ii] a Secret Service intelligence assessment titled "Foreign Dignitary Assessment — Japan," prepared by the Secret Service's

As with the WAVES and ACR records considered above, the parties do not dispute that the Secret Service obtained these records.  Whether they qualify as agency records subject to FOIA therefore depends on the extent to which the Secret Service, as opposed to the White House, exerted control over them, *Tax Analysts II*, 492 U.S. at 144-45, or whether special policy considerations necessitate removing such documents from FOIA's scope, *Judicial Watch*, 726 F.3d at 220-21.  The Court considers Defendants' categorical withholdings in turn.

---

[Protective Intelligence Division] for the visit of Prime Minister Abe, containing the statement that the Prime Minister will meet with the President at Mar-a-Lago;

[iii] a letter from the Secret Service to the Federal Bureau of Investigation (FBI), advising that the President and First Lady would be visiting the FBI's West Palm Beach Resident Office district on February 10-12, 2017, and noting that the Prime Minister of Japan and Spouse will stay as guests of President Trump at the Mar-a-Lago Club;

[iv] a Secret Service document titled "Special Operations Division (SOD) Joint Tactical Survey" for the visit of President Donald Trump and family to Palm Beach, Florida, February 10-12, 2017, containing two references to the fact that the President will be hosting and meeting with the Prime Minister of Japan and Spouse at Mar-a-Lago; [and]

[v] seven internal Secret Service e-mails containing or forwarding Secret Service operational, scheduling, reporting, or Presidential or other event information, including Presidential scheduling information obtained from the White House Office, and each containing a notation that the Prime Minister of Japan would be meeting or dining with the President at Mar-a-Lago[.]

(Herndon Decl. ¶¶ 28(vii)-(xi)).

### i.     The Presidential Schedule Documents

Defendants refer to the first category of withheld documents as "Presidential Schedule Documents."  (Def. Br. 20-23).  The Court understands by way of background that a member of the White House transmits the Presidential Schedule Documents to the Secret Service on a nightly basis by "upload[ing] the schedule to an EOP web portal," which generates an automated email to certain members of the Secret Service.  (Murray Decl. ¶ 22). The White House provides access to the web portal and the automated emails to "a limited number of Secret Service personnel with an operational need to know the scheduling information."  (*Id.*).  To acquire this privilege, a Secret Service member must request the access from the White House and obtain approval.  (*Id.* at ¶ 23).  Secret Service members who receive the Presidential Schedule Documents utilize the records "solely to fulfill [their] operational needs," and the White House similarly provides these records "solely for the limited purpose of allowing the Secret Service to perform its statutory duty to protect the President, Vice President and other protectees, as well as the White House Complex."  (*Id.* at ¶ 24).  Defendants urge the Court to extend the rationale behind *Judicial Watch* to encompass these documents, thereby moving them outside of FOIA's scope for failing to qualify as agency records. The Court agrees with Defendants' position.

The considerations that render FOIA inapplicable to WAVES and ACR records apply with equal force to the Presidential Schedule Documents.  The White House's intent to control these documents is apparent from its selective

disclosure only to approved Secret Service members.  Moreover, these handpicked Secret Service members had no part in creating the documents, but only passively received them from the White House.

To be sure, the Court does not read the 2015 MOU, along with its requirements for the use and disposal of WAVES and ACR records, as applying to the Presidential Schedule Documents, and Defendants do not so contend. Nor does the Court doubt that the Secret Service members who receive these documents rely on them to carry out their statutory duty to protect the President.  (*See* Murray Decl. ¶ 22 ("The Secret Service relies on information regarding the President's schedule that is provided by the White House Office to fulfill its protective mission.")).  But these differences do not assuage the Court's concerns that exposing these documents to disclosure under FOIA would produce the same problems as applying FOIA to WAVES and ACR records.

Further, the same separation-of-powers concerns that animated *Judicial Watch* apply here.  Just as "the Secret Service must monitor and control access to the building in which the President lives and works," which "requires presidential staff to request access [from the Secret Service] for visitors," *Judicial Watch*, 726 F.3d at 225, "[t]he Secret Service uses the Presidential [S]chedule [D]ocuments … solely to fulfill its operational needs" (Murray Decl. ¶ 2p).  In one sense, subjecting the Presidential Schedule Documents to FOIA would intrude more deeply into the Office of the President than doing so for WAVES and ACR records:  whereas the latter would allow "a FOIA requester

50

effectively [to] receive *copies* of [the President's] calendars," *Judicial Watch*, 726 F.3d at 225 (emphasis added), the former would provide *direct* access to these calendars in their original forms.

In removing the Office of the President from FOIA's scope, Congress surely did not "intend[] to require the effective disclosure of the President's calendars in this roundabout way." *Judicial Watch*, 726 F.3d at 225. The Presidential Schedule Documents also track the definition of "presidential records" in the PRA even more closely than WAVES and ACR records: They are "documentary materials ... created ... by the President, the President's immediate staff, or a unit or individual of the [EOP] whose function is to advise or assist the President, in the course of conducting activities which relate to" the President's "official or ceremonial duties[.]" 44 U.S.C. § 2201(2). And by providing them to the Secret Service, like WAVES and ACR records, "they are essential to ensuring that the President can go about these core activities without risking his security or that of his family and staff." *Judicial Watch*, 726 F.3d at 228.

Plaintiffs counter that adopting Defendants' position would create an "unsustainable rule that documents that merely relate to information about the president's schedule are also, as a matter of law, beyond FOIA's reach." (Pl. Opp. 29). This argument is a straw man. The Court's holding is limited to the documents at issue, consisting of correspondence detailing the President's daily schedule that was transmitted from the White House to a select set of Secret Service members. It does not speak to, or even anticipate, a broader set

of documents than those presented here.  The Presidential Schedule Documents are not agency records subject to FOIA, and Defendants properly withheld them.

### ii.    The Operational Records

The Court next considers Defendants withholding of "a small number of operational records related to the Japanese Prime Minister's visit that also referred to the fact that the Prime Minister and his spouse were scheduled to meet or dine with the President and First Lady at Mar-a-Lago." (Def. Br. 29). Defendants maintain that "[t]he only arguably responsive information in these documents is the statement, repeated in each document, that the Prime Minister of Japan and his spouse would be meeting, dining, or present with the President at Mar-a-Lago." (*Id.*).  Thus, Defendants argue, they were not required to disclose these records "only to release a minute amount of already public information" that "is also duplicative of the information contained in the State Department email released to [P]laintiffs." (*Id.*).  Defendants' position, however, does not have a basis in FOIA.

That the responsive material contained in these documents is relatively slim is of no moment.  Information that would be valuable in public discourse may be expansive or contracted; in either case, FOIA expressly provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt[.]" 5 U.S.C. § 552(b).  Nor may the Government withhold production of records simply because they are publicly available by other means.  "If Congress had

wished to codify an exemption for all publicly available materials, it knew perfectly well how to do so."  *Tax Analysts II*, 492 U.S. at 152-53.  And although an agency need not "produce multiple copies of the exact same document," an agency may not withhold documents based on the fact that the documents merely contain similar statements.  *Defs. of Wildlife* v. *U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 10 (D.D.C. 2004).  Defendants therefore have improperly withheld the operational records and must disclose these materials — subject, as always, to any applicable FOIA exemptions.

## C.   Defendants' Motion to Dismiss Plaintiffs' APA Claims Based on the FRA and PRA Is Granted

The Court next considers Defendants' motion to dismiss Plaintiffs' APA claims that seek judicial review, under the FRA and PRA, of the 2015 MOU. Specifically, Claim Three alleges that the EOP "enter[ed] into an MOU that declares that the records of visits to agency components of the EOP are under the exclusive ownership, control, and custody of the President, Vice President, or originating EOP component," which violated the EOP's "mandatory, non-discretionary obligation under the FRA and the PRA to treat [WAVES and ACR records] as agency records of DHS subject to the FOIA."  (Am. Compl. ¶ 63). Similarly, Claim Four alleges that by entering the same MOU, "DHS violated its mandatory, non-discretionary obligation under the FRA to treat and manage these records as agency records of DHS subject to FOIA."  (*Id.* at ¶ 67).

Defendants seek dismissal of these claims for lack of subject matter jurisdiction and failure to state a claim. In addressing Defendants' motions, the Court first summarizes the law relevant to Plaintiffs' claims based on the FRA

and PRA.  It then considers the specifics of Defendants' motion.  Because the Court grants Defendants' motion on jurisdictional grounds, it does not — as it may not without a proper jurisdictional basis — consider Defendants' motion to dismiss for failure to state a claim.

### 1.      Applicable Law

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Lyons* v. *Litton Loan Servicing LP*, 158 F. Supp. 3d 211, 218 (S.D.N.Y. 2016) (quoting *Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  In resolving a Rule 12(b)(1) motion, "the district court must take all uncontroverted facts in the complaint ... as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  *Fountain* v. *Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (quoting *Tandon* v. *Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014)).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Id.* (quoting *Makarova*, 201 F.3d at 113).

### 2.      The FRA and the PRA

As with the FOIA claims in this case, the parties' briefing on these claims focuses on cases from the D.C. Circuit (*see* Def. Br. 30-35; Pl. Opp. 32-35), and the Court's independent research confirms that courts within the D.C. Circuit, to the near exclusion of any others, provide the little case law that illuminates the statutes at issue.  Two D.C. Circuit cases in particular provide a framework for evaluating the justiciability of Plaintiffs' claims:  *Armstrong* v. *Bush*

("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991), and *Armstrong* v. *Executive Office of the President, Office of Administration* ("*Armstrong II*"), 1 F.3d 1274 (D.C. Cir. 1993) (per curiam).  Given the dearth of binding case law on the issues presented by Plaintiffs' claims, along with the lack of any dispute by the parties as to the persuasive value of these cases, the Court shall adopt the analytical structure that these cases provide for the purpose of ruling on Defendants' motion.

### a.  General Statutory Schemes

The FRA is composed of a collection of statutes that govern the creation, management, and disposal of records held by agencies of the federal government.  *See* 44 U.S.C. §§ 2102-2118, 2901-2910, 3101-3107, 3301-3324; *Armstrong I*, 924 F.2d at 284 n.1.  The FRA requires the head of every federal agency to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures and essential transactions of the agency[.]"  44 U.S.C. § 3101.  Under the FRA, agency heads must also establish "an active, continuing program for the economical and efficient management of the records of the agency" and "safeguards against the removal or loss of records[.]"  *Id.* §§ 3102, 3015.  "No records may be 'alienated or destroyed' except pursuant to the disposal provisions of the FRA."  *Armstrong I*, 924 F.2d at 285 (quoting 44 U.S.C. § 3314).

Under the FRA, the Archivist of the United States is directed to further the mission of these agency heads by assisting agencies in proper record

disposition, issuing "standards, procedures, and guidelines" regarding record management, and evaluating the records and recordkeeping systems and practices of the federal agencies.  *See* 44 U.S.C. §§ 2904(a), 2904(c)(1).  If the Archivist discovers any FRA violations by an agency, he or she must first notify the offending agency and recommend a curative measure.  *See id.* § 2115(b)).  If the agency fails to cure the violation in a timely and satisfactory manner, the Archivist must report the issue to the President and Congress.  *See id.*

The Archivist's role in enforcing the FRA also entails, if the Archivist learns of any "actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of [an] agency," to "notify the agency head of the problem and assist the agency head in initiating an action through the Attorney General for the recovery of wrongfully removed records or for other legal redress."  *Armstrong II*, 1 F.3d at 1280 (alteration in original) (quoting § 2905(a)).  If the agency head fails to seek legal recourse, the Archivist must request that the Attorney General take such action and notify Congress of the request.  *Id.* (citing § 2905(a)).

In contrast to the FRA, the PRA governs the maintenance and disposal of "Presidential records."  44 U.S.C. § 2201(2).  In enacting the PRA, "Congress sought to establish the public ownership of presidential records and ensure the preservation of presidential records" while "minimiz[ing] outside interference with the day-to-day operations of the President and his closest advisors and" ensuring "executive branch control over presidential records during the President's term in office."  *Armstrong I*, 924 F.2d at 290.  In furtherance of the

56

former goal, the PRA requires the President to "take all … steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records[.]"  44 U.S.C. § 2203.

The PRA imposes document retention requirements that differ depending on whether a President is currently in office.  While in office, "the President may dispose of those Presidential records … that no longer have administrative, historical, informational, or evidentiary value[.]"  44 U.S.C. § 2203(c).  "If the Archivist thinks it advisable, he may notify Congress of the President's intent to dispose of the records; and if the Archivist notifies Congress, the President must submit the disposal schedules to the appropriate congressional committees and wait sixty days before destroying the records." *Armstrong I*, 924 F.2d at 286 (citing 44 U.S.C. § 2203(c)-(d)).  But "neither the Archivist nor the Congress [has] authority to veto the President's decision to destroy the records."  *Id.*  After the President has left office, however, the Archivist assumes control over the presidential records and, after notifying the Federal Register, may dispose of records with "insufficient administrative, historical, informational, or evidentiary value to warrant their continued preservation."  44 U.S.C. § 2203(g)(1), (4).

### b.    Availability of Judicial Review

Courts have recognized that neither the FRA nor the PRA — of their own force — affords a private right of action.  *See Kissinger*, 445 U.S. at 148-50 ("Congress has not vested federal courts with jurisdiction to adjudicate [violations of the FRA] upon suit by a private party."); *Competitive Enter. Inst.* v. *Office of Sci. & Tech. Policy*, 827 F.3d 145, 147 (D.C. Cir. 2016) ("[N]either the [FRA] nor the Records Disposal Act contemplate a private right of action for access to or recovery of federal records."); *Citizens for Responsibility & Ethics in Washington* v. *Trump*, No. 17 Civ. 1228 (CRC), 2018 WL 1401271, at *7 (D.D.C. Mar. 20, 2018) ("The [PRA] does not itself provide" a cause of action. (citing *Judicial Watch, Inc.* v. *NARA*, 845 F. Supp. 2d 288, 299 n.5 (D.D.C. 2012); *Citizens for Responsibility & Ethics in Wash.* v. *Cheney*, 593 F. Supp. 2d 194, 218 (D.D.C. 2009))).

Yet the D.C. Circuit has recognized that federal courts have jurisdiction to engage in limited review, under the APA, of agency compliance with the FRA.[22]  *Armstrong I* held that a private plaintiff may seek review under the APA of an agency's "recordkeeping guidelines and directives," in order to determine whether they "are inadequate because they permit the destruction of 'records' that must be preserved under the FRA."  924 F.2d at 291.  Conversely, the

---

[22]    The APA does not provide an independent basis of federal jurisdiction, but "waives the federal government's sovereign immunity in actions" invoking federal question jurisdiction.  *Lunny* v. *United States*, 319 F.3d 550, 557-58 (2d Cir. 2003).  As relevant to the D.C. Circuit's analysis of the FRA, "[a] court's jurisdiction to enforce the APA is limited ... when a statute 'preclude[s] judicial review,' or the agency decision being challenged 'is committed to agency discretion by law.'"  *Kilani-Hewitt* v. *Bukszpan*, 130 F. Supp. 3d 858, 862-63 (S.D.N.Y. 2015) (quoting 5 U.S.C. § 701(a)(1), (2)).

Court held that the FRA "preclud[es] private litigants from suing directly to enjoin agency actions in contravention of agency guidelines," as the FRA's statutory scheme saved this responsibility for administrative enforcement through a request by the agency head or Archivist to the Attorney General.  *Id.* at 294-95.[23]  In addition, the Court held that the FRA precludes judicial review of actions "to prevent an agency official from improperly destroying or removing records," as this too would contravene the FRA's enforcement scheme.  *Id.* at 294.

The D.C. Circuit has recognized even more limited judicial review of compliance with the PRA.  In *Armstrong I,* the Court held that "[t]he APA does not authorize judicial review of the President's compliance with the PRA because the President is not an 'agency' within the meaning of the APA and because the PRA precludes judicial review of the President's *record creation and management decisions.*"  924 F.2d at 297 (emphasis added).  In *Armstrong II,* however, it clarified that "the PRA allows limited review to assure that *guidelines defining presidential records* do not improperly sweep in nonpresidential records."  1 F.3d at 1278 (emphasis added).  The Court reasoned that "if guidelines that purport to implement the PRA were not reviewable for compliance with the statute's definition of presidential records, non-presidential materials that would otherwise be immediately subject to the

---

[23]    The court noted, however, that this conclusion did not mean to preclude "judicial review of the agency head's or Archivist's refusal to seek the initiation of an enforcement action by the Attorney General."  *Armstrong I,* 924 F.2d at 295.

FOIA would be shielded from its provisions, whether wittingly or unwittingly, if they were managed as presidential records." *Id.* at 1293.

The *Armstrong II* Court distinguished "creation, management, and disposal decisions," which are not subject to judicial review, from "the initial classification of materials as presidential records," which is subject to judicial review.  1 F.3d at 1294.  It further clarified that

> [a] "creation" decision refers to the determination to *make* a record documenting presidential activities.  Thus, the courts may not review any decisions regarding *whether to create* a documentary presidential record.  "Management decisions" describes the day-to-day process by which presidential records are maintained.  The courts may likewise not review these particulars of the presidential records management system.  Finally, "disposal decisions" describes the process outlined in [the PRA] for disposing of presidential records.   Judicial review of the President's action under these provisions is also unavailable.  But guidelines describing which *existing* materials will be treated as presidential records in the first place are subject to judicial review.

*Id.* at 1294 (internal citations omitted).  In sum, "although the PRA impliedly precludes judicial review of the President's decisions concerning the creation, management, and disposal of presidential records during his term in in office, the courts may review guidelines outlining what is, and what is not a 'presidential record[.]'"  *Id.* (internal citation omitted).

The parties agree these cases afford limited judicial review of agency recordkeeping guidelines categorizing records under the FRA and PRA.  (*See* Def. Br. 31, 34; Pl. Opp. 33).  But they dispute whether Plaintiffs' claims are based on a guideline that the Court may review for compliance with the FRA or

PRA.  As the following section explains, the Court holds that Plaintiffs fail to

allege such a guideline, which leaves the Court without subject matter

jurisdiction over these claims.

### 3. The Complaint Does Not Allege a Guideline That Is Subject to Judicial Review for Compliance with the FRA or PRA

#### a. Plaintiffs' Claims Are Premised Only on the 2015 MOU

The Court begins by determining which MOU forms the basis of

Plaintiffs' claims.  Plaintiffs' opposition brief urges the Court to review

Defendants' "functional classification of WAVES and ACR records as

presidential records" pursuant to the terms of both the 2006 and 2015 MOUs

(Pl. Opp. 34), but the operative complaint makes no mention of the 2006 MOU.

Indeed, the only citation to any MOU in the Amended Complaint reads as

follows:

> In its opposition to [a] motion for a temporary restraining order [filed in this case,] the Secret Service relied in part on a 2015 Memorandum of Understanding ("MOU") that, on information and belief, has never before been made public.  That MOU states in relevant part:  "[a]ll records created, stored, used, or transmitted by, on, or through the unclassified information systems and information resources provided to the President, Vice President, and EOP shall remain under the exclusive ownership control, and custody of the President, Vice President, or originating EOP component."  The Secret Service has interpreted this provision as applying to all the records at issue in [a separate] lawsuit.

(Am. Compl. ¶ 50).  As mentioned above, the claims at issue go on to reference

this provision of the 2015 MOU as violating the EOP's "obligation under the

FRA and the PRA to treat [records of presidential visitors] as agency records of

DHS subject to FOIA" (*id.* at ¶ 63), and violating DHS's "obligation under the FRA to treat and manage these records as agency records of DHS subject to the FOIA" (*id.* at ¶ 67．  The operative complaint thus does not reference the 2006 MOU.

The Court recognizes that it may refer to evidence outside of the pleadings in ruling on a motion to dismiss for lack of subject matter jurisdiction to resolve factual disputes on which subject matter jurisdiction depends.  *See Zappia Middle E. Const. Co. Ltd.* v. *Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).  But where, as here, a defendant mounts a facial challenge to jurisdiction — *i.e.*, a Rule 12(b)(1) motion "based solely on the allegations of the complaint" — the district court's "task … is to determine whether the [p]leading 'allege[s] facts that affirmatively and plausibly suggest'" that it has jurisdiction.  *Carter* v. *HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (last alteration in original) (quoting *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).  Nor can Plaintiffs inject the 2006 MOU into their pleading by way of their opposition brief, as this would constitute an improper amendment of their complaint.  *See Wright* v. *Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).  The Court will thus confine its analysis to the language above from the 2015 MOU.

### b.    The FRA and PRA Preclude the Court's Review of the 2015 MOU

The excerpted language of the 2015 MOU on which Plaintiffs' claims are premised is not the sort of guideline or directive that courts have reviewed for compliance with either the FRA or the PRA.  In *Armstrong II*, for instance, the

D.C. Circuit found reviewable, for compliance with the FRA, instructions from the EOP and National Security Council ("NSC") to employees, "that when any electronic document *meets the definition of a federal record*, the employee should either print out the information that appears on her computer screen or incorporate that material into a written memorandum."  1 F.3d at 1282 (emphasis added).  The Court held that this guidance did not comply with the FRA because the hard-copy printouts of the records could omit information that formed "an integral part of the original electronic records[.]"  *Id.* at 1278. This outcome accords with the directive announced in *Armstrong I* of limiting judicial review under the FRA to guidelines that would permit the improper destruction of records that should otherwise be preserved.  *See* 924 F.2d at 291; *see also, e.g.*, *Competitive Enter. Inst.* v. *U.S. Envtl. Prot. Agency*, 67 F. Supp. 3d 23, 33 (D.D.C. 2014) (holding alleged policy of deleting text messages constituting federal records was subject to judicial review); *Citizens for Responsibility and Ethics in Wash.* v. *Exec. Office of the President*, 587 F. Supp. 2d 48, 53, 56-58 (D.D.C. 2008) (holding that Automated Records Management System was subject to judicial review where it "'automatically captured, preserved and categorized all e-mail sent through the White House e-mail system,' and separately segregated, categorized and archived records subject to FRA and those subject to" PRA).

As to examples of guidelines subject to review for compliance with the PRA, *Armstrong II* is illuminative.  That Court considered an EOP policy that "classif[ied] broad categories of NSC records as federal records," and declared

63

that such records "are [p]residential records if they were received or created for the President," or certain other White House members, thus imposing a definition of "presidential records" not based on the definition found in the PRA. 1 F.3d at 1291. To avoid confusion, the Court provided a hyperbolic example of a guideline that would surely be reviewable as covering an initial classification of documents as presidential records — "a guideline defining 'presidential records' as 'all records produced or received by, or in the possession or under the control of, any government agency or employee of the United States.'" *Id.* at 1293.

As these examples make clear, judicial review for compliance with the PRA extends only to guidelines that categorize materials as presidential records, such that by doing so, an agency may run afoul of the PRA's definition of "presidential records" and, thus, treat records as presidential when they would otherwise fall within the FRA. *See also, e.g.*, *Cheney*, 593 F. Supp. 2d at 201, 216 (subjecting to judicial review (i) executive order providing that PRA "applies to the executive records of the Vice President," and (ii) policy under which Vice President, EOP, and Office of Vice President indicated they were "not part of the executive branch" to avoid record preservation under the PRA); *Am. Historical Ass'n* v. *Peterson*, 876 F. Supp. 1300, 1313-18 (D.D.C. 1995) (holding alleged agreement between former president and former national archivist was subject to judicial review for compliance with PRA where it provided that certain presidential records, as defined under PRA, would be subject to president's control after leaving office).

Here, Plaintiffs' claims under the FRA and PRA do not contain a sufficient factual basis for the Court's review.  The portion of the 2015 MOU excerpted in the Amended Complaint simply states the understanding of the parties to the MOU that certain records "shall remain under the exclusive ownership, control, and custody of the President, Vice President, or originating EOP component."  This section of the MOU thus does not command recordkeeping practices that could result in improper disposal under the FRA, *cf. Armstrong II*, 1 F.3d at 1282; "encompass[ ] the initial classification of materials as presidential records," *id.* at 1294; or constitute the functional equivalent of such impermissible steps.

As to judicial review for compliance with the FRA, Plaintiffs "challeng[e] the Secret Service's failure to treat the WAVES and ACR records as agency records under the FRA," by transferring those records to the WHORM rather than retaining them.  (Pl. Opp. 34).  But this practice, rather than constituting a reviewable guideline, is precisely the sort of claim that the FRA, as interpreted by the Supreme Court, has precluded courts from reviewing.  As the *Kissinger* Court noted, "'the [FRA] establishes only one remedy for the improper removal of a 'record' from the agency': the agency head, in conjunction with the Archivist, is required to request the Attorney General to initiate an action to recover records unlawfully removed from the agency." *Armstrong I*, 924 F.2d at 294 (quoting *Kissinger*, 445 U.S. at 148).  Nor do Plaintiffs bring a claim seeking review of an agency head's or the Archivist's

failure to demand enforcement by the Attorney General.  *See Armstrong I*, 924 F.2d at 295.

Plaintiffs' claims under the PRA similarly fall short.  Plaintiffs argue that through the 2015 MOU, the EOP improperly categorizes WAVES and ACR records as presidential records, and that the Court must be able to review this categorization "[t]o maintain the integrity of the line Congress drew between agency records … and presidential records[.]"  (Pl. Opp. 34).  But the MOU does no such thing.  By stating that certain documents "shall remain under the exclusive ownership, control, and custody of the President, Vice President, or originating EOP component," the MOU does not "purport to implement the PRA."  *Armstrong II*, 1 F.3d at 1293.  Indeed, it says nothing of whether the parties understand these records to constitute presidential records, and as discussed above, the judicial determination of whether material constitutes an agency record under FOIA, and is thus exempt from the PRA by its own terms, takes into account the drafter's intent as just one factor among several others. *See* 44 U.S.C. § 2201(2) (defining "Presidential records" as excluding agency records as defined by FOIA).  Rather, this portion of the MOU describes which governmental entities will be responsible for such documents on a day-to-day basis.  Construing this portion of the MOU as a guideline amenable to review for compliance with the PRA would thus muddy the "narrow, clearly defined limitation on the scope of the PRA" that restrains courts only to consider "guidelines describing which *existing* materials will be treated as presidential records in the first place[.]"  *Armstrong II*, 1 F.3d at 1292, 1294.

For all of these reasons, the Court may not review Plaintiffs' claims premised on the FRA and PRA, and Defendants' motion to dismiss for lack of subject matter jurisdiction is granted.

### D.   Defendants' Motion to Dismiss Plaintiffs' Claim for Declaratory Judgment Is Granted

Having determined that Plaintiffs' claims under the FRA, PRA, and APA fail, and that certain of Plaintiffs' FOIA claims shall proceed, the Court next considers Defendants' motion to dismiss Plaintiffs' claims for declaratory judgment.  The issue depends on whether a federal court may award declaratory judgment based solely on a FOIA claim.  Plaintiffs do not address the issue, aside from stating that "[t]his case presents an actual and adversarial issue that entitles Plaintiffs to declaratory relief."  (Pl. Opp. 35).

The Declaratory Judgment Act allows a federal court to "declare the rights and other legal relations of any interested party seeking such a declaration" in "a case of actual controversy[.]"  28 U.S.C. § 2201(a).  This does not confer a right on the parties to obtain a declaratory judgment, however; whether to award such relief remains within the discretion of the district court. *See Fleisher* v. *Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 301 (S.D.N.Y. 2012); *Apotex Inc.* v. *Sanofi-Synthelabo*, 386 F. Supp. 2d 549, 551 (S.D.N.Y. 2005).  In determining whether to exercise such discretion, courts consider "[i] whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and [ii] whether a judgment would finalize the controversy and offer relief from uncertainty."  *Amusement Indus., Inc.* v. *Stern*, 693 F. Supp. 2d 301, 311 (S.D.N.Y. 2010) (quoting *Duane Reade, Inc.* v. *St. Paul Fire & Marine*

*Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005)).  In addition, courts may consider

whether the party seeking declaratory judgment has available "a better or more

effective remedy."  *Id.* (quoting *Dow Jones & Co.* v. *Harrods Ltd.*, 346 F.3d 357,

359-60 (2d Cir. 2003)).

Courts have come to varying conclusions as to the propriety of

declaratory relief for FOIA claims.  One court within the Second Circuit, while

declining to grant declaratory relief, has noted that "in the FOIA context, courts

have granted declaratory judgment where a plaintiff has shown that an agency

engaged in a pattern or practice of delayed disclosure and that it is possible the

violations will recur with respect to the same requesters."  *Navigators Ins. Co.* v.

*Dep't of Justice*, 155 F. Supp. 3d 157, 168 (D. Conn. 2016) (collecting cases

outside of the Second Circuit).  Similarly, the D.C. Circuit has declared that

"FOIA imposes no limits on courts' equitable powers in enforcing its terms,"

which district courts have interpreted to allow declaratory and injunctive relief.

*Muttitt* v. *U.S. Cent. Command*, 813 F. Supp. 2d 221, 227-28 (D.D.C. 2011)

(quoting *Payne Enters., Inc.* v. *United States*, 837 F.2d 486, 494 (D.C. Cir.

1988)).

These courts have limited such relief, however, to circumstances in

which bringing an action to enjoin the withholding of records or to compel their

production would fail to provide an adequate remedy.  *See, e.g.*, *Isiwele* v. *U.S.*

*Dep't of Health & Human Servs.*, 85 F. Supp. 3d 337, 352-53 (D.D.C. 2015)

("[T]he 'comprehensiveness of FOIA' forecloses any claims purportedly brought

also under the APA, the [Declaratory Judgment Act], and the All Writs Act."

(quoting *Johnson*, 310 F.3d at 777); *Inst. for Policy Studies* v. *C.I.A.*, 885 F. Supp. 2d 120, 152-53 (D.D.C. 2012) (holding declaratory relief improper because FOIA provided adequate remedy to address alleged FOIA violations). As one court has explained, declaratory relief may be appropriate in a FOIA case, even after the claim becomes moot, either in a challenge to an "isolated agency action" that becomes moot during the litigation because of the agency's voluntary cessation of wrongful withholding, or in a challenge to "an allegedly illegal agency policy and the future implementation of that policy." *Swan View Coalition* v. *Dep't of Agric.*, 39 F. Supp. 2d 42, 46 (D.D.C. 1999).

The Court declines to exercise its discretion to entertain a declaratory judgment action here. The relief Plaintiffs seek on this front consists of the following: [i] "a declaration that Plaintiff Doyle is entitled to prompt processing and disclosure of the requested records"; [ii] "a declaration that [P]laintiffs are entitled to expedited processing and disclosure of the requested records"; and [iii] "a declaration that all records the Secret Service creates and maintains of visits to agency components of the EOP are agency records of DHS and any MOU to the contrary is unlawful and unenforceable." (Am. Compl. Request for Relief ¶¶ 2, 4, 6). The Court effectively disposed of the last of these three requests in its ruling on the merits of Plaintiffs' FOIA claims. And the first two requested declarations would provide no further practical relief than that which Plaintiffs' FOIA claims seek. *Cf. Isiwele*, 85 F. Supp. 3d at 352-53. Nor have Plaintiffs alleged that Defendants engaged in a pattern or practice of flouting FOIA's requirements. *See Swan View Coalition*, 39 F. Supp. 2d at 46. The

69

Court thus grants Defendants' motion to dismiss Plaintiffs' claims for declaratory relief.

## CONCLUSION

For the above reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART, and Defendants' motion to dismiss is GRANTED.  Within 60 days of the date of this Opinion and Order, Defendants are directed to disclose any materials responsive to Plaintiffs' FOIA surviving FOIA claims, and the parties are to provide a joint letter to the Court as to how they wish to proceed.

SO ORDERED.

Dated:     July 26, 2018
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge